1  Robert Mittelstaedt (State Bar No. 060359)
   ramittelstaedt@jonesday.com
2  Shawn Hanson (State Bar No. 109321)
   shanson@jonesday.com
3  David C. Kiernan (State Bar No. 215335)
   dkiernan@jonesday.com
4  JONES DAY
   555 California Street, 26th Floor
5  San Francisco, CA  94104
   Telephone:     (415) 626-3939
6  Facsimile:     (415) 875-5700

7  Attorneys for Defendant
   MERIDIAN REAL ESTATE INVESTMENT
8  COMPANY II

9

                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11

12
   **MERIDIAN INVESTMENT**          Case No. C 08-02542 MMC
13 **MANAGEMENT, INC., a Delaware**
   **Corporation**                  **DEFENDANT'S NOTICE OF**
14                                   **MOTION, MOTION TO DISMISS,**
                **Plaintiff,**       **AND SUPPORTING**
15                                   **MEMORANDUM**
         v.
16                                   **DATE:**        July 11, 2008
   **MERIDIAN REAL ESTATE**          **TIME:**        9:00 a.m.
17 **INVESTMENT COMPANY II, a**      **CTRM:**        7, 19th Floor
   **Cayman's Island Company**       **JUDGE:**       Hon. Maxine M. Chesney
18
                **Defendant.**
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................. 2

RELIEF REQUESTED ......................................................................................... 2

MEMORANDUM OF POINTS AND AUTHORITIES ........................................ 2

I.      RELEVANT ALLEGATIONS ...................................................................... 3

II.     ARGUMENT ................................................................................................. 5

     A.    Standard of Review ............................................................................. 5

     B.    MIM's Breach of Contract Claim Should Be Dismissed Because MIM
           Fails To Allege A Breach By FUND II ............................................... 5

     C.    MIM's Breach Of The Covenant Of Good Faith And Fair Dealing Should
           Be Dismissed...................................................................................... 6

          1.    FUND II had the express right to decide whether and when to
               dispose of the real estate assets, and MIM was not guaranteed a fee ......... 6

          2.    Even if this Court were to imply a covenant of good faith and fair
               dealing to limit FUND II's express right to direct the sale of its own
               investments, MIM's claim still fails, as it was not "forced" to sell
               the properties........................................................................... 11

     D.    MIM's Slander Per Se Claim Should Be Dismissed............................ 13

          1.    MIM's Slander Per Se Claim Is Barred .................................... 13

          2.    Alternatively, MIM Has Failed Sufficiently To Plead Malice................. 14

III.    CONCLUSION ............................................................................................. 16

# TABLE OF AUTHORITIES

Page

## Cases

*Anthony v. Yahoo!, Inc.*
421 F. Supp. 2d 1257 (N.D. Cal. 2006) ...................................................................... 6

*Ashland Chemical Co. v. Provence*
181 Cal. Rptr. 340 (Cal. Ct. App. 1982) ................................................................... 13

*Bell Atl. Corp. v. Twombly*
U.S., 127 S. Ct. 1955, 1974 (2007) ......................................................................... 5

*Brandt v. Lockhead Missiles & Space Co.*
201 Cal. Rptr. 746 (Cal. Ct. App. 1984) ..................................................................... 9

*Carma Developers, Inc. v. Marathon Development California, Inc.*
6 Cal. Rptr. 467 (Cal. 1992) .............................................................................. 7, 8

*Chokel v. Genzyme Corp.*
867 N.E.2d 325 (Mass. 2007) ................................................................................... 7

*Conley v. Gibson*
355 U.S. 41, 45-46 (1957) ......................................................................................... 5

*Crown Paper Liquidating Trust v. Am. Int'l Group, Inc.*
No. C-07-2308 MMC, 2007 WL 4207943
(N.D. Cal. Nov. 27, 2007) ......................................................................................... 4

*Deutsch v. Turner Corp.*
324 F.3d 692 (9th Cir. 2003) ................................................................................... 13

*Foley v. Interactive Data Corp.*
47 Cal. 3d 654 (1988) ................................................................................................ 7

*Gerlund v. Electronic Dispensers Int'l*
235 Cal. Rptr. 279 (Cal. Ct. App. 1987) ..................................................................... 8

*Guz v. Bechtel National, Inc.*
100 Cal. Rptr. 252, 375 (Cal. 2000) ........................................................................... 7

*Hebrew Academy of San Francisco v. Goldman*
70 Cal. Rptr. 3d 178 (Cal. 2007) ............................................................................. 14

*Jones v. Tozzi*
No. 1:05-CV-0148 OWW DLB, 2006 WL 1582311
( E.D. Cal. June 2, 2006) ........................................................................................ 14

*Kacludis v. GTE Sprint Communications Corp.*
806 F. Supp. 866 (N.D. Cal. 1992) .................................................................... 14, 15

*Kaywood v. Mills College*
No. C-04-03706 MMC, 2005 WL 1279152,
(N.D. Cal. May 31, 2005) .......................................................................................... 9

*Lesperance v. North American Aviation, Inc.*
31 Cal. Rptr. 873 (Cal. Ct. App. 1963) ................................................................... 15

*Martin v. Kearney*
124 Cal. Rptr. 281 (Cal. Ct. App. 1975) ................................................................. 15

1

**TABLE OF AUTHORITIES**
(Continued)

2

Page

3    *Noel v. River Hills Wilsons*
        7 Cal. Rptr. 3d 216 (Cal. Ct. App. 2003) ................................................................. 15

4    *Pavlovsky v. The Board of Trade of San Francisco*
        340 P.2d 63 (Cal. Ct. App. 1959) ........................................................................... 15

5

6    *Pearce v. Romeo*
        No. C-02-04011 RMW, 2007 WL 30596
        (N.D. Cal. Jan. 3, 2007) ......................................................................................... 14

7

8    *PMC, Inc. v. Porthole Yachts, Ltd.*
        76 Cal. Rptr. 2d 832 (Cal. Ct. App. 1998) .............................................................. 8

9    *Robomatic, Inc. v. Vetco Offshore*
        275 Cal. Rptr. 70 (Cal. Ct. App. 1990) ................................................................... 15

10   *Shivley v. Bozanich*
        7 Cal. Rptr. 3d 576 (Cal. 2003) ............................................................................. 14

11   *Smith v. Hatch,*
        76 Cal. Rptr. 350 (Cal. Ct. App. 1969) ................................................................. 15

12   *Spiegler v. Home Depot U.S.A., Inc.,*
        No. CV 07-4428 CAS (AJW), 2008 WL 1848292
13      (C.D. Cal. April 9, 2008) .................................................................................... 7, 8

14   *Third Story Music, Inc. v. Waits,*
        48 Cal. Rptr. 2d 747 (Cal. Ct. App. 1995) ..................................................... passim

15   *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.,*
        805 N.E.2d 957 (Mass. 2004) .................................................................................. 7

16

17   *Wolf v. Walt Disney Pictures and Television*
        --- Cal. Rptr. 3d ---, 2008 WL 1991699
        (Cal. Ct. App. May 9, 2008) .................................................................................... 9

18

**Statutes and Codes**

19

      Cal. Civ. Code
20      § 47(c) ................................................................................................................... 14
        § 48 ....................................................................................................................... 15

21   California Civil Procedure
        340(c) .................................................................................................................... 13

22

23   Federal Rule of Civil Procedure
        8(a)(2) ..................................................................................................................... 5
24      12(b)(6) ................................................................................................................... 2

25

26

27

28

1

**NOTICE OF MOTION AND MOTION**

2

TO THE COURT AND ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE that on July 11, 2008, at 9:00 a.m., or as soon thereafter as the

4

matter may be heard, in Courtroom 7 of the United States District Court for the Northern District

5

of California, located at 450 Golden Gate Avenue, 19th Floor, San Francisco, California,

6

defendant Meridian Real Estate Investment Company II ("FUND II") will move this Court

7

pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss with prejudice the complaint by

8

plaintiff Meridian Investment Management, Inc.'s ("MIM").

9

**RELIEF REQUESTED**

10

Defendant requests an order dismissing with prejudice the first cause of action ("Breach of

11

Contract") and the second cause of action ("Slander Per Se") for failure to state a claim.

12

**MEMORANDUM OF POINTS AND AUTHORITIES**

13

Plaintiff is the investment advisor for defendant real estate investment fund.  The parties

14

entered a contract (the "Advisory Agreement") under which the advisor is entitled to a fee based

15

on the value of the fund's investments.  Like any investor, the fund's goal was to maximize the

16

returns to its shareholders.  To further this goal, the Advisory Agreement expressly granted the

17

fund the right to direct whether and when to sell its real estate investments.  After the collapse of

18

the San Francisco commercial real estate market following September 11, 2001, the fund's board

19

decided to cut its losses by selling its portfolio.  Now, years after the real estate investments were

20

sold, the advisor has brought this action for additional fees.

21

In essence, the advisor claims that, even though it has been paid in accordance with the

22

terms of the Advisory Agreement, it is entitled to continuing fees as if the properties had not been

23

sold.  That is like a lawyer suing his client on the ground that he would have been entitled to

24

ongoing fees had the client decided not to settle the case, or a stock broker, who earns a 1%

25

annual fee, suing an investor because the investor decided to sell its stock.  The Advisory

26

Agreement does not contain a provision entitling the advisor to an annuity, guaranteeing a fee

27

regardless of the disposition of the properties.  Implying such a provision, as the advisor requests,

28

would contradict the express terms of the contract and would frustrate the fund's control over,

1    and ability to protect, its own investments.

2        Equally meritless is the claim that it is actionable slander for the managing agent of the

3    fund to tell the fund's shareholders at a shareholders' meeting that the advisor was doing a poor

4    job. Not only is the claim time-barred, but the communication is privileged.

5                        **I.    RELEVANT ALLEGATIONS.**

6        The relevant allegations, taken as true only for purposes of this motion, are as follows.

7    FUND II sought to invest approximately $50 million in California real estate. (Compl. ¶ 6,

8    attached as Ex. 1, hereto; *see also* Kiernan Decl. attached as Exhibit 3.) Under the September

9    2000 Advisory Agreement, which is fully interested, FUND II appointed MIM as its "investment

10   and management advisor" to provide certain advisory services "[s]ubject to the supervision of the

11   Board [of FUND II]." (*See* Compl., Ex. A, Art. I & II.) The Advisory Agreement made clear

12   that the parties were not "partners or joint venturers with each other." (*Id.* ¶ 8.3.) MIM's duties,

13   which were to be performed "subject to the supervision" and "on behalf of" FUND II, included

14   investing in real estate properties, arranging necessary financing, identifying properties for sale,

15   negotiating the price and terms of sale, and providing information about performance of the

16   investments. (*See id.* ¶¶ 2.3-2.9.) As compensation, FUND II agreed to pay MIM "an annual fee

17   equal to one percent (1%) of the overall value of [FUND II's] assets under management." (*Id.* ¶

18   3.1.)

19       Pursuant to the Advisory Agreement, MIM formed three corporations (the "U.S. Property

20   Companies") to acquire three California real estate properties. One of the properties was located

21   in San Francisco and the other two were located in San Diego. According to the complaint, in

22   early 2001, the value of those real estate properties was more than $75 million, and MIM was

23   earning over $750,000 in fees. (Compl. ¶ 7-8.)

24       But the promise of the San Francisco investment, which constituted more than $50 million

25   of the approximately $75 million of FUND II's assets, was short lived. The leasehold rents in

26   San Francisco plummeted due to the market downturn caused by the September 11, 2001 terrorist

27   attacks and the bursting of the "dot.com" real estate bubble. (*Id.* ¶¶ 9, 17.) As a result, the rents

28   from the San Francisco property were insufficient to cover property expenses including taxes,

SFI-584566v9

Defendant Motion To Dismiss
C 08-02542 MMC

1  maintenance, and debt service. (*Id.* ¶ 9.)  MIM recommended that FUND II "ride out the market

2  downturn," by restructuring the financing for the San Francisco property, including using FUND

3  II's equity in the San Diego properties to pay down the debt.[1]  (*Id.* ¶¶ 9, 17.)

4          On February 22, 2003, frustrated by "the performance of the real property investments,"

5  FUND II sent a letter to the Board of Directors of the U.S. Holding Companies, noting among

6  other things, that "[s]uch performance overall has resulted, and continues to result, in severe

7  losses to [FUND II and its shareholders]."  (Letter referenced in Paragraph 14 of the Complaint,

8  attached as Exhibit 2 hereto; *see also* Kiernan Decl. attached as Exhibit 3.)[1]  FUND II requested

9  that the Boards of the respective U.S. Property Companies "take the following actions

10  immediately in order to protect the interests of such Companies and [FUND II]: 1. Commence

11  discussions with the respective lenders with respect to their accepting deeds-in-lieu of foreclosure

12  for the [San Francisco property] . . . [;] 2. Cease making and repay all existing inter-company

13  loans among the U.S. Property Companies[;] [and] 3. Engage a Big Four certified public

14  accounting firm to audit [certain payments] . . . ." (*Id.* at 4.)  Although not essential to this

15  motion, this letter is properly considered with this motion.  *See Crown Pape*r….

16          On August 25, 2003, FUND II held a shareholders meeting regarding MIM's management

17  of FUND II assets.[2]  (Compl. ¶ 19.)  According to the complaint, FUND II reported to the

18  shareholders of FUND II that "MIM had mismanaged the assets of FUND II, that their

19          [1]On February 22, 2003, frustrated by "the performance of the real property investments,"
    FUND II sent a letter to the Board of Directors of the U.S. Holding Companies, noting among
20  other things, that "[s]uch performance overall has resulted, and continues to result, in severe
    losses to [FUND II and its shareholders]."  (Letter referenced in Paragraph 14 of the Complaint,
21  attached as Exhibit 2 hereto; see also Kiernan Decl. attached as Exhibit 3.)  FUND II requested
    that the Boards of the respective U.S. Property Companies "take the following actions
22  immediately in order to protect the interests of such Companies and [FUND II]: 1. Commence
    discussions with the respective lenders with respect to their accepting deeds-in-lieu of foreclosure
23  for the [San Francisco property] . . . [;] 2. Cease making and repay all existing inter-company
    loans among the U.S. Property Companies[;] [and] 3. Engage a Big Four certified public
24  accounting firm to audit [certain payments] . . . ." (Id. at 4.)  Although not essential to this
    motion, this letter is properly considered by this Court.  *Crown Paper Liquidating Trust v. Am.*
25  *Int'l Group, Inc.*, No. C-07-2308 MMC, 2007 WL 4207943, at *2 (N.D. Cal. Nov. 27, 2007).
          [2] Although immaterial for current purposes, contrary to Paragraph 19 of the complaint,
26  MIM was not a 1.5% minority shareholder of FUND II in August 2003.  MIM is not, and has
    never been, a shareholder of FUND II.  Rather, MIM owned 100% of the *voting* stock, which
27  represented 1.5% of all outstanding stock, in each of the U.S. Property Companies.  FUND II
    owned 100% of the *non-voting* stock, which represented 98.5% of all outstanding stock, in each
28  of the U.S. Property Companies.  (Ex. 2, at 2.)

Defendant Motion To Dismiss
C 08-02542 MMC

1    investment in FUND II was lost, and that MIM had overcharged the FUND with management

2    fees while investing in speculative investments that had lost value that could not be recouped."

3    (*Id.* ¶ 19.)  FUND II's shareholders voted to instruct MIM to sell the assets, and FUND II

4    requested that the San Francisco property be deeded to the lender in lieu of forfeiture and that the

5    San Diego properties be sold.  (*Id.* ¶¶ 20-21, 25).  Ultimately, the San Francisco property was

6    deeded to the lender and the San Diego properties were sold.  (*Id.* ¶¶ 22, 25.)  The sale of the

7    properties resulted in MIM's management fee being reduced to zero.  (*Id.* ¶ 25.)

8                                  **II.  ARGUMENT**

9    **A.    Standard of Review.**

10           A plaintiff must allege "enough facts to state a claim to relief that is plausible on its

11   face."[3]  *Bell Atl. Corp. v. Twombly*, *** U.S. ***, 127 S. Ct. 1955, 1974 (2007).  The factual

12   allegations must be definite enough to "raise a right to relief above the speculative level."  *Id.* at

13   1964-65.  As the Supreme Court observed, Federal Rule of Civil Procedure 8(a)(2) requires a

14   "showing" that the plaintiff is entitled to relief, "rather than a blanket assertion" of entitlement to

15   relief.  *Id.* at 1965 n.3.  Therefore, "plaintiff's obligation to provide the 'grounds' of his

16   'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of

17   the elements of a cause of action will not do."  *Id.* 1964-65 (internal citation omitted).  In short,

18   "[t]he pleading must contain something more . . . than . . . a statement of facts that merely creates

19   a suspicion [of] a legally cognizable right of action."  *Id.* at 1965.  The court "may disregard

20   factual allegations if such allegations are contradicted by the facts established by reference to

21   exhibits attached to the complaint."  *Crown Paper*, 2007 WL 4207943, at *2.  "Conclusory

22   allegations, unsupported by the facts alleged, need not be accepted as true."  *Id.*

23   **B.    MIM's Breach of Contract Claim Should Be Dismissed Because MIM Fails To**

24   **Allege A Breach By FUND II.**

25           For its breach of contract claim, MIM must allege facts sufficient to establish (1) a

26   _____

27           [3] The Supreme Court explicitly repudiated the familiar language in *Conley v. Gibson*, 355
     U.S. 41, 45-46 (1957) that, "a complaint should not be dismissed for failure to state a claim unless
     it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

28   would entitle him to relief."  *See Twombly*, 127 S. Ct. at 1968-69.

1    contract between the parties, (2) MIM's performance, (3) FUND II's breach, and (4) damages.

2    *Anthony v. Yahoo!, Inc.*, 421 F. Supp. 2d 1257, 1260 (N.D. Cal. 2006).  MIM does not allege,

3    either generally or with particularity, that FUND II breached an express provision of the Advisory

4    Agreement.  Although MIM seeks fees that it alleges it would have received if FUND II's assets

5    had not been sold, no contractual term prohibits FUND II from directing the sale of the real estate

6    properties or guarantees a fee even if the real estate properties had been sold.  Nor does MIM

7    allege that FUND II failed to pay any management fees that were owing as provided for in the

8    Advisory Agreement or failed to perform any other obligation under the Advisory Agreement.

9    Accordingly, MIM has failed to state a breach of contract claim.

10    **C.    MIM's Breach Of The Covenant Of Good Faith And Fair Dealing Should Be**

11    **Dismissed.**

12        The gravamen of MIM's claim is that FUND II breached an implied covenant of good

13    faith and fair dealing by directing MIM to sell or transfer FUND II's real estate investments.

14    (Compl. ¶¶ 13, 21-22, 25, 31-34.)  MIM's theory is that, had they not been sold, the assets would

15    have remained under management and MIM would have been entitled to a fee.  In other words,

16    although FUND II paid the fees owing under the express provisions of the Advisory Agreement,

17    MIM nevertheless claims that it is entitled to fees without regard to "the overall value of [FUND

18    II's] assets under management," as if the real estate assets had not been sold.  In essence, MIM

19    asks this Court to rewrite the parties' negotiated contract so as to limit FUND II's right to direct

20    whether and when to sell its investment properties or to guarantee MIM a fee without regard to

21    the disposition of the assets or the "value of [FUND II's] assets under management."  No basis

22    exists to do so.  Implying such a covenant would not effectuate the clear and obvious intent of the

23    parties, but would instead contradict the express provisions and overall purpose of the Advisory

24    Agreement.

25        **1.    FUND II had the express right to decide whether and when to dispose of the**

26        **real estate assets, and MIM was not guaranteed a fee.**

27        A covenant of good faith and fair dealing is implied in every contract "to prevent one

28    contracting party from unfairly frustrating the other party's right to receive the benefits of the

agreement actually made."[4] *Guz v. Bechtel National, Inc.*, 100 Cal. Rptr. 252, 375 (Cal. 2000). "It is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." *Carma*, 6 Cal. Rptr. 2d at 484. The covenant is "read into contracts 'to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose.'" *Id.* (*quoting Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 690 (1988)).  In other words, the covenant will be implied *only* to further the contract's purpose and to assure compliance with its terms — *i.e.*, "to effectuate the clear and obvious intent of the parties." *Third Story Music, Inc. v. Waits*, 48 Cal. Rptr. 2d 747, 753 (Cal. Ct. App. 1995).[5]  Indeed, "[i]t cannot impose substantive duties or limits on the contracting parties *beyond those incorporated in the specific terms of their agreement*." *Guz*, 100 Cal. Rptr. at 375.  Nor can it contradict the express terms of a contract:

> The general rule [that the covenant of good faith and fair dealing is read into every contract] is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing.  This is in accord with the general principle that, in interpreting a contract 'an implication . . . should not be made when the contrary is indicated in clear and express words.'

*Carma*, 6 Cal. Rptr. 2d at 485 (citations omitted).  The California Supreme Court added:  "As to

---

[4] The Advisory Agreement contains a choice of law provision that provides that it "shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts." (Ex. A, at ¶ 8.7.)  Nevertheless, MIM cites to California law in support of its breach of the covenant of good faith and fair dealing claim.  (Compl. ¶ 31.)  For purposes of this motion only, the Court need not decide whether the choice of law provision is enforceable and which law applies, as the relevant law in both states is the same.  *Compare Carma Developers, Inc. v. Marathon Development. California, Inc.*, 6 Cal. Rptr. 467, 483-87 (Cal. 1992) *with Chokel v. Genzyme Corp.*, 867 N.E.2d 325, 329 (Mass. 2007); *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 805 N.E.2d 957, 964 (Mass. 2004).  Because MIM cites to California law and California and Massachusetts law are the same, FUND II will cite to California law.

[5] *See also id.* at 750 (recognizing that the following "long-established rule[s] concerning implied covenants" apply equally to the covenant of good faith and fair dealing: "To be imposed, (1) the implication must arise from the language used or it must be indispensable to effectuate the intention of the parties; (2) it must appear from the language used that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it; (3) implied covenants can only be justified on the grounds of legal necessity; (4) a promise can be implied only where it can be rightfully assumed that it would have been made if attention had been called to it; (5) there can be no implied covenant where the subject is completely covered by the contract."); *Spiegler v. Home Depot U.S.A., Inc.*, No. CV 07-4428 CAS (AJW), 2008 WL 1848292, at *14-15 (C.D. Cal. April 9, 2008) (applying these rules and refusing to imply the covenant where doing so would contradict the express terms of the contract).

1   acts and conduct authorized by the express provisions of the contract, no covenant of good faith

2   and fair dealing can be implied which forbids such acts and conduct.  And if defendants were

3   given the right to do what they did by the express provisions of the contract there can be no

4   breach." *Id.*; *see also Spiegler*, 2008 WL 1848292, at *14-15 (granting 12(b)(6) motion on good

5   faith and fair dealing claim on the ground that implying the covenant would contradict the express

6   terms of the contract).

7        Although it has been noted that the covenant "finds particular application in situations

8   where one party is invested with a discretionary power affecting the rights of another," *Carma*, 6

9   Cal. Rptr. 2d at 483, "courts are not at liberty to imply a covenant directly at odds with a

10  contract's express grant of discretionary power except in those relatively rare instances when

11  reading the provision literally would, contrary to the parties' clear intention, result in an

12  unenforceable, illusory agreement." *Third Story*, 48 Cal. Rptr. 2d at 753 (emphasis added); *see*

13  *also Wolf*, 2008 WL 1991699, at *7; *PMC, Inc. v. Porthole Yachts, Ltd.*, 76 Cal. Rptr. 2d 832,

14  836-37 (Cal. Ct. App. 1998).  "In all other situations where the contract is unambiguous, the

15  express language is to govern, and '[n]o obligation can be implied . . . which would result in the

16  obliteration of a right expressly given under a written contract.'" *Third Story*, 48 Cal. Rptr. 2d at

17  753 (quoting *Gerlund v. Electronic Dispensers Int'l*, 235 Cal. Rptr. 279, 286 (Cal. Ct. App.

18  1987)); *see also Wolf*, 2008 WL 1991699, at *7.

19       *Carma* illustrates the narrow scope of the implied covenant.  There, the lease provided

20  that, if the tenant obtained a potential sublessee and requested consent from the landlord to

21  sublease the property, the landlord had the express right to terminate the lease, lease the property

22  to the prospective sublessee, and keep all profits from the arrangement.  6 Cal. Rptr. 2d at 469-70.

23  The California Supreme Court rejected the claim that the covenant of good faith and fair dealing

24  prohibited, or limited in any way, the lessor's unfettered right to exercise its discretion to

25  terminate the lease in order to obtain for itself, at the expense of the tenant, all profit from the

26  prospective sublease.  *Id.* at 484-87.  The Court explained that, because the lessor's actions were

27  "expressly permitted by the lease and was clearly within the parties' reasonable expectations, . . .

28  such conduct can never violate an implied covenant of good faith and fair dealing." *Id.* at 486; *in*

1  *accord Guz*, 100 Cal. Rptr. at 376-77 (where contract provided unfettered discretion to terminate

2  employee, holding that covenant of good faith and fair dealing could not be implied to limit the

3  employer's discretion and that "[a]llegations that [a] breach was wrongful, in bad faith, arbitrary,

4  and unfair are unavailing"); *Wolf v. Walt Disney Pictures and Television*, --- Cal. Rptr. 3d ----,

5  2008 WL 1991699, at *7 (Cal. Ct. App. May 9, 2008) (refusing to imply covenant where doing so

6  would limit the defendant's discretion expressly granted by the contract); *Third Story*, 48 Cal.

7  Rptr. 2d at 753 (same); *Gerlund*, 235 Cal. Rptr. at 286-87 (same); *Brandt v. Lockhead Missiles &*

8  *Space Co.*, 201 Cal. Rptr. 746, 749-50 (Cal. Ct. App. 1984) (same); *Kaywood v. Mills College*,

9  No. C-04-03706 MMC, 2005 WL 1279152, (N.D. Cal. May 31, 2005) (same).

10      Here, the Advisory Agreement expressly provides and contemplates that FUND II had the

11  unlimited right to direct whether and when to dispose of which of its real estate assets, for

12  whatever reasons.  Specifically, the Advisory Agreement expressly states that, "Subject to the

13  supervision of the Board [of FUND II], . . . [MIM] shall, on behalf of [FUND II], identify

14  appropriate properties for sale, negotiate the price and other terms of sale and supervise the

15  documentation related to the consummation of such sales."  (Compl., Ex. A, ¶ 2.7.)  Reading the

16  other provisions of the Advisory Agreement as a whole makes plain that it was the intent, and

17  within the contemplation, of the parties to grant FUND II this unfettered right.  MIM was

18  appointed only to "serve as [FUND II's] investment and management advisor."  (*Id.* Art. I.).

19  Contrary to MIM's wishes now, the parties were not "partners or joint venturers with each other."

20  (*Id.* ¶ 8.3.).  And, MIM was required to perform all its duties "[s]ubject to the supervision of

21  [FUND II]" as well as "on behalf of" or "in consultation with" FUND II.

22      Significantly, where the parties intended to limit discretion or include a covenant of good

23  faith, they did so expressly in the Advisory Agreement.  (*See, e.g.*, *Id.* Art. II ("[MIM] shall use

24  its *best efforts* to perform the following duties . . . .") (emphasis added)); *id.* Art. VI ("[MIM]

25  assumes no responsibility under this Agreement other than to render the services called for

26  hereunder in *good faith* . . . ." (emphasis added)).)  No such provision limits any of FUND II's

27  rights including its right to "supervis[e]" and direct its advisor.  Granting such an unfettered right

28  to FUND II, of course, makes business and economic sense: it was FUND II's real estate

1   investment at risk, not MIM's.

2          MIM makes the unsupported assertion that FUND II had an ulterior motive for requesting

3   the sale of the real estate, namely to reduce FUND II's expenses by reducing the fees owed to

4   MIM.  (Compl. ¶ 3.)  But because FUND II had the unlimited right to direct the sale of its

5   investments, the covenant of good faith cannot be implied, and thus FUND II's motives for

6   directing the sale are immaterial.  Thus, if FUND II was willing forgo its investment opportunity

7   by directing the sale of its investments solely for the purpose of reducing the fees owed to MIM,

8   that was its right under the express provisions of the contract.

9          Implying a covenant here would violate another provision of the Advisory Agreement.  It

10  provides that MIM's fee is "equal to one percent (1%) of the overall value of [FUND II's] assets

11  under management."  (Compl., Ex. A, ¶ 3.1.)  Given that the fee was based upon "the overall

12  value of [FUND II's] assets," which of course could be equal to or less than zero, the parties

13  plainly contemplated that MIM would be entitled to a fee **only if** there were "assets under

14  management."  The obvious corollary is that MIM is not entitled to a fee if there are no "assets

15  under management."  It simply does not guarantee MIM a fee without regard to the disposition of

16  FUND II's assets or the value of those assets.  Thus, implying such a fee would be contrary to the

17  express provisions of the agreement and the clear intention of the parties.  This is true even if, as

18  alleged, the purpose in directing the sale of the assets was to reduce MIM's fees.

19         Complaining that FUND II's exercise of its express right to direct the sale of its assets was

20  unfair or unjust because it prevented MIM from earning more in fees is simply beside the point.

21  That is an insufficient basis to ask a court to rewrite the contract.  "It is not enough to say that

22  without the proposed implied covenant, the contract would be improvident or unwise or would

23  operate unjustly.  Parties have the right to make such agreements . . ., [and MIM] was free to

24  accept or reject the bargain offered . . . ."  *Third Story*, 48 Cal. Rptr. 2d at 753.  The parties here

25  could have agreed that MIM would be guaranteed a fee if the value of the assets fell below a

26  certain level or if the assets were sold for whatever reason.  But as the express language of the

27  Advisory Agreement makes plain, the parties did not agree to such a fee structure—instead,

28  MIM's fee is based on the "value of [FUND II's] assets under management."  MIM cannot now

1    complain about not receiving a fee when the assets are no longer under management.  And MIM

2    "cannot look to the courts to amend the terms that [it now finds] unsatisfactory."  *Id.* at 753.

3    **2.    Even if this Court were to imply a covenant of good faith and fair dealing to**

4    **limit FUND II's express right to direct the sale of its own investment assets,**

5    **MIM's claim still fails, as it was not "forced" to sell the assets.**

6          To get around the fact that MIM characterizes itself as the selling "actor" here, MIM

7    alleges that FUND II breached the covenant of good faith and fair dealing by taking several

8    actions that "forced" MIM to sell FUND II's investments.  The fundamental factual assumption

9    upon which MIM's argument rests, however, is flat wrong.  FUND II did not, and could not have,

10   "forced" MIM to dispose of the real estate properties.  The properties were owned by the U.S.

11   Property Companies, not MIM.  (Compl. ¶ 7; *see also* Ex. 2.)  Thus, it was the Board of Directors

12   of the U.S. Property Companies, presumably in the exercise of their fiduciary duties owed to

13   FUND II, that approved and caused the sale of those properties.[6]   For this reason alone, MIM's

14   claim fails as a matter of law.

15         Even if MIM, not the U.S. Property Companies, had sold the properties, MIM's claim

16   would still fail because none of the actions allegedly taken by FUND II could have possibly

17   forced MIM to sell the properties.  MIM first alleges that Fund requested costly audits and made

18   unreasonable demands for information.  (Compl. ¶ 33.)  The Advisory Agreement, however,

19   contemplates that MIM would provide information to FUND II whether in response to a request

20   for an audit or simply for information.  Indeed, MIM was required not only to continually advise

21   FUND II regarding the performance of its portfolio, but also, "on behalf of [FUND II]," to

22   maintain various records and documents.[7]  Although not expressly stated, the obvious import of

23   these provisions is that MIM was required to provide FUND II with information regarding its

24   _____
       [6] It is notable that MIM has not alleged that the Board of Directors of the U.S. Property
       Companies breached their fiduciary duties by disposing of the properties.

25       [7] (*See, e.g.,* Compl., Ex. A, ¶ 2.3 (requiring MIM, on behalf of FUND II, to prepare and
       supervise documents in connection with FUND II's investments); ¶ 2.4 (requiring MIM
26     continually to advise FUND II on all aspects of FUND II's investment, including preparing
       budgets, schedules for improvements, strategic management plans, and other information); ¶ 2.7
27     (requiring MIM, on behalf of FUND II, to supervise documents related to sales); ¶ 2.9 (requiring
       MIM, on behalf of FUND II, to maintain records and documents); ¶ 3.4(n) (requiring FUND II to
28     reimburse MIM for "[l]egal, appraisal, accounting and auditing fees and expenses.").)

1   investments, including information that MIM was required to maintain on behalf of FUND II.

2   But even if FUND II did not have the right to request audits or information, it could not have

3   forced MIM to sell its properties by doing so: if MIM did not believe that Fund had a right to

4   request an audit or information, its recourse was simply not to comply with the requests.

5        MIM next makes the conclusory allegation that FUND II made repeated threats of

6   meritless but costly litigation.  That allegation is unsupported by any factual allegations and

7   contrary to documents relied on in the complaint.  The allegation, therefore, should be ignored.

8   *Crown Paper*, 2007 WL 4207943, at *2 (noting that "[c]onclusory allegations, unsupported by

9   the facts alleged, need not be accepted as true" and that the court "may disregard factual

10  allegations if such allegations are contradicted by the facts established by reference to exhibits

11  attached to the complaint.")  Although MIM cites to the February 22, 2003 letter as support, that

12  letter was sent to the Board of Directors of the U.S. Property Companies, not MIM; it cautioned

13  the Boards of those companies that, if they failed to exercise their fiduciary duties in the best

14  interest of the companies, FUND II would bring a shareholder derivative action against the

15  Boards, *not MIM*.  (*See* Ex. 2, at 4.)  No threats were made against MIM.

16       But even if FUND II had made repeated threats against MIM, such threats could not have

17  "forced" MIM to sell the properties.  Given the plain language of the Advisory Agreement

18  granting FUND II the unfettered right to direct the sale of its investments, FUND II had every

19  right to advise MIM that it would take legal action if it did not comply with its request.[8]  This is

20  true even if FUND II's legal position ended up being wrong.  And if MIM truly believed *then* that

21  FUND II did not have the right to direct the sale of its own investment assets, MIM could have

22  ignored FUND II's direction and forced its hand.

23       MIM next alleges that FUND II forced the sale by not consenting to the use of the cash

24       [8] Although MIM alleges that the threats of litigation were "meritless," it apparently was
concerned enough about a claim of breach of contract or some other duty that it complied with the
25  request to dispose of the properties.  Indeed, had MIM thought that FUND II's request to sell the
properties was a breach of an implied covenant, it could have endeavored to protect those
26  perceived rights by refusing to sell the properties, riding out the market, and forcing FUND II's
hand.  Had it done so, MIM might have continued to collect its fee if, upon judicial review, it was
27  held entitled to do so.  Instead, MIM chose to sell the properties and, only years later, to lay claim
against FUND II as if the properties had not been sold, when in fact they had.  The message from
28  MIM to FUND II: "heads I win, tails you lose."

Defendant Motion To Dismiss
C 08-02542 MMC

1  flow from, or equity in, the San Diego properties to ride out the market downturn in San

2  Francisco.  (Compl. ¶¶ 9, 17, 31.)  MIM cites no source of any duty requiring FUND II to throw

3  good money after bad by cross-subsidizing properties.  Indeed, no contractual provision or

4  language requires FUND II to follow any of MIM's advice, including advice to restructure the

5  financing of the San Francisco property, to cross-subsidize the properties or to wait for the market

6  to rebound.  Nor should one be implied.  Reading the contract as a whole demonstrates not only

7  that such a covenant was not within the contemplation of the parties, but also that the parties did

8  not intend to obligate FUND II to do so.  As noted, MIM is "[s]ubject to the supervision of

9  [FUND II]" and must perform various duties "on behalf of" or "in consultation with" FUND II,

10  not the other way around.  And MIM "shall not in any event be responsible for any action of

11  [FUND II] in following or declining to follow any advice or recommendations of [MIM],"

12  evidencing the parties' clear contemplation that FUND II would decline some or all of MIM's

13  advice.  (Compl., Ex. A, Art. VI.)

14       Finally, MIM makes the conclusory allegation that it was forced to sell the properties

15  because shareholders of FUND II insisted the properties be sold.  The shareholders of FUND II

16  could not have "forced" or required MIM to sell the properties.  The Advisory Agreement was

17  between MIM and FUND II, not between MIM and the shareholders of FUND II.  And nothing in

18  the Advisory Agreement required MIM to heed requests made by the shareholders of FUND II.

19  **D.    MIM's Slander Per Se Claim Should Be Dismissed**

20       **1.    MIM's Slander Per Se Claim Is Barred**

21       California's statue of limitations for slander is one year.[9]  Cal. Civ. Proc. 340(c); *Pearce v.*

_____

22       [9] Because this case was filed in California, California's statute of limitations governs
   MIM's claims.  *Deutsch v. Turner Corp.*, 324 F.3d 692, 717 (9th Cir. 2003) ("Regardless of the

23  source of the substantive law, because all the claims, including both common law and statutory,
   were brought in California state court or in a district court within California, we apply to them the

24  statute of limitations that would be applied in California state court.").  This remains true where
   an enforceable choice-of-law provision determines the applicable substantive law and California

25  provides a shorter statute of limitations.  *Ashland Chemical Co. v. Provence*, 181 Cal. Rptr. 340,
   341 (Cal. Ct. App. 1982) (applying California's shorter statute of limitations even though choice-

26  of-law provision provided that the contract shall be "governed by and construed in accordance
   with the laws of the Commonwealth of Kentucky"); *see also Deutsch*, 324 F.3d at 717

27  ("California's interest in applying its own law is strongest when its statute of limitations is shorter
   than that of the foreign state . . . .  Hence, subject to rare exceptions, the forum will dismiss a

28  claim that is barred by [California's] statute of limitations.'") (internal citation omitted).

1   *Romeo*, No. C-02-04011 RMW, 2007 WL 30596 at *4 (N.D. Cal. Jan. 3, 2007) (dismissing

2   defamation claim based upon California's statute of limitations); *Jones v. Tozzi*, No. 1:05-CV-

3   0148 OWW DLB, 2006 WL 1582311 at *13-14 ( E.D. Cal. June 2, 2006) (same).  And "'a cause

4   of action for defamation accrues . . . when the defendant communicates the defamatory statement

5   to a person other than the person being defamed.'"  *Pearce*, 2007 WL 30596 at *4 (quoting

6   *Shivley v. Bozanich*, 7 Cal. Rptr. 3d 576, 587 (Cal. 2003)).  California's discovery rule applies

7   only "if the defamation was committed in an inherently secretive manner," preventing plaintiff

8   from discovering the defamatory statement.  *Jones*, 2006 WL 1582311 at *13-14.  It is limited to

9   instances where "'the defamatory statement [was] hidden from view as, for example, in a

10   personnel file that generally cannot be inspected by the plaintiff.'"  *Hebrew Academy of San*

11   *Francisco v. Goldman*, 70 Cal. Rptr. 3d 178, 185 (Cal. 2007) (quoting *Shively*, 7 Cal. Rptr. 3d at

12   589).

13           MIM alleges that the allegedly defamatory statements were made at an August 25, 2003

14   shareholder's meeting.  (Compl. ¶ 37).  That was more than one year before the commencement

15   of the present action in March 2008.  MIM does not allege that the statements were "hidden from

16   view" or that, with reasonable diligence, it could not discover such statements within the one-year

17   limitations period.  Nor could it: MIM admits that it learned of the defamatory statements within

18   the last three years.  (Compl. ¶ 37.)  Accordingly, MIM's slander claim is time-barred and should

19   be dismissed with prejudice.

20           **2.       Alternatively, MIM Has Failed Sufficiently To Plead Malice**

21           Defamatory statements that are made, without malice, to a person sharing a common

22   interest are privileged and thus not actionable under California law.  Cal. Civ. Code § 47(c)[10];

23   *Kacludis v. GTE Sprint Comm. Corp.*, 806 F. Supp. 866, 872 (N.D. Cal. 1992).  If the privilege is

24   apparent from the face of the complaint, the communication is presumed to be privileged and

25   therefore Plaintiff must plead "malice in fact" with sufficient particularity to defeat the

26   _____

27           [10] "A privileged publication . . . is one made . . ., without malice, to a person interested
     therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person
     interested as to afford a reasonable ground for supposing the motive for the communication to be

28   innocent, or (3) who is requested by the person interested to give the information."

1  presumption that the communication is privileged.  *Kacludis*, 806 F. Supp. at 872 (citing *Smith v.*

2  *Hatch*, 76 Cal. Rptr. 350 (Cal. Ct. App. 1969)); *Lesperance v. N. Am. Aviation, Inc.*, 31 Cal. Rptr.

3  873, 875-76 (Cal. Ct. App. 1963).  "General allegations of malice will not suffice; plaintiff must

4  allege detailed facts showing defendant's ill will towards him."  *Robomatic, Inc. v. Vetco*

5  *Offshore*, 275 Cal. Rptr. 70, 74 (Cal. Ct. App. 1990) (granting judgment on the pleadings).  And

6  malice cannot be inferred from the communication itself.  Cal. Civ. Code § 48.  "The malice

7  necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that

8  the publication was motivated by hatred or ill will towards the plaintiff or by a showing that the

9  defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted

10  in reckless disregard of the plaintiff's rights."  *Noel v. River Hills Wilsons*, 7 Cal. Rptr. 3d 216,

11  221-22 (Cal. Ct. App. 2003) (internal quotations and citations omitted).

12       Here, MIM alleges that, at a FUND II shareholders meeting, FUND II made several

13  statements to its shareholders regarding MIM's management of FUND II's assets.  FUND II and

14  its shareholders plainly held a common interest regarding the management of FUND II's assets:

15  FUND II's shareholders had an economic interest in those same assets through FUND II.  *See,*

16  *e.g., Kacludis*, 806 F. Supp. at 872; *see also Pavlovsky v. The Board of Trade of San Francisco*,

17  340 P.2d 63 (Cal. Ct. App. 1959) (holding that board members' statements to other board

18  members privileged).  "As it is apparent from the face of [MIM's] complaint that [FUND II and

19  its shareholders] were interested parties, the communication is presumed to be privileged absent

20  pleading of specific facts to defeat that privilege."  *Kacludis*, 806 F. Supp. at 872.  MIM,

21  however, has pled no facts showing that malice existed sufficient to rebut the presumptive

22  privilege.  MIM's conclusory allegation that FUND II's "statements were false and were known

23  by FUND II to be false" (Compl. ¶ 38) is insufficient as a matter of law to rebut the statutory

24  presumption of privilege.  *See, e.g., Martin v. Kearney*, 124 Cal. Rptr. 281, 281-83 (Cal. Ct. App.

25  1975); *Kacludis*, 806 F. Supp. at 872.  In *Martin,* 124 Cal. Rptr. at 281-83, for example, the Court

26  of Appeal affirmed the granting of defendant's motion to dismiss for failure to state a defamation

27  cause of action where it was apparent from the face of the complaint that the communication was

28  privileged.  The court held that allegations that "Defendants knew that the[] statements were

1    untrue and published them for the purpose of exposing plaintiff to hatred, contempt, ridicule, and

2    obloquy in order to injure her in her occupation" and the like were insufficient as a matter of law

3    to overcome the privilege.  *Id.* at 282.

4           Because FUND II's statements are privileged and MIM has not sufficiently pled malice,

5    MIM's slander claim should be dismissed with prejudice.

6                                    **III. CONCLUSION**

7           For the foregoing reasons, the complaint should be dismissed with prejudice.

8    Dated: June 6, 2008                          Respectfully submitted,

9                                                 Jones Day

10

11                                               By:   /s/  David C. Kiernan
                                                        David C. Kiernan
12

13                                               Counsel for Defendant
                                                 MERIDIAN REAL ESTATE INVESTMENT
14                                               COMPANY II

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHBIT 1

| **SUMMONS** | **SUM-100** |
|---|---|
| *(CITACION JUDICIAL)* | |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Meridian Real Estate Investment Company II, a Cayman
Islands company

and Does 1 through 10, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Meridian Investment Management, Inc., a Delaware
Corporation

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| The name and address of the court is: | CASE NUMBER: |
|---|---|
| *(El nombre y dirección de la corte es):* | CGC-08-473759 |
| San Francisco Superior Court | |
| 400 McAllister Street | |
| San Francisco, CA 94102 | |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Douglas A. Applegate (SBN 142000)        (415) 979-0500
Seiler Epstein Ziegler & Applegate LLP
101 Montgomery Street, 27th Floor        M. RAYRAY
San Francisco, CA 94104

| DATE: MAR 28 2008 Gordon Park-Li | Clerk, by _____, Deputy |
|---|---|
| *(Fecha)* | *(Secretario)* *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☑ on behalf of *(specify):* Meridian Real Estate Investment Company II

   under: ☑ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)          ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. January 1, 2004] | **SUMMONS** | Legal Solutions Plus | Code of Civil Procedure §§ 412.20, 465 |
|---|---|---|---|

BY FAX



1  William J. Ziegler (SBN 041203)
2  Douglas A. Applegate (SBN 142000)
   SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
3  101 Montgomery Street, 27th Floor
   San Francisco, California 94104
   Phone: (415) 979-0500
4  Fax:   (415) 979-0511

5  Attorneys for Plaintiff
   Meridian Investment Management, Inc.

6

7

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10               IN AND FOR THE COUNTY OF SAN FRANCISCO

11                   UNLIMITED CIVIL JURISDICTION

12

13  MERIDIAN INVESTMENT                    Case No.   CGC-08-473759
    MANAGEMENT, INC., a Delaware
14  Corporation
                                           COMPLAINT
15            Plaintiff,

16       vs.

17  MERIDIAN REAL ESTATE INVESTMENT
    COMPANY II, a Cayman Islands company;
18  and DOES 1 through 10, inclusive.

19            Defendants,

20

21

22       COMES NOW plaintiff MERIDIAN INVESTMENT MANAGEMENT, INC. and

23  alleges against the defendants as follows:

24                               I.

25                            PARTIES

26       1.  Plaintiff  MERIDIAN  INVESTMENT  MANAGEMENT,  INC.  ("MIM")  is  a

27  Delaware corporation with its principal place of business in San Francisco, California, duly

28  registered and licensed to conduct business in the State of California.

                                1
                             COMPLAINT

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1    2.  Defendant MERIDIAN REAL ESTATE INVESTMENT COMPANY II

2    ("FUND II") is a company organized in the Cayman Islands.

3    3.  Plaintiff is unaware of the true names of the defendants sued herein as DOES 1

4    through 10 and accordingly sues these defendants by fictitious names.  Plaintiff will amend the

5    complaint to allege the true names and capacities of defendants DOES 1 through 10 when the

6    true names and capacities have been ascertained.  Plaintiff is informed and believes, and

7    thereon alleges, that DOES 1 through 10 were responsible in some manner for the damages and

8    injuries described in this Complaint.

9                         II.

10                        VENUE

11    4.  Venue is appropriate in the Superior Court of the State of California, City and

12    County of San Francisco, because the contract between the parties was to be performed in San

13    Francisco, and because defendants' tortuous conduct was directed at plaintiff in San Francisco

14    and was intended to, and did, cause harm to plaintiff in San Francisco.

15                         III.

16             FACTUAL BACKGROUND

17    5.  On or about September 1, 2000, MIM and FUND II entered into a written contract,

18    pursuant to which MIM agreed to provide investment advice and management services to

19    FUND II in exchange for a fee, predominantly measured on an annual basis at 1% of the value

20    of the FUND II assets under management.  A true and correct copy of the Advisory Agreement

21    ("the Contract") is attached hereto as Exhibit A.

22    6.  When the parties entered into the Contract, FUND II wished to invest

23    approximately $50 million in California real estate, to be leveraged into an asset portfolio

24    exceeding $200 million value (with a corresponding fee to MIM of roughly $2 million

25    annually).  A significant portion of the shareholders in FUND II were Kuwaiti nationals who

26    had worked with MIM before.

27    7.  Pursuant to the Contract and the parties' intentions, MIM located three attractive

28    real estate investment opportunities in California – one located at 450 Sansome Street in San

1  Francisco, and the other two located in San Diego, California.  MIM arranged for three separate

2  corporations to be formed to hold ownership of each of the three properties, and arranged for

3  the real estate acquisition financing, and for the management of the properties, both to provide

4  cash flow through the collection of rents, and also to provide value growth through the

5  appreciation of equity in the three properties.

6      8.  The property at 450 Sansome Street in San Francisco was successfully purchased on

7  or about September 21, 2000 for slightly more than $50 million.  That property predominantly

8  consisted of class-A commercial office leasehold space in the downtown financial district area

9  of San Francisco.  The two San Diego properties were purchased in late 2000 or early 2001 for

10  more than $25 million.  Accordingly, by early 2001, MIM was actively managing assets for

11  FUND II valued at more than $75 million, and earning a contractual fee in excess of $750,000

12  annually.

13      9.  In the months following September 11, 2001, the prevailing leasehold rates for

14  class-A commercial office space in San Francisco plummeted.  To ride out the market

15  downturn, MIM arranged for a restructuring of the loan on the 450 Sansome Street property to:

16  (a) extend the term of the loan; (b) convert the payments on the loan to interest only payments;

17  (c) reduce the principal amount of the loan with a $1 million pay down, drawn from the equity

18  available in the San Diego properties; and (d) further reduce the principal by approximately $5

19  million in loan forgiveness by the lender.

20      10. With this restructuring, the 450 Sansome Street property would have generated in

21  rents sufficient cash to cover all property expenses, including taxes, maintenance and debt

22  service.   The San Diego properties continued to generate sufficient income to meet all

23  expenses, and also continued to appreciate in value.

24      11. On or about July 6, 2002, a Kuwaiti national named Mutasem Al-Shihabi became

25  the chief executive officer of FUND II. Mr. Al-Shihabi had a different idea of how to reduce

26  expenses for FUND II: circumvent MIM's management fee.

27      12. Within days of being appointed as the chief executive officer of FUND II,

28  Mr. Al-Shihabi telephoned Carl Stegerwald, one of MIM's shareholders and officers, and a key

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

3

1  member of MIM's management and financial advisory team.  On behalf of FUND II,

2  Mr. Al-Shihabi tried to entice Mr. Stegerwald to leave MIM and personally take over the

3  management of the FUND II assets, at a vastly reduced management fee.

4      13. When Mr. Stegerwald refused, Mr. Al-Shihabi, acting on behalf of FUND II,

5  formed a 5-prong strategy to break the Contract with MIM: (a) subject MIM to costly audits

6  and unreasonable demands for information; (b) force the sale or transfer of FUND II's assets,

7  so that MIM's management fee would be correspondingly reduced; (c) interfere with the

8  prudent management of FUND II's assets by preventing the use of the cash flow or equity in

9  the San Diego properties to ride out the market downturn in San Francisco; (d) subject MIM to

10  the repeated threat of meritless, but costly, litigation; and (e) falsely report to FUND II's

11  shareholders (including those who had a prior business relationship with MIM) that MIM had

12  and continued to mismanage the fund assets.

13      14. Mr. Al-Shihabi proceeded to implement his 5-prong strategy on behalf of

14  FUND II, most explicitly demonstrating that he was acting with a motivation to break the

15  Contract through a letter dated February 22, 2003 that demanded that MIM agree to a reduced

16  fee and demanded that MIM agree replace the Contract with a new agreement, with the threat

17  that otherwise, costly litigation would ensue.

18      15. MIM did not agree to FUND II's extortionate demands, but, as Mr. Al-Shihabi

19  proceeded to implement the 5 prongs of his strategy to break the Contract, MIM found it

20  increasingly impossible to prudently manage FUND II's assets.

21      16. As noted above in paragraph 9, MIM was able to negotiate with the lender for the

22  450 Sansome Street property a forgiveness of nearly $5 million in debt.  FUND II, however,

23  acting through Mr. Al-Shihabi, refused to accept the new loan terms and insisted that if the

24  lender would not provide an additional $3 million in loan forgiveness, that instead of rewriting

25  the loan, MIM must instead deed the property to the lender and accept the loss.

26      17. MIM explained, time and again, that the market downturn in San Francisco was

27  temporary, and was the product of a confluence of an economic downturn caused by the attacks

28  of September 11, 2001, and the implosion of the dot.com real estate bubble.  Time and again,

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

4

1 MIM explained that the prudent approach was to restructure the loan on the terms that MIM

2 had negotiated, and to ride out the economic cycle.

3  18. FUND II, acting through Mr. Al-Shihabi, refused to accept MIM's sound advice,

4 motivated by its desire to break the Contract.

5  19. FUND II further caused a shareholders meeting to be called and conducted on

6 August 25, 2003, but FUND II and Mr. Al-Shihabi intentionally failed to notify MIM of the

7 shareholder's meeting, even though MIM was a 1.5% minority shareholder of FUND II.

8 Within the last three years, MIM has learned that at that shareholders meeting, which was held

9 at 11:45 am at the offices of the Al Mal Kuwaiti Company in Safat, Kuwait, Mr. Al-Shihabi,

10 acting as an officer of FUND II and acting within the scope and course of his agency, falsely

11 told the shareholders of FUND II that MIM had mismanaged the assets of FUND II, that their

12 investment in FUND II was lost, and that MIM had overcharged the fund with management

13 fees while investing in speculative investments that had lost value that could not be recouped.

14  20. Relying upon the false information provided to them by Mr. Al-Shihabi, the

15 shareholders of FUND II voted to instruct MIM to sell the entire FUND II portfolio.

16  21. Thereafter, Mr. Al-Shihabi, acting in the scope and course of his agency as the chief

17 executive officer of FUND II, again refused the restructuring of the loan on 450 Sansome

18 Street that MIM had arranged, and again rejected MIM's advice to ride out the real estate cycle.

19 Instead, Mr. Al-Shihabi instructed and directed MIM to deed the 450 Sansome Street property

20 to the lender, in lieu of foreclosure.

21  22. On March 30, 2004, at FUND II's direction, and under the threat of meritless but

22 costly litigation, MIM capitulated and deeded the 450 Sansome Street to the lender.

23  23. As MIM had predicted and explained, the San Francisco real estate market quickly

24 rebounded, and within less than 2 years, the property at 450 Sansome Street was worth double

25 what FUND II had purchased it for.  Through its vindictive strategy and its ill-conceived effort

26 to break the Contract and avoid the management fees that it had contractually agreed to pay,

27 FUND II foisted upon its shareholders a loss of investment profit of more than $50 million.

28

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

24. In addition, through its actions as set forth above, FUND II caused MIM to lose management fees that it was contractually entitled to, in a sum exceeding $1 million per year.

25. In the year following the loss of the 450 Sansome Street property, MIM also sold, at FUND II's direct instruction and without commercially reasonable grounds, the two San Diego properties. FUND II's conduct has thus caused MIM's management fee to be reduced to $0.

26. At the time FUND II was created and the Contract negotiated and signed, all parties recognized that the type of real estate investments that FUND II desired provided a long-term investment opportunity – an investment path that would most likely require at least 10 years before it made economic sense to liquidate the investment and provide the return of profits to the FUND II shareholders.

27. Accordingly, if Mr. Al-Shihabi, acting on behalf of and within the scope and course of his agency, had not caused FUND II to embark on the ill-conceived strategy to break the Contract, MIM would have earned its contractual management fee on a property portfolio exceeding $100 million in value for a period lasting until at least the year 2010. Instead, MIM was relegated to managing a vastly reduced portfolio for a vastly shorter period.

28. The loss caused to MIM by FUND II's intentional breach of the parties' agreement thus exceeds $7 million.

IV.

FIRST CAUSE OF ACTION

BREACH OF CONTRACT

29. Plaintiff incorporates by reference, as though set forth in full, the allegations of paragraphs 1 through 28, above.

30. On or about September 1, 2000, MIM and FUND II entered into a written contract, pursuant to which MIM agreed to provide investment advice and management services to FUND II in exchange for a fee, predominantly measured on an annual basis at 1% of the value of the FUND II assets under management. A true and correct copy of the Advisory Agreement ("the Contract") is attached hereto as Exhibit A.

6

1    31. Under the covenant of good faith and fair dealing, implied into every contract,

2  FUND II in entering in the Contract agreed that it would not engage in any conduct to frustrate

3  MIM's rights to secure the contractual benefits of the management fee provided for in the

4  Contract. (See, e.g., *Pasadena Live v. City of Pasadena* (2004) 114 Cal.App.4[th] 1089, 1093.)

5    32. MIM performed all acts required of it by the Contract.

6    33. FUND II, however, intentionally acted to deprive MIM of the management fee to

7  which it was entitled. FUND II wrongfully subjected MIM to costly audits and unreasonable

8  demands for information; FUND II forced the sale or transfer of FUND II's assets, so that

9  MIM's management fee would be correspondingly reduced; FUND II interfered with the

10  prudent management of FUND II's assets by preventing the use of the cash flow or equity in

11  the San Diego properties to ride out the market downturn in San Francisco; FUND II subjected

12  MIM to the repeated threat of meritless, but costly, litigation; and FUND II falsely reported to

13  its shareholders (including those who had a prior business relationship with MIM) that MIM

14  had and continued to mismanage the fund assets, causing the shareholders to insist upon the

15  sale of FUND II's assets.

16    34. As a result of FUND II's breach of the covenant of good faith and fair dealing,

17  MIM was deprived of the management fees that it was contractually entitled to, and MIM has

18  accordingly been damaged in a sum exceeding $7 million, and subject to proof at trial.

19    35.    WHEREFORE, Plaintiff prays for relief as set forth below.

20              IV.

21          SECOND CAUSE OF ACTION

22            SLANDER PER SE

23    36. Plaintiff incorporates by reference, as though set forth in full, the allegations of

24  paragraphs 1 through 35, above.

25    37. Within the last three years, MIM has learned that on August 25, 2003, at a

26  shareholders meeting held at 11:45 am at the offices of the Al Mal Kuwaiti Company in Safat,

27  Kuwait, Mr. Al-Shihabi, acting as an officer of FUND II and acting within the scope and

28  course of his agency, falsely told the shareholders of FUND II that MIM had mismanaged the

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1  assets of FUND II, that the shareholders' investment in FUND II was lost, and that MIM had

2  overcharged the fund with management fees while investing in speculative investments that

3  had lost value that could not be recouped.

4      38. These statements were false and were known by FUND II to be false.

5      39. Indeed, only four months earlier, Mr. Al-Shihabi, acting as an officer of FUND II

6  and acting within the scope and course of his agency, had truthfully reported, in writing, to

7  Ernst & Young LLP, accountants, that the investments of FUND II were being properly and

8  adequately managed, that "none of the Funds['] investments have permanently declined in

9  value to an amount less than the carrying amount in the financial statements" and that those in

10 charge of managing FUND II's assets had engaged in "no violations or possible violations of

11 laws or regulations."

12     40. The false statements made by Mr. Al-Shihabi to the shareholders of FUND II were

13 made as part of his efforts to break the Contract and force MIM to accept reduced payment for

14 its services.

15     41. The statements were intended to, and necessarily did, disparage MIM in the conduct

16 of its business and profession, and the statements were understood by all who heard them as

17 impugning MIM's competence, professionalism, ethical standards and acumen.

18     42. The audience who heard FUND II's defamatory statements included many investors

19 who had previously retained MIM's services and who likely would have, but for FUND II's

20 defamatory remarks, continued to retain MIM's services for the foreseeable future.

21     43. However, in response to Mr. Al-Shihabi's false remarks and representations,

22 knowingly made but made within the scope and course of his agency as FUND II's chief

23 executive office, the shareholders of FUND II were induced to, and did, cease doing business

24 with MIM.

25     44. As a result, MIM has not only lost the management fees that it would otherwise

26 have earned for providing services to FUND II pursuant to the Contract, but in addition, MIM

27 has lost additional business, causing it to incur further damages in a sum exceeding $5 million,

28 and subject to proof at trial.

8

45.     WHEREFORE, Plaintiff prays for relief as set forth below.

V.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.     For general damages according to proof in a sum exceeding $12 million;

2.     For costs of suit; and

3.     For such other and further relief as the court deems just and proper.

Dated: March 28, 2008

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP

By:_____
        Douglas A. Applegate

Attorneys for Plaintiff
Meridian Investment Management, Inc.

9

COMPLAINT

EXHIBIT A

**EXHIBIT A**

# ADVISORY AGREEMENT

This Agreement is made and entered into as of September 1, 2000, by and between Meridian Real Estate Investment Company II, a Cayman Islands company (the "Company"), and Meridian Investment Management, Inc., a Delaware corporation (the "Advisor").

WHEREAS, the Company desires to avail itself of the experience, resources, advice and assistance of the Advisor and to have the Advisor undertake duties and responsibilities hereinafter set forth with respect to real estate investments of the Company, whether made directly or through its subsidiaries (which term shall be deemed to include any company of which the Company owns more than 50% of the equity capitalization, without regard to voting power), subject to the supervision of the Board of Directors of the Company (the "Board"), as provided in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

## ARTICLE I

### Appointment

The Company hereby appoints the Advisor to serve as its investment and management advisor on the terms and conditions set forth in this Agreement, and the Advisor hereby accepts such appointment.

## ARTICLE II

### Duties of Advisor

Subject to the supervision of the Board, the Advisor shall use its best efforts to perform the following duties for and on behalf of the Company (which shall be deemed to include, except as the context indicates otherwise, any subsidiary through which the Company invests):

2.1    Investment Plan.  The Advisor, in consultation with the Board, shall establish and maintain an appropriate plan for investment in real estate in the United States consistent with the Company's overall investment objectives, which plan shall include policy guidelines for property type and size, geographic diversification, tenancy, yield, leverage and such other factors as the Board may from time to time determine.

2.2    Market Research.  The Advisor shall gather and evaluate information, conduct market research on real estate markets in the United States, and the local and national trends, comparative values and economic and financial data affecting the Company's real estate investments and investment policies and objectives in such markets.

2.3   Investments.  The Advisor shall, on behalf of the Company, identify, investigate and evaluate appropriate properties for investment; furnish advice with respect to the acquisition thereof; negotiate the price and terms of investments; negotiate options to acquire such properties when requested by the Company's Board and assign options acquired by the Advisor to the Company; perform or supervise a due diligence examination of potential investments, including environmental, structural and legal reviews; and supervise the documentation of investments.

2.4   Portfolio Management.  The Advisor shall advise the Company on all aspects of the Company's portfolio of real estate investments in an effort to optimize the long-term investment results of the portfolio (including without limitation the management of the day-to-day operations of the Company, the preparation of operating and maintenance budgets, capital improvement budgets and schedules for improvements; monitoring borrower compliance with any mortgage loans made by the Company and assistance in the negotiation of significant leases) and shall perform and supervise the performance of such other administrative functions in connection with the management of the Company as may be agreed upon by the Advisor and the Board. The Advisor will also develop and maintain strategic management plans for each property relating to such issues as refinancing, property taxes and sales strategies.

2.5   Property Management.  The Advisor, on behalf and at the expense of the Company, shall, with such assistance of consultants or local subadvisors as the Advisor may require, investigate, select and retain, as appropriate, property managers and, following appointment of each such property manager, conduct relations with such property manager in connection with the Company's properties managed by it. Any such property managers may be affiliates of the Advisor.

2.6   Financing Activities.  The Advisor shall negotiate, as appropriate, on behalf of the Company, with investment banking firms, banks, insurance companies, pension funds, mortgage lenders and other institutions or investors for secured or unsecured borrowings by the Company.

2.7   Sales.  The Advisor shall, on behalf of the Company, identify appropriate properties for sale, negotiate the price and other terms of sale and supervise the documentation related to the consummation of such sales.

2.8   Investment of Cash.  The Advisor shall advise the Company on the short-term investment and reinvestment of any idle monies of the Company in accordance with the Company's investment policies.

2.9   Reports and Records.  The Advisor shall, on behalf of the Company, maintain appropriate records and documents for each property in the Company's portfolio. The Advisor shall, on behalf of the Company, cause to be prepared and delivered to the shareholders of the Company annual and semi-annual reports which contain financial statements and which will discuss investment activity during the period and the status of the Company's investments and contain such additional information which the Advisor deems relevant to the shareholders.

## ARTICLE III

### Compensation

The Company shall pay the Advisor for its services compensation at the rates and at the times specified herein.

3.1    Advisory Fee.  The Company shall pay the Advisor an annual fee equal to one percent (1%) of the overall value of the Company's assets under management.  For purposes of this Section 3.1, assets contributed by the Company to its subsidiaries shall be deemed assets of the subsidiaries and not of the Company, provided the Company has entered into an assignment agreement with the relevant subsidiary whereby the subsidiary assumes the fee obligation to the Manager with respect to such amounts, in which case the subsidiary rather than the Company shall be liable to the Advisor for the fee in respect thereof.  Such fee shall be payable within ten days following the end of each quarter in an amount equal to 0.25% of the average Unreturned Capital during such quarter.  If this Agreement is terminated prior to the end of a quarter pursuant to Section 5.2 hereof, the fee payable for such quarter shall equal a pro rata percentage of 0.25%, based on the number of days in the quarter which have elapsed prior to termination, times the average Unreturned Capital for the period commencing with the first day of such quarter and ending on the date of termination.

3.2    Additional Services.  If the Company shall request the Advisor to render services to the Company other than those required to be rendered by the Advisor hereunder, such additional services, if performed, shall be compensated separately on terms to be agreed upon from time to time between the Advisor and the Company, which terms shall not exceed either (a) the terms under which the Advisor is then performing similar services for others or (b) the terms under which qualified unaffiliated persons are then performing such services for comparable organizations.

3.3    Expenses of the Advisor.  Without regard to the amount of compensation received hereunder by the Advisor, the Advisor will bear the following expenses:

(a)    Employment expenses of the personnel employed by the Advisor and of officers, directors and employees of the Company who are also employees of the Advisor including, but not limited to, salaries, wages, incentive payments, payroll taxes and the cost of employee benefit plans; and

(b)    Rent, telephone, utilities, office furniture and equipment and machinery (including computers, to the extent utilized) and other office expenses of the Advisor.

3.4    Expenses of the Company.  The Company shall pay all of its expenses except those which are the responsibility of the Advisor pursuant to Section 3.3 of this Agreement and, without limiting the generality of the foregoing, it is agreed that the following expenses of the Company shall be paid by the Company:

(a)    To the extent the Advisor is not required to pay such expenses pursuant to Section 3.3(a) hereof, salaries and other employment expenses of the personnel employed by the

- 3 -

Company; directors' fees and expenses incurred in attending directors' meetings; and the cost of directors' and officers' liability insurance;

(b)     Expenses relating to any office or office facilities maintained by the Company separate from the office or offices of the Advisor;

(c)     Advertising and promotional expenses, if any, incurred by the Advisor in seeking investments for the Company or seeking to sell any of the Company's assets;

(d)     The cost of borrowed money;

(e)     All taxes applicable to the Company;

(f)     Legal, accounting, auditing, underwriting and other expenses and taxes incurred in connection with the organization or dissolution of the Company, or the issuance, distribution or transfer of the Company's securities;

(g)     Fees and expenses paid to local subadvisors and independent contractors, consultants, managers and other agents employed directly by the Company or by the Advisor at the Company's request for the account of the Company;

(h)     To the extent not paid by borrowers from the Company, costs of loan administration and mortgage servicing;

(i)     Expenses connected with the acquisition, disposition, leasing and ownership of investments, including, to the extent not paid by others, but not limited to:  legal fees and other expenses of professional services; maintenance, repair and improvement of property; brokerage and sales commissions; and expenses of the Advisor's personnel in traveling in connection with the performance of its duties hereunder;

(j)     All insurance costs incurred in connection with the Company;

(k)     Expenses connected with payments of dividends or interest or distributions in cash or any other form made or caused to be made by the Board of Directors to holders of securities of the Company;

(l)     All expenses connected with communications to holders of securities of the Company and the other bookkeeping and clerical work necessary in maintaining relations with holders of securities and in complying with the continuous reporting and other requirements of governmental bodies or agencies, including the cost of printing and mailing certificates for securities and proxy solicitation materials and reports to holders of the Company's securities;

(m)     Transfer agent and registrar's fees and charges; and

(n)     Legal, appraisal, accounting and auditing fees and expenses.

3.5     Reimbursement of the Advisor.  To the extent that the Advisor pays any of the expenses of the Company set forth in Section 3.4, the Advisor shall, within 30 days after each

month in which such expenses were incurred, invoice the Company therefor, and the Company shall pay such invoice within 30 days after the date of the invoice.

## ARTICLE IV

### Other Activities of the Advisor

4.1     Other Activities. Nothing in this Agreement shall prevent the Advisor or an affiliate of the Advisor from engaging in other activities and receiving compensation therefor, including, without limitation, the rendering of advice to other investors and the management of other investments, including investors and investments advised, sponsored or organized by the Advisor or its affiliates, and including joint ventures and partnerships in which the Company is a co-venturer or partner and the other co-venturers and partners in such joint ventures and partnerships. Nothing in this Agreement shall limit or restrict the right of any director, principal, officer, employee or shareholder of the Advisor or an affiliate of the Advisor to engage in any other business or to render services of any kind to any other corporation, partnership, firm, individual, trust or association.

4.2     Allocation of Investment Opportunities. The Company acknowledges that the Advisor currently performs management services for entities other than the Company, and expects to perform management and other services for other entities in the future. If the Advisor is presented with a potential investment which might be made by more than one entity which it advises or manages, the decision as to the suitability of the property for investment by a particular entity will be based on a review of the investment objectives of each entity and upon such factors as cash available for investment, maximum investment limit per acquisition, the nature of the development, the time frame for funding the investment, other potential investments available to such entity, estimated income tax effects, leverage policies, any regulatory restrictions on investment and the length of time funds have been available for investment in the particular market. The Advisor will then determine for which entity the particular investment is most suitable and allocate to that entity the opportunity to make the particular investment.

## ARTICLE V

### Term and Termination

5.1     Term. This Agreement shall commence upon the date set forth above and will terminate upon liquidation of the Company unless earlier terminated pursuant to Section 5.2 hereof.

5.2     Termination. At the option of the Company, this Agreement may be terminated:

(a)     immediately if the Advisor shall violate any material provisions of this Agreement and, after written notice of such violation, shall not cure such default within 60 days;

- 5 -

(b)    immediately if the Advisor shall be adjudged bankrupt or insolvent by a court of competent jurisdiction, or any order shall be made by a court of competent jurisdiction for the appointment of a receiver, liquidator or trustee of the Advisor or of all or substantially all of its property by reason of the foregoing, or approving any petition filed against the Advisor for its reorganization;

(c)    immediately if the Advisor shall institute proceedings for voluntary bankruptcy or shall file a petition seeking reorganization under the Federal bankruptcy laws or for relief under any law for the relief of debtors, or shall consent to the appointment of a receiver of itself or of all or substantially all of its property, or shall make a general assignment for the benefit of its creditors, or shall admit in writing its inability to pay its debts generally as they become due; or

(d)    immediately in the event it is "assigned" by the Advisor except to the extent such assignment is permitted in Section 8.2.

The Advisor agrees that if any of the events specified in subsections (b), (c) or (d) of this Section 5.2 shall occur, it will give written notice thereof to the Company within 7 days after the occurrence of such event.

5.3    Compensation Upon Termination.  Upon any termination of this Agreement, the Advisor shall be entitled to receive (a) immediate payment of any unpaid advisory fees payable pursuant to Section 3.1 hereof, (b) immediate payment of any reimbursement provided for in Section 3.5 and (c) reasonable compensation for the services, if any, which the Advisor performed after the date of such termination, payable within 30 days of the date such services were performed.

5.4    Rights of Termination Cumulative.  The rights of termination specifically provided shall be considered to be cumulative, and shall be in addition to the rights of termination for breach of the Agreement otherwise inuring to the parties by operation of law.

## ARTICLE VI

### Exculpation and Indemnification

The Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder in good faith and shall not in any event be responsible for any action of the Company in following or declining to follow any advice or recommendations of the Advisor. Neither the Advisor, its shareholders, directors, principals nor its employees shall be liable to the Company, the Board or the shareholders of the Company, except by reasons of acts constituting bad faith, willful misfeasance, gross negligence or reckless disregard of their duties. The Advisor may consult with legal counsel, which may be the regular counsel of the Advisor or other counsel, independent public accountants or other professional advisors and, not withstanding anything to the contrary herein, shall not be liable for any action taken or omitted in good faith by it in accordance with the advice of such counsel, accountants or advisor, or at the request or direction of the Board in connection with the performance of its duties under this Agreement.

- 6 -

The Company shall indemnify and hold harmless the Advisor, its shareholders, directors, principals and employees from and against any and all liabilities, claims, damages or losses arising in the performance of its duties hereunder or from any act or omission arising out of its activities on behalf of the Company, including without limitation any judgement, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened proceeding, other than any loss or expense (a) arising from the Advisor's willful misfeasance, gross negligence or reckless disregard of its duties, (b) arising from a breach or failure by the Advisor to perform an obligation or responsibility under this Agreement or (c) as to which indemnification is barred by applicable law.

## ARTICLE VII

### Action Upon Termination or Cancellation

7.1    Accounting.  The Advisor shall immediately upon termination:

(a)    pay over to the Company all monies collected and held for the account of the Company pursuant to this Agreement, after deducting any accrued compensation and reimbursement for its expenses to which it is then entitled;

(b)    deliver to the Company a full accounting, including a statement showing all payments collected by it and a statement of all monies held by it, covering the period following the date of the last accounting furnished to the Company; and

(c)    deliver to the Company all property and documents of the Company then in the custody of the Advisor.

7.2    Change of Name.  Upon termination of this Agreement by either party, the Board of the Company shall, upon the written request of the Advisor, make reasonable efforts (including, if necessary, calling a meeting of shareholders and recommending an amendment to the Company's Memorandum and Articles of Association) to cause the name of the Company to be changed to a name that does not contain all or a distinctive portion of the name of the Advisor or any affiliate thereof or any approximation or abbreviation thereof and that is sufficiently dissimilar to such name as to be unlikely to cause confusion or identification with the Advisor.

## ARTICLE VIII

### Miscellaneous

8.1    Amendments.  This Agreement shall not be modified or terminated except by an instrument in writing signed by both parties hereto, or their respective successors or assigns, or otherwise as provided herein.

8.2    Assignment.  This Agreement shall not be assignable by either party without the consent of the other, except that the Company may assign its rights and transfer its obligations hereunder to one or more subsidiaries without the Advisor's consent as provided in Section 3.1.

- 7 -

Any permitted assignment of this Agreement shall be conditioned on the assignee's execution of a written instrument acceptable to the non-assigning party pursuant to which the permitted assignee agrees to be bound hereunder in the same manner as the assignor is bound hereunder.

    8.3    No Partnership, Joint Venture or Agency. The Company and the Advisor are not, and shall not be deemed to be, partners or joint venturers with each other, nor shall either be deemed the agent of the other. Neither the Company, nor the Adviser shall be authorized to bind the other to any contract or obligation without the express written consent of the other.

    8.4    Survival. The provisions of Sections 5.3, 7.1 and 7.2 and Article VI (and any definitions necessary for the operation of such provisions) shall survive the termination of this Agreement.

    8.5    Notices. Any notice, report or other communication required or permitted to be given hereunder shall be in writing and shall be given: (a) by delivery in person to an officer of the party to whom it is addressed, or (b) by telegraph, telecopy, international overnight delivery service or other commercially reasonable means, to the person to whom it is addressed at the following address:

    To the Company:

        Meridian Real Estate Investment Company II
        c/o Maples & Calder
        Ugland House
        P.O. Box 309
        Grand Cayman Islands
        British West Indies
        Attn: Gareth Griffiths, Esq.

    With a copy to:

        Hale and Dorr LLP
        60 State Street
        Boston, MA  02109
        Attn: Christopher P. Harvey, Esq.

    To the Advisor:
        Meridian Investment Management, Inc.
        One Main Street
        Concord, MA  01742
        Attn: Carl Stegerwald

With a copy to:

      Hale and Dorr LLP
      60 State Street
      Boston, MA 02109
      Attn: Christopher P. Harvey, Esq.

If any notice is telegraphed, the same shall be deemed served or delivered forty-eight hours after the transmission thereof. Any notice or other documents sent or delivered in any other manner shall be effective only if and when received.

— Either party, by notices aforesaid, may designate a different address or addresses for notices, reports or other communications intended for it.

8.6    Headings. The section headings used herein have been inserted for convenience of reference only and do not constitute matters to be considered in interpreting this Agreement.

8.7    Governing Law and Jurisdiction. This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts excluding that body of law pertaining to conflicts of law. The parties hereby irrevocably consent to the jurisdiction of the federal or state courts located within the Commonwealth of Massachusetts.

8.8    Entire Agreement. This Agreement contains the entire agreement between the parties with respect to the subject hereof and supersedes any prior written or oral agreements with respect to the subject hereof.

IN WITNESS WHEREOF, the Company and the Advisor have executed this Agreement as of the day and year first above written.

MERIDIAN REAL ESTATE INVESTMENT
COMPANY II

By:_____
Name:_____
Title:_____

Executed outside U.S.

MERIDIAN INVESTMENT MANAGEMENT, INC.

By:_____
Name:_____
Title:_____

Executed in Concord, Massachusetts

- 9 -

# Alternative Dispute Resolution (ADR) Program Information Package

# Alternatives to Trial

## There are other ways to resolve a civil dispute.

The plaintiff must serve a copy of the ADR information package
on each defendant along with the complaint. (CRC 201.9(c))

### Superior Court of California
### County of San Francisco

## Introduction

Did you know that most civil lawsuits settle without a trial?

And did you know that there are a number of ways to resolve civil disputes without having to sue somebody?

These alternatives to a lawsuit are known as alternative dispute resolutions (ADR). The most common forms of ADR are mediation, arbitration and case evaluation. There are a number of other kinds of ADR as well.

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediation, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.

ADR is not new. ADR is available in many communities through dispute resolution programs and private neutrals.

## Advantages of ADR

ADR can have a number of advantages over a lawsuit.

- *ADR can save time.* A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.

- *ADR can save money.* Court costs, attorneys fees, and expert fees can be saved.

- *ADR can be cooperative.* This means that the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.

- *ADR can reduce stress.* There are fewer, if any, court appearances. And because ADR can be speedier, and save money, and because the parties are normally cooperative, ADR is easier on the nerves. The parties don't have a lawsuit hanging over their heads for years.

- *ADR encourages participation.* The parties may have more chances to tell their side of the story than in court and may have more control over the outcome.

- *ADR is flexible.* The parties can choose the ADR process that is best for them. For example, in mediation the parties may decide how to resolve their dispute.

- *ADR can be more satisfying.* For all the above reasons, many people have reported a high degree of satisfaction with ADR.

Because of these advantages, many parties choose ADR to resolve a dispute, instead of filing a lawsuit. Even when a lawsuit has been filed, the court can refer the dispute to a neutral before the parties' position harden and the lawsuit becomes costly. ADR has been used to resolve disputes even after a trial, when the result is appealed.

## Disadvantages of ADR

ADR may not be suitable for every dispute.

- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

- There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

- The neutral may charge a fee for his or her services.

- If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

- Lawsuits must be brought within specified periods of time, known as statutes of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

## ALTERNATIVE DISPUTE RESOLUTION PROGRAMS
## Of the San Francisco Superior Court

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to a mandatory settlement conference or trial." (Superior Court Local Rule 4)

This guide is designed to assist attorneys, their clients and self-represented litigants in complying with San Francisco Superior Court's alternative dispute resolution ("ADR") policy. Attorneys are encouraged to share this guide with clients. By making informed choices about dispute resolution alternatives, attorneys, their clients and self-represented litigants may achieve a more satisfying resolution of civil disputes.

The San Francisco Superior Court currently offers three ADR programs for general civil matters; each program is described below:

1)    Judicial Arbitration
2)    Mediation
3)    The Early Settlement Program (ESP) in conjunction with the San Francisco Bar Association.

### JUDICIAL ARBITRATION

*Description*

In arbitration, a neutral "arbitrator" presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case. When the Court orders a case to arbitration it is called judicial arbitration. The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.

Although not currently a part of the Court's ADR program, civil disputes may also be resolved through private arbitration. Here, the parties

voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

## Operation

Pursuant to CCP 1141.11 and Local Rule 4, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. A case is ordered to arbitration after the Case Management Conference. An arbitrator is chosen from the Court's Arbitration Panel. Most cases ordered to arbitration are also ordered to a pre-arbitration settlement conference. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is <u>not</u> binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a court trial within 30 days after the arbitrator's award has been filed.

## Cost

There is no cost to the parties for judicial arbitration or for the pre-arbitration settlement conference.

## MEDIATION

### Description

Mediation is a voluntary, flexible, and confidential process in which a neutral third party "mediator" facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of the dispute after exploring the significant interests, needs, and priorities of the parties in light of relevant evidence and the law.

Although there are different styles and approaches to mediation, most mediations begin with presentations of each side's view of the case. The mediator's role is to assist the parties in communicating with each other, expressing their interests, understanding the interests of opposing parties, recognizing areas of agreement and generating options for resolution. Through questions, the mediator aids each party in assessing the strengths and weaknesses of their position.

ADR-1    10/07 (ja)                                                      Page 5

A mediator does not propose a judgment or provide an evaluation of the merits and value of the case. Many attorneys and litigants find that mediation's emphasis on cooperative dispute resolution produces more satisfactory and enduring resolutions. Mediation's non-adversarial approach is particularly effective in disputes in which the parties have a continuing relationship, where there are multiple parties, where equitable relief is sought, or where strong personal feelings exist.

## Operation

San Francisco Superior Court Local Court Rule 4 provides three different voluntary mediation programs for civil disputes. An appropriate program is available for all civil cases, regardless of the type of action or type of relief sought.

To help litigants and attorneys identify qualified mediators, the Superior Court maintains a list of mediation providers whose training and experience have been reviewed and approved by the Court. The list of court approved mediation providers can be found at www.sfgov.org/courts. Litigants are not limited to mediators on the court list and may select any mediator agreed upon by all parties. A mediation provider need not be an attorney.

Local Rule 4.2 D allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate within 240 days from the date the complaint is filed. If settlement is not reached through mediation, a case proceeds to trial as scheduled.

## Private Mediation

The Private Mediation program accommodates cases that wish to participate in private mediation to fulfill the court's alternative dispute resolution requirement. The parties select a mediator, panel of mediators or mediation program of their choice to conduct the mediation. The cost of mediation is borne by the parties equally unless the parties agree otherwise.

Parties in civil cases that have not been ordered to arbitration may consent to private mediation at any point before trial. Parties willing to submit a matter to private mediation should indicate this preference on the Stipulation to Alternative Dispute Resolution form or the Case Management Statement (CM-110). Both forms are attached to this packet.

### Mediation Services of the Bar Association of San Francisco

The Mediation Services is a coordinated effort of the San Francisco Superior Court and The Bar Association of San Francisco (BASF) in which a court approved mediator provides three hours of mediation at no charge to the parties.  It is designed to afford civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint, in an effort to resolve the matter before substantial funds are expended on the litigation process.  Although the goal of the program is to provide the service at the outset of the litigation, the program may be utilized at anytime throughout the litigation process.

The mediators participating in the program have been pre-approved by the court pursuant to strict educational and experience requirements.

After the filing of the signed Stipulation to Alternative Dispute Resolution form included in this ADR package the parties will be contacted by BASF. Upon payment of the $200 per party administration fee, parties select a specific mediator from the list of court approved mediation providers.  The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waiver of the administrative fee based on financial hardship is available.

A copy of the Mediation Services rules can be found on the BASF website at www.sfbar.org, or you may call BASF at 415-782-9000.

### Judicial Mediation

The Judicial Mediation program is designed to provide early mediation of complex cases by volunteer judges of the San Francisco Superior Court. Cases considered for the program include construction defect, employment discrimination, professional malpractice, insurance coverage, toxic torts and industrial accidents.

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program.  A preference for a specific judge may be indicated.  The court Alternative Dispute Resolution Coordinator will coordinate assignment of cases that qualify for the program.

## Cost

Generally, the cost of Private Mediation ranges from $200 per hour to $400 per hour and is shared equally by the parties. Many mediators are willing to adjust their fees depending upon the income and resources of the parties. Any party who meets certain eligibility requirements may ask the court to appoint a mediator to serve at no cost to the parties.

The Mediation Services of the Bar Association of San Francisco provides three hours of mediation time at no cost with a $200 per party administrative fee.

There is no charge for participation in the Judicial Mediation program.

## EARLY SETTLEMENT PROGRAM

### Description

The Bar Association of San Francisco, in cooperation with the Court, offers an Early Settlement Program ("ESP") as part of the Court's settlement conference calendar. The goal of early settlement is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of the dispute. The two-member volunteer attorney panel reflects a balance between plaintiff and defense attorneys with at least 10 years of trial experience.

As in mediation, there is no set format for the settlement conference. A conference typically begins with a brief meeting with all parties and counsel, in which each is given an opportunity to make an initial statement. The panelists then assist the parties in understanding and candidly discussing the strengths and weaknesses of the case. The Early Settlement Conference is considered a "quasi-judicial" proceeding and, therefore, is not entitled to the statutory confidentiality protections afforded to mediation.

### Operation

Civil cases enter the ESP either voluntarily or through assignment by the Court. Parties who wish to choose the early settlement process should indicate this preference on the status and setting conference statement.

If a matter is assigned to the ESP by the Court, parties may consult the ESP program materials accompanying the "Notice of the Early Settlement Conference" for information regarding removal from the program.

Participants are notified of their ESP conference date approximately 4 months prior to trial. The settlement conference is typically held 2 to 3 months prior to the trial date. The Bar Association's ESP Coordinator informs the participants of names of the panel members and location of the settlement conference approximately 2 weeks prior to the conference date.

Local Rule 4.3 sets out the requirements of the ESP. All parties to a case assigned to the ESP are required to submit a settlement conference statement prior to the conference. All parties, attorneys who will try the case, and insurance representatives with settlement authority are required to attend the settlement conference. If settlement is not reached through the conference, the case proceeds to trial as scheduled.

### Cost

All parties must submit a $250 generally non-refundable administrative fee to the Bar Association of San Francisco. Parties who meet certain eligibility requirements may request a fee waiver. For more information, please contact the ESP Coordinator at (415) 782-9000 ext. 8717.

* * * * * * * * * * * * * * * * * * *

For further information about San Francisco Superior Court ADR programs or dispute resolution alternatives, please contact:

Superior Court Alternative Dispute Resolution,
400 McAllister Street, Room 103
San Francisco, CA   94102
(415) 551-3876

or visit the Superior Court Website at
http://sfgov.org/site/courts_page.asp?id=3672

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF SAN FRANCISCO

400 McAllister Street, San Francisco, CA  94102-4514

| | |
|---|---|
| Plaintiff<br><br>v.<br><br>Defendant | Case No. _____<br><br>**STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION** |

The parties hereby stipulate that this action shall be submitted to the following alternative dispute resolution process:

☐   **Private Mediation**     ☐   **Mediation Services of BASF**    ☐   **Judicial Mediation**
☐   **Binding arbitration**                                         Judge _____
☐   **Non-binding judicial arbitration**                 Judge _____
☐   **BASF Early Settlement Program**
☐   **Other ADR process (describe)** _____

Plaintiff(s) and Defendant(s) further agree as follows:

_____

_____

_____

_____

| | | |
|---|---|---|
| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| ☐ Plaintiff   ☐ Defendant   ☐ Cross-defendant | | Dated: _____ |
| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| ☐ Plaintiff   ☐ Defendant   ☐ Cross-defendant | | Dated: _____ |
| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| ☐ Plaintiff   ☐ Defendant   ☐ Cross-defendant | | Dated: _____ |

☐   *Additional signature(s) attached*

ADR-2  3/06             STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION



# Superior Court of California
## County of San Francisco

**HON. DAVID BALLATI**
**PRESIDING JUDGE**

## Judicial Mediation Program

**JENIFER B. ALCANTARA**
**ADR PROGRAM ADMINISTRATOR**

The Judicial Mediation program offers mediation of complex civil litigation by a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

The Honorable David J. Ballati
The Honorable Anne Bouliane
The Honorable Ellen Chaitin
The Honorable Robert L. Dondero
The Honorable Ernest H. Goldsmith
The Honorable Harold E. Kahn
The Honorable Patrick J. Mahoney
The Honorable Tomar Mason

The Honorable James J. McBride
The Honorable Kevin M. McCarthy
The Honorable John E. Munter
The Honorable Ronald Quidachay
The Honorable A. James Robertson, II
The Honorable John K. Stewart
The Honorable Mary E. Wiss

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program and deliver a courtesy copy to Dept. 212. A preference for a specific judge may be indicated. The court Alternative Dispute Resolution Program Administrator will facilitate assignment of cases that qualify for the program.

Note: Space is limited. Submission of a stipulation to judicial mediation does not guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
(415) 551-3876

10/07 (ja)

CASE NUMBER: CGC-08-471/3759  MERIDIAN INVESTMENT MANAGEMENT, INC., VS. MERID

## NOTICE TO PLAINTIFF

A Case Management Conference is set for

|  |  |
|---|---|
| **DATE:** | **AUG-29-2008** |
| **TIME:** | **9:00AM** |
| **PLACE:** | **Department 212** |
|  | **400 McAllister Street** |
|  | **San Francisco, CA  94102-3680** |

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.

However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 212 twenty-five (25) days before the case management

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

### ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A MANDATORY SETTLEMENT CONFERENCE OR TRIAL. (SEE LOCAL RULE 4)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]

Superior Court Alternative Dispute Resolution Coordinator
400  McAllister Street, Room 103
San Francisco, CA  94102
(415) 551-3876

See Local Rules 3.6, 6.0 C and 10 D re stipulation to commissioners acting as temporary judges

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. d.   The party or parties are willing to participate in *(check all that apply)*:

(1) ☐  Mediation

(2) ☐  Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)

(3) ☐  Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)

(4) ☐  Binding judicial arbitration

(5) ☐  Binding private arbitration

(6) ☐  Neutral case evaluation

(7) ☐  Other *(specify):*

e. ☐  This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.

f. ☐  Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.

g. ☐  This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption):*

**11. Settlement conference**

☐  The party or parties are willing to participate in an early settlement conference *(specify when):*

**12. Insurance**

a. ☐  Insurance carrier, if any, for party filing this statement *(name):*

b.   Reservation of rights:   ☐ Yes   ☐ No

c. ☐  Coverage issues will significantly affect resolution of this case *(explain):*

**13. Jurisdiction**

Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.
☐ Bankruptcy   ☐ Other *(specify):*
Status:

**14. Related cases, consolidation, and coordination**

a. ☐  There are companion, underlying, or related cases.
(1) Name of case:
(2) Name of court:
(3) Case number:
(4) Status:
☐  Additional cases are described in Attachment 14a.

b. ☐  A motion to   ☐ consolidate   ☐ coordinate   will be filed by *(name party):*

**15. Bifurcation**

☐  The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**16. Other motions**

☐  The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

**CASE MANAGEMENT STATEMENT**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Discovery**

   a. ☐ The party or parties have completed all discovery.

   b. ☐ The following discovery will be completed by the date specified (describe all anticipated discovery):

| Party | Description | Date |
|---|---|---|

   c. ☐ The following discovery issues are anticipated (specify):

**18. Economic Litigation**

   a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.

   b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed (if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):

**19. Other Issues**

   ☐ The party or parties request that the following additional matters be considered or determined at the case management conference (specify):

**20. Meet and confer**

   a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court (if not, explain):

   b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following (specify):

**21. Case management orders**

   Previous case management orders in this case are (check one): ☐ none ☐ attached as Attachment 21.

**22. Total number of pages attached (if any):** _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____  ▶ _____
(TYPE OR PRINT NAME)                          (SIGNATURE OF PARTY OR ATTORNEY)

_____  ▶ _____
(TYPE OR PRINT NAME)                          (SIGNATURE OF PARTY OR ATTORNEY)

                                             ☐ Additional signatures are attached

CM-110 [Rev. January 1, 2007]

**CASE MANAGEMENT STATEMENT**

Page 4 of 4

EXHBIT 2

# Meridian US Real Estate Fund I & II

February 22, 2003

*VIA FACSIMILE*

To the Board of Directors
of each of:

Sutter Street Corp.
450 Sansome Street Corp.
225 Friend Street Corp.
Dry Creek Road Corp.
320 Interlocken Parkway Corp.
555 West Beech Street Corp.
Summit Ridge Corp.
   (collectively, the "U.S. Property Companies")

c/o Mr. Ken K. Tailo
   Mr. Carl Stegerwald
   Mr. Shimshon Antar
Meridian Investment Management, Inc.
One Main Street
Concord, Massachusetts 01742

c/o Mr. Ken K. Tailo
   Mr. Carl Stegerwald
   Mr. Shimshon Antar
Meridian Investment Management, Inc.
450 Sansome Street
Suite 150
San Francisco, California 94104

c/o Mr. Domenic Borriello
1209 Orange Street
Wilmington, DE 19801

     *Re:  Meridian Investment Management Company, Inc. ("Meridian Management")*

Gentlemen:

Meridian Real Estate Investment Company and Meridian Real Estate Investment Company II (collectively, the "Shareholders") are the owners of all of the outstanding non-voting common stock of each of the U.S. Property Companies. Such non-voting common stock represents 98.5% of the total equity of each of the U.S. Property Companies.

Together with our own shareholders, we are very disappointed and dissatisfied with the performance of the real property investments of the U.S. Property Companies. We believe that much of the poor performance of these investments is attributable to unsatisfactory and generally superficial analysis by Meridian Management at the time it recommended these investments. In this connection, the materials and information the Shareholders were furnished when Meridian Management proposed the investments were not consistent with the underwriting and analytical materials prepared and furnished in similar contexts by truly institutional-grade, professional real estate advisors. We are also very disappointed with the property-level management and supervision of the investments in question, and the U.S. Property Companies themselves, by Meridian Management and its affiliates. Such performance overall has resulted, and continues to result, in severe losses to the Shareholders and the investors who own the capital stock of the Shareholders.

We believe that the challenges of the current real estate marketplace are such that it is in the best interests of the U.S. Property Companies and the Shareholders to engage new, professional advisors and service providers for each of the U.S. Property Companies, advisors and managers who are capable of meeting such challenges and performing in accordance with customary industry standards without the inherent conflicts of interest to which Meridian Management and its affiliates are subject. Based upon the performance of Meridian Management and its affiliates to date, we do not have confidence in the ability of Meridian Management to guide the U.S. Property Companies satisfactorily through these difficult times.

In accordance with their terms, the obligations and rights of the Shareholders under original Advisory Agreements between Meridian Management and the Shareholders have effectively been delegated and assigned to the U.S. Property Companies. New Asset Management Agreements (the "AM Agreements") to which Meridian Management and the respective U.S. Property Companies are parties replaced the earlier Advisory Agreements in 1998, 1999, 2000 and 2001, depending on the U.S. Property Company in question. The new AM Agreements expire in 3 years by their terms unless renewed in writing; some of these Agreements likely already have expired.

Property Management Agreements (the "PM Agreements") between Pacific Property Management. LLC, an affiliate of Meridian Management, and the respective U.S. Property Companies were signed in 1999, 2000 and 2001, depending on the U.S. Property Company in question.

The Shareholders hereby put you on notice that the Board of Directors of each U. S. Property Company (comprised of Mr. Tailo, Mr. Stegerwald, Mr. Antar and/or Mr. Borriello) has a fiduciary duty continually to examine whether the existing agreements with Meridian Management and its affiliates are in the best interests of each respective U. S. Property Company and to monitor and enforce the performance of Meridian Management and its affiliates under those Agreements. Given that (a) the advisor and the property manager, as applicable, in all of the AM Agreements and all of the PM Agreements is Meridian Management or an affiliate; (b) that Meridian Management or an affiliate owns all the voting common stock of the U.S. Property Companies (meaning that neither the AM Agreements nor the PM Agreements are at arm's length); (c) the Shareholders have incurred substantial investment losses; and (d) the Shareholders have lost confidence in the current arrangements, we do not believe the Board of Directors of any of the U. S. Property Companies, consistent with its fiduciary duty to such Company and the Shareholders, can permit the current situation to continue.

The Shareholders respectfully insist that the Board of Directors of each U. S. Property Company immediately act in the best interests of the U.S. Property Companies and the Shareholders to cause a termination of each AM Agreement and each PM Agreement and to negotiate and execute new asset management and property management agreements with independent third parties, containing industry standard provisions and being satisfactory to the Shareholders. (The PM Agreements are terminable by the U.S. Property Companies upon 60 days' notice. The Board of Directors of each U.S. Property Company should require such Company's officers to give immediate notice of termination of these Agreements and put out the property management role in each for competitive bid by independent third party service providers. In no case should an AM or a PM Agreement be renewed.)

Pending the completion of such actions, the Board of Directors of each U. S. Property Company should carefully monitor the performance under each Agreement with Meridian Management and its affiliates and demand performance in accordance with customary industry standards, including, without limitation, conforming financial, asset and property reporting management reporting to industry standards (which standards we believe would be implied and held applicable, in the context of the

3

magnitude of these investments). Additionally, during such period, payments under the existing AM Agreements between the respective U.S. Property Companies and Meridian Management should be reduced to the level of fees agreed to in the previous Advisory Agreements among Meridian Real Estate Finance Company and Meridian Real Estate Finance Company II (collectively, the "Finance Companies"), the Shareholders and Meridian Management.

In addition, we respectfully demand that the Board of Directors of the respective U.S. Property Companies cause each of such Companies' officers to take the following actions immediately in order to protect the interests of such Companies and the Shareholders:

1.    Commence discussions with the respective lenders with respect to their accepting deeds-in-lieu of foreclosure for the 186 Lincoln Street and 450 Sansome Street properties and cease any additional capital spending on such projects.

2.    Cease making and repay all existing inter-company loans among the U.S. Property Companies.

3.    Engage a Big Four certified public accounting firm to audit for the past 5 fiscal years (*i.e.*, 1998 through 2002) all payments that have been made by the Shareholders, the Finance Companies and/or the U.S. Property Companies to Meridian Management and its affiliates and all distributions that have been made during those years to the shareholders of the U.S. Property Companies.

4.    Institute payments on U. S. Property Company debt to the Finance Companies in accordance with the principles outlined in the respective Private Placement Memoranda used to place the investments in the Shareholders and the Finance Companies.

5.    Initiate regular cash flow distributions on a reasonable basis to the shareholders of the U.S. Property Companies that own performing assets.

If the Boards of Directors of the U.S. Property Companies fail or refuse immediately to take the indicated actions, the Shareholders will be forced to commence shareholder derivative legal actions to assure that the best interests of the U.S. Property Companies are served.

4

If you have any questions about these matters, your counsel should contact either Don Knight (404-572-4764) or Alan Albright (404-572-4756) of the law firm of King & Spalding LLP, our counsel.

Very truly yours,

**MERIDIAN REAL ESTATE INVESTMENT COMPANY**

By: _____
    Mohammad Jassem Al-Sager
    Chairman and Managing Director

**MERIDIAN REAL ESTATE INVESTMENT COMPANY II**

By: _____
    Mohammad Jassem Al-Sager
    Chairman and Managing Director

5

EXHBIT 3

1    Robert Mittelstaedt (State Bar No. 060359)
      ramittelstaedt@jonesday.com
2    Shawn Hanson (State Bar No. 109321)
      shanson@jonesday.com
3    David C. Kiernan (State Bar No. 215335)
      dkiernan@jonesday.com
4    JONES DAY
      555 California Street, 26th Floor
5    San Francisco, CA  94104
      Telephone:    (415) 626-3939
6    Facsimile:    (415) 875-5700

7    Attorneys for Defendant
      MERIDIAN REAL ESTATE INVESTMENT
8    COMPANY II

9

                 UNITED STATES DISTRICT COURT

10

                 NORTHERN DISTRICT OF CALIFORNIA

11

12

13 **MERIDIAN INVESTMENT**
    **MANAGEMENT, INC., a Delaware**
    **Corporation**

14

15             **Plaintiff,**

      **v.**

16

17 **MERIDIAN REAL ESTATE**
    **INVESTMENT COMPANY II, a**
    **Cayman's Island Company**

18

           **Defendant.**

19

|  |  |
|---|---|
| | **Case No. C 08-02542 MMC** |
| | **DECLARATION OF DAVID C. KIERNAN IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** |
| | **DATE:**     **July 11, 2008** |
| | **TIME:**     **9:00 a.m.** |
| | **CTRM:**    **7, 19th Floor** |
| | **JUDGE:**  **Hon. Maxine M. Chesney** |

20       I, David C. Kiernan, declare as follows:

21       1.     I am a member of the State Bar of California and an associate with Jones Day,

22 counsel of record for Defendant Meridian Real Estate Investment Co. II in the above-styled

23 action.  I make this declaration in support of Defendant's Motion to Dismiss and Memorandum of

24 Points and Authorities in support thereof.  The following is based on my personal knowledge,

25 and, if called as a witness, I could and would competently testify thereto.

26       2.     Attached as Exhibit 1 is a true and correct copy of the Complaint and Exhibit A

27 attached thereto dated March 28, 2008 and filed in this Court on May 20, 2008 as an attachment

28 to Defendant's Notice of Removal (Docket No. 1).

1        3.      Upon my request, Defendant Meridian Real Estate Investment Company II sent

2 me a copy of the letter from Defendant Meridian Real Estate Investment Company II and

3 Meridian Real Estate Investment Company to the Board of Directors of Sutter Street Corp., 450

4 Sansome Street Corp., 225 Friend Street Corp., Dry Creek Road Corp., 320 Interlocken Parkway

5 Corp., 555 West Beech Street Corp., and Summit Ridge Corp. (c/o Plaintiff Meridian Investment

6 Management, Inc.) (February 22, 2003) referred to in Paragraph 14 of the Complaint filed in this

7 action.  Exhibit 2 is a true and correct copy of that letter.

8        I declare under penalty of perjury under the law of the United States that the foregoing is

9 true and correct.  Executed June 4, 2008.

10

11                By:    /S/  David C. Kiernan

12                        David C. Kiernan

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28