William J. Ziegler (SBN 041203)
Douglas A. Applegate (SBN 142000)
**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
101 Montgomery Street, 27th Floor
San Francisco, California 94104
Phone: (415) 979-0500
Fax:    (415) 979-0511

Attorneys for Plaintiff
Meridian Investment Management, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MERIDIAN INVESTMENT MANAGEMENT, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>MERIDIAN REAL ESTATE INVESTMENT COMPANY II, a Cayman Islands company; and DOES 1 through 10, inclusive,<br><br>Defendants, | Case No. C 08-02542 MMC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Date:  July 11, 2008<br>Time:  9:00 am<br>Dept:  Courtroom 7, 19th Floor<br><br>Hon. Maxine M. Chesney |

**I.**

**<u>Introduction</u>**

In seeking to dismiss plaintiff's complaint, defendant Meridian Real Estate Investment Company II ("FUND II") ignores the applicable Massachusetts law, misstates the terms of the parties' contractual agreement, incorrectly concludes that the actions of its chief executive officer are the same as the actions of its Board of Directors, and incorrectly asserts that the right to "supervise" is tantamount to a right to maliciously interfere with another's work. FUND II also misapplies the statute of limitations that governs plaintiff's defamation claim – a

claim that in any event arises from an ongoing course of conduct that continues to this day. As we demonstrate below, plaintiff's complaint is properly pled and should be allowed to proceed; and if there are any infirmities in plaintiff's complaint, they can be quickly cured by an amendment.

## II.

## Brief Factual Summary

Plaintiff Meridian Investment Management, Inc. ("MIM") agreed to provide real estate management services to FUND II in exchange for a commission based upon the total fund assets that it managed – a portfolio that was anticipated to reach approximately $200 million. (Complaint at ¶6.)  After a written management agreement was signed, and after MIM had invested approximately $75 million in fund assets to purchase three parcels of California commercial property, FUND II appointed a new chief executive officer to head its operations, Mr. Al-Shihabi.  Mr. Al-Shihabi wanted to break the management agreement and hire a new manager to oversee the fund's investments.  (Complaint at ¶11.)

In his zeal to get rid of MIM and break the management agreement that the parties had signed, Mr. Al-Shihabi:

- Tried to lure a key officer and employee away from MIM; (Complaint at ¶12.)
- Subjected MIM to time-consuming and commercially unreasonable audits and information requests; (Complaint at ¶13.)
- Threatened MIM with meritless but costly litigation; (Complaint at ¶14.)
- Held a shareholder's meeting without providing advance notice to MIM, where he falsely accused MIM of mismanaging the fund; (Complaint at ¶19.)
- Prevented MIM from securing a $5 million debt forgiveness that would have allowed MIM to continue making all payments on all three of the real estate parcels that had been purchased for investment; (Complaint at ¶¶10 and 16.)
- Demanded that the main investment be deeded to the mortgage holder without any payment; (Complaint at ¶16.)

- Without commercially reasonable grounds, insisted that MIM sell the remaining assets. (Complaint at ¶¶18 and 21-22.)

Through these acts, Mr. Al-Shihabi ultimately succeeded in forcing MIM to prematurely sell the real estate investments that it had overseen and was managing, preventing MIM from earning the management fee that the parties had envisioned when the signed the management agreement. (Complaint at ¶45.) And he continued to disparage MIM to the shareholders of FUND II.

### III.

### Analysis

**A.  Massachusetts Law Governs This Case.**

According to FUND II, it "expressly" had the "unlimited right to direct whether and when to dispose of which of its real estate assets, for whatever reasons." (Defendant's Supporting Points and Auth. ("P&As") at p. 9:10-12.) In essence, FUND II states that it had the right to terminate its relationship with MIM "at will." Accordingly, it claims, it can have no liability to MIM.

In the next section below, we demonstrate that FUND II has grossly misstated the parties' agreement. But just as importantly, *even if* FUND II had the contractual right to terminate the agreement "at will" as it claims, under Massachusetts law, it still could not terminate the agreement solely to deprive MIM of the management fee that it reasonably anticipated under the parties' management agreement. For as plaintiff has alleged, FUND II acted out of spite and in a commercially unreasonable fashion in deciding to force the sale of the FUND II assets, and it thus breached the implied covenant of good faith and fair dealing that was incorporated into the parties' management agreement under Massachusetts law.

First, FUND II concedes that Massachusetts law governs this action. (Defendant's P&As at p. 7, fn. 4; see also Complaint, Exhibit A at ¶8.7 ["This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts excluding that body of law pertaining to conflicts of law."].) But it argues that Massachusetts law and

California law are the same, and thus in its motion to dismiss, FUND II relies solely upon California law.

FUND II is incorrect. Massachusetts law prevents a party from terminating a contract out of spite, or out of a desire to avoid paying the compensation that it had previously agreed to pay, even when the contract expressly provides for termination at will. *Fortune v. NCR*, 373 Mass. 96, 364 N.E.2d 1251 (Mass. 1977) demonstrates this law.

In that case, plaintiff Fortune worked for defendant NCR under a salesman's contract that provided for the payment of commissions based, in part, upon the number of cash registers delivered to Mr. Fortune's territory while he was acting as a salesman for NCR. The contract was terminable "at will." 364 N.E.2d at 1255. Shortly after placing a $5 million order, but before the machines were delivered, NCR terminated the contract. Mr. Fortune argued that NCR had timed the termination in an effort to avoid paying his full commission, and thus that NCR acted in bad faith. NCR countered that its contract expressly gave it the right to terminate the agreement at any time. The Massachusetts Supreme Court sided with Mr. Fortune, holding:

> We hold that NCR's written contract contains an implied covenant of good faith and fair dealing, and a termination not made in good faith constitutes a breach of the contract.

364 N.E.2d at 1255-1256.

The court further explained that it was merely applying the longstanding rule that applied to all commercial contracts in Massachusetts (and not just to employment contracts) that:

> in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract their exists an implied covenant of good faith and fair dealing.

*Id*. at 1257. And lastly, the court noted that whether or not NCR had acted in bad faith was a question of fact for the jury, to be determined based upon a "jury determination of NCR's motives in terminating his services." *Id.*, 364 N.E.2d at 1255. The jury's determination that NCR's motive was to escape the payment of commissions that the plaintiff had reasonably expected (and bargained for) was thus sufficient to support its verdict that NCR had violated

1  the covenant of good faith and fair dealing.

2  So too here.  Plaintiff has alleged FUND II's bad motives, and alleged in detail that its
3  actions were part of a concerted attempt to break the management agreement so that it could
4  replace MIM with another manager of its choice.  Plaintiff further alleges that FUND II forced
5  MIM to sell the fund's assets in order to deprive plaintiff of the management fee that it
6  reasonably expected and bargained for pursuant to the agreement.  Under Massachusetts law,
7  the complaint thus states a valid cause of action for breach of the implied covenant of good
8  faith and fair dealing -- a covenant described by the Massachusetts Supreme Court as follows:

> In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . .

11  *Fortune, supra,* 364 N.E.2d at 1257.  See also, *Chokel v. Genzyme Corporation*, 449 Mass.
12  272, 867 N.E.2d 325, 329 (Mass. 2007).

14  **B.  Defendant Misconstrues the Management Agreement.**

15  FUND II's motion to dismiss is further misplaced, in claiming that it "expressly" had
16  the "unlimited right to direct whether and when to dispose of which of its real estate assets, for
17  whatever reasons."  FUND II has misconstrued the parties' agreement.  *Nowhere* in the
18  agreement is FUND II given authority to direct that any property be sold.  (Indeed, if the
19  agreement did so "expressly" allow, defendant would have cited exact language to that effect,
20  rather than relying on an a reading of the document "as a whole," and relying on the "intent"
21  and the "contemplation of the parties.  Defendant's P&A's at p. 9:15-18 )  Instead, what the
22  agreement actually states is that "subject to the supervision of the ***Board*** . . . [MIM] shall, on
23  behalf of the [FUND II], identify appropriate properties for sale, negotiate the price and other
24  terms of sale and supervise the documentation related to the consummation of such sales."
25  (Complaint, Exhibit A at ¶2.7.)  That did not give defendant the "unlimited right" to direct
26  liquidation – if made in bad faith.  Indeed, the language of the agreement that defendant cites
27  does not say the word "unlimited" at all, and nowhere can defendant imply any such lack of
28  limitation.  And at the very best, there appears to be a factual dispute over whether any such

limitations existed.

Plaintiff asserts that FUND II's input into investment decisions was expressly limited to *supervision*, and it was expressly limited to supervision by the *Board*. Mr. Al-Shihabi was not empowered by the parties' agreement to act unilaterally in dealing with MIM; and his efforts to break the parties' management agreement, to interfere with MIM's work, to expose MIM to costly but commercially unreasonable audits and information requests, and to threaten MIM with costly litigation hardly falls within any normal definition of "supervision." FUND II therefore, without supervision or approval by the board, unilaterally took the actions complained of in the complaint, through Mr. Al-Shihabi, to escape from its contractual provisions to plaintiff.

In taking the steps that he did, Mr. Al-Shihabi stepped beyond any authority given to FUND II by the parties' agreement. And because he did so in an attempt to get rid of MIM and circumvent the management fee that FUND II had contractually agreed to pay, FUND II acted to deprive plaintiff of the benefit that plaintiff reasonably expected to receive from the parties' management agreement. In short, plaintiff has properly asserted that FUND II breached the covenant of good faith and fair dealing under Massachusetts law.

### C. FUND II's Intentional Efforts Caused MIM to Lose its Management Fee.

In its moving papers, FUND II next engages in a semantic exercise about whether MIM was "forced" to relinquish or sell all of the real estate parcels that the parties had invested in. Contradicting its earlier claim that FUND II had the "express right" to direct the sale of any investments, FUND II next observes that the investments were all structured so that full management authority resided with MIM. Thus, FUND II posits, since the final decision rested with MIM, MIM could not have been *forced* to do anything.

FUND II's arguments sound like those of the landlord who, facing a constructive eviction lawsuit, claims that the tenant wasn't *forced* to move out merely because the landlord disconnected the tenant's water and turned off the heat. After all, if the tenant had a lease that gave him a contractual right to stay, he therefore could not have been *forced* to leave.

Defendant's semantics fail to persuade that plaintiff has not stated a cause of action here. The test is whether FUND II took steps to prevent MIM from receiving the benefits of the parties' management agreement, under Massachusetts law. Whether MIM was "forced" to sell all of the property investments, or whether it was *coerced* into selling the property, or whether FUND II's conduct simply increased MIM's expenses or reduced its benefit is immaterial. As the Massachusetts Supreme Court recently noted:

> The purpose of the implied covenant is to ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract [citation], and that, when performing the obligations of the contract, the parties "remain faithful to the intended and agreed expectations" of the contract [citation]. A breach occurs when one party violates the reasonable expectations of the other.

*Chokel v. Genzyme Corp.*, *supra*, 867 N.E.2d at 329.

And threatening a party with meritless litigation in an attempt to secure a modification of an existing agreement is precisely the type of conduct that deprives the threatened party of the benefits that it reasonably expected. As the Restatement of Contracts notes:

> The obligation of good faith and fair dealing extends to the assertion, settlement and litigation of contract claims and defenses. See, e.g., §§ 73, 89. The obligation is violated by dishonest conduct such as conjuring up a pretended dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts. It also extends to dealing which is candid but unfair, such as taking advantage of the necessitous circumstances of the other party to extort a modification of a contract for the sale of goods without legitimate commercial reason.

Restatement (Second) of Contracts § 205(e) (ALI 2008).

It is, of course, true – as FUND II notes – that MIM could have refused to sell the properties, forced FUND II's hand, and then defended the litigation that FUND II's lawyers would have pursued, all while continuing to manage the fund while facing the regular disruptions and interference foisted by FUND II's commercially unreasonable audits and information requests. Likewise it is true that a tenant with no water or heat does not have to succumb to the landlord's coercive tactics and vacate the premises, but instead can pursue injunctive relief from a court to get the utilities reinstated.

But contrary to FUND II's implication, the aggressor does not get to make the election. MIM was well within its rights to accede to FUND II's demands, and then seek relief in this

1 lawsuit.

2

### D. FUND II Misstates the Applicable Statute of Limitations.

In its moving papers, FUND II states that the statute of limitations on all slander claims is one year. But FUND II is mistaken; under Massachusetts law, which applies here, the statute of limitations for slander or libel is three years. (Mass. Gen. Laws Ann. 260 § 4.) Under California law, the statute of limitations for slander against a *business* (as opposed to an individual) is two years. *Guess v. Superior Court*, 176 Cal.App.3d 473, 478-479 (1986).

In the complaint, MIM focused on FUND II's slander occurring at a shareholder's meeting in August of 2003 – a slander that MIM learned about more than two years ago. Accordingly, if California law applies to determine the statute of limitations, the claim as it is currently pled cannot stand. However, FUND II's disparaging and untrue statements about MIM have are part of an ongoing course of conduct, and are evidenced by e-mails sent and received through last year.

MIM can accordingly amend, so that it has a viable cause of action *regardless* of which state's law governs. Thus, it is with the topic of amendment that we close this brief.

### E. IM Can Amend To Cure Any Shortcomings

Plaintiff has prepared a proposed amended complaint to cure any possible shortcomings raised by FUND II's motion. (See Decl. of Douglas A. Applegate, Exhibit A.) In addition to reciting FUND II's ongoing slander of MIM's business – continuing through last year – the amended complaint also demonstrates that FUND II had contractually committed to keep its funds under MIM's management for a minimum period of five years, unless: (a) MIM breached the agreement or became insolvent, or (b) MIM recommended to the shareholders that an earlier termination was in the best interest of the Fund and the shareholders voted, by a two-thirds majority, to liquidate the fund early.

Neither of these events happened. Thus, MIM was wholly justified in expecting to receive a management fee for a minimum five-year period. By instead insisting that FUND II

1 sell all of its assets early, so that there was nothing left for MIM to manage, FUND II plainly 2 violated the parties' agreement.

3 The proposed amended complaint is attached to the declaration which accompanies this 4 opposition brief.

## IV.
## Conclusion

For the foregoing reasons, FUND II's motion to dismiss should be denied. In the alternative, plaintiff MIM should be granted leave to file an amended complaint.

Respectfully submitted,

Dated: June 20, 2008    **SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**

              /s/ Douglas Applegate
             Douglas A. Applegate

             Attorneys for Plaintiff
             Meridian Investment Management, Inc.

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

**DECLARATION RE ATTESTATION OF SIGNATURE**

(N.D. Gen. Order 45, section X)

I, George M. Lee, declare as follows:

1. I am over the age of 18, and am not a party to this action. My business address is 101 Montgomery Street, 27th Floor, San Francisco, California 94104. I have personal knowledge of the facts stated herein, and if called as a witness, could competently testify thereto.

2. I am/will be responsible for filing the foregoing document electronically, in compliance with the Local Rules, general orders, policies and procedures of this District. I hereby attest that I have on file all holograph signatures for any signatures indicated by a "conformed" signature (/s/) within this e-filed document.

3. An original copy of this document bearing such signatures will be maintained and remain available for inspection and/or production to the court if ordered.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 20$^h$ day of June, 2008, at San Francisco, California.

By: /s/ George M. Lee
George M. Lee
SEILER EPSTEIN ZIEGLER & APPLEGATE LLP