1  William J. Ziegler (SBN 041203)
   Douglas A. Applegate (SBN 142000)
2  **SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
   101 Montgomery Street, 27th Floor
3  San Francisco, California 94104
   Phone:  (415) 979-0500
4  Fax:      (415) 979-0511

5  Attorneys for Plaintiff
   Meridian Investment Management, Inc.

6

7

8

9                  UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11

12

13  MERIDIAN INVESTMENT                      Case No.  C-08 02542 MMC
    MANAGEMENT, INC., a Delaware
    Corporation
14
                                            **FIRST AMENDED COMPLAINT**
15           Plaintiff,

16      vs.                                 **DEMAND FOR JURY**

17  MERIDIAN REAL ESTATE INVESTMENT
    COMPANY II, a Cayman Islands company,
18
             Defendant,
19

20       COMES NOW plaintiff MERIDIAN INVESTMENT MANAGEMENT, INC. and

21  alleges against the defendants as follows:

22                                   I.

23                                 PARTIES

24       1.  Plaintiff  MERIDIAN  INVESTMENT  MANAGEMENT,  INC.  ("MIM")  is  a

25  Delaware corporation with its principal place of business in Redwood City, California, duly

26  registered and licensed to conduct business in the State of California.

27       2.  Defendant  MERIDIAN  REAL  ESTATE  INVESTMENT  COMPANY  II

28  ("FUND II") is a company organized in the Cayman Islands.

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

II.

JURISDICTION AND VENUE

3.   Jurisdiction is appropriate in this court under 28 U.S.C. §1332 because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and is between a citizen of a state and a citizen of a foreign state.  Venue is appropriate in this court because the defendant's conduct was directed at plaintiff within this district and was intended to, and did, cause harm to plaintiff in this district.

III.

FACTUAL BACKGROUND

4.   Since its formation in 1997, MIM has been engaged in the business of investment management, primarily focusing upon the creation of investment funds and the acquisition, management and sale of real estate investments for those investment funds.  The investors in the various investment funds that MIM has created and managed have predominantly been Kuwaiti nationals and Kuwaiti companies and organizations.  Until the events described below, MIM and its principals had strong ties with the Kuwaiti investment community.

5.   In early 1998, MIM began to work with the Al-Mal Kuwaiti Company to create an investment fund, for which MIM would acquire and manage a real estate portfolio.  (The Al-Mal Kuwaiti Company was renamed in May of 2005 as the Al-Mal Investment Company.)  In 2000, MIM worked with Al-Mal Kuwaiti Company to create a second investment fund, again for which MIM would acquire and manage a real estate portfolio.  That new fund was successfully formed, and was comprised of an investment arm – the defendant in this lawsuit, FUND II – as well as a financing arm, a sister Cayman Islands Company named Meridian Real Estate Finance Company II.  FUND II also encompasses three subsidiary corporations that were formed pursuant to, and under the protection of California law, to hold the real estate investments that MIM was to manage.

6.   The Al-Mal Kuwaiti Company was the sponsor and lead investor for FUND II, and in or about March of 2000, acting in its role as the incorporator and fund sponsor of FUND II, Al-Mal Kuwaiti Company circulated a Private Placement Memorandum ("PPM") to all of the

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

shareholders, outlining in more detail the investment approach, the minimum term for FUND II and other key provisions regarding the management and operation of FUND II. A true and correct copy of the PPM is attached hereto as **Exhibit A**.

7. MIM was expressly disclosed in the PPM as the company that would manage FUND II's real estate portfolio; and the PPM further identified MIM's San Francisco address, and included as well a brief bio for a key member of MIM's management and financial advisory team. Accordingly, all of the shareholders of FUND II knew that MIM would be the manager for FUND II. Indeed, the bulk of the Kuwaiti investment community knew that MIM would be the manager for FUND II.

8. On or about September 1, 2000, after FUND II was successfully formed and funded, MIM and FUND II entered into a written contract, pursuant to which MIM agreed to provide investment advice and management services to FUND II in exchange for a fee, predominantly measured on an annual basis at 1% of the value of the FUND II assets under management. A true and correct copy of the Advisory Agreement ("the Contract") is attached hereto as **Exhibit B**. As was customary, the Chairman of FUND II's sponsor, the Al-Mal Kuwaiti Company, was also appointed as the chief executive and managing director of FUND II. That director was named Mohammad Jassem Al-Sager. An additional officer of the Al-Mal Kuwaiti Company, Mr. Abdul Mohsen Hayat, was appointed as the second managing director for FUND II.

9. Pursuant to the Contract and the parties' intentions, MIM located three attractive real estate investment opportunities in California – one located at 450 Sansome Street in San Francisco, and the other two located in San Diego, California. MIM arranged for three separate corporations to be formed to hold ownership of each of the three properties, and arranged for the real estate acquisition financing, and for the management of the properties, both to provide cash flow through the collection of rents, and also to provide value growth through the appreciation of equity in the three properties.

10. The property at 450 Sansome Street in San Francisco was successfully purchased on or about September 21, 2000 for slightly more than $44 million. That property predominantly

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

consisted of class-A commercial office leasehold space in the downtown financial district area of San Francisco.  The two San Diego properties were purchased in late 2000 or early 2001 for more than $25 million.  Accordingly, by early 2001, MIM was actively managing assets for FUND II valued at more than $75 million, and earning a contractual fee in excess of $750,000 annually.

11. In the months following September 11, 2001, the prevailing leasehold rates for class-A commercial office space in San Francisco plummeted.  To ride out the market downturn, MIM arranged for a restructuring of the loan on the 450 Sansome Street property to: (a) extend the term of the loan; (b) convert the payments on the loan to interest only payments; (c) reduce the principal amount of the loan with a $1 million pay down, drawn from the equity available in the San Diego properties; and (d) further reduce the principal by approximately $5 million in loan forgiveness by the lender.

12. With this restructuring, the 450 Sansome Street property would have generated in rents sufficient cash to cover all property expenses, including taxes, maintenance and debt service.  The San Diego properties continued to generate sufficient income to meet all expenses, and also continued to appreciate in value.

13. On or about July 6, 2002, following a change in the management of the Al-Mal Kuwaiti Company, a Kuwaiti national named Mutasem Al-Shihabi was appointed to replace Mr. Abdul Mohsen Hayat as the second managing director of FUND II.  Mr. Al-Shihabi almost immediately sought to replace MIM as the manager of FUND II.

14.  Within days of being appointed as a managing director of FUND II, Mr. Al-Shihabi telephoned Carl Stegerwald, one of MIM's shareholders and officers, and a key member of MIM's management and financial advisory team.  On behalf of FUND II, Mr. Al-Shihabi tried to entice Mr. Stegerwald to leave MIM and personally take over the management of the FUND II assets, at a reduced management fee.

15.  When Mr. Stegerwald refused, Mr. Al-Shihabi retaliated against FUND II and actively tried to cause damage to MIM's business.

16. As noted above in paragraph 11, MIM was able to negotiate with the lender for the

450 Sansome Street property a forgiveness of nearly $5 million in debt. FUND II, however, acting through Mr. Al-Shihabi, refused to accept the new loan terms and insisted that if the lender would not provide an additional $3 million in loan forgiveness, that instead of rewriting the loan, MIM must instead deed the property to the lender and accept the loss. Mr. Al-Shihabi's refusal to accept the $5 million in debt forgiveness that MIM had negotiated was motivated by spite and and lacked any reasonable business purpose.

17. MIM explained, time and again, that the market downturn in San Francisco was temporary, and was the product of a confluence of an economic downturn caused by the attacks of September 11, 2001, and the implosion of the dot.com real estate bubble. Time and again, MIM explained that the prudent approach was to restructure the loan on the terms that MIM had negotiated, and to ride out the economic cycle.

18. Without reasonable grounds, and again as part of Mr. Al-Shihabi's effort to retaliate against MIM, FUND II further sent two consultants from Kuwait to MIM's offices to subject MIM to a costly, time consuming investigation of MIM's management of the fund. FUND II also hired another real estate investment firm with offices in California, Legg Mason Real Estate Services, and endeavored to have them replace MIM as FUND II's manager. That attempt ultimately failed, because under section 8.2 of the Contract, the management agreement was not assignable without MIM's consent. But Mr. Al-Shihabi nonetheless insisted that Legg Mason Real Estate Services continue to monitor MIM's management.

19. FUND II further caused a shareholders meeting to be called and conducted on August 25, 2003, but FUND II and Mr. Al-Shihabi intentionally failed to notify MIM of the shareholder's meeting. At the meeting, Mr. Al-Shihabi provided a false description of the financial condition and profit prospects for FUND II. Relying upon the false information provided to them by Mr. Al-Shihabi, the shareholders of FUND II voted to instruct MIM to sell the entire FUND II portfolio.

20. Thereafter, Mr. Al-Shihabi, acting in the scope and course of his agency as the managing director of FUND II, again refused the restructuring of the loan on 450 Sansome Street that MIM had arranged, and again rejected MIM's advice to ride out the real estate cycle.

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1   Instead, Mr. Al-Shihabi instructed and directed MIM to deed the 450 Sansome Street property

2   to the lender, in lieu of foreclosure.

3       21. On March 30, 2004, at FUND II's direction, and under the threat of meritless but

4   costly litigation, MIM deeded the 450 Sansome Street to the lender.

5       22. As MIM had predicted and explained, the San Francisco real estate market quickly

6   rebounded, and within less than 2 years, the property at 450 Sansome Street was worth double

7   what FUND II had purchased it for.  Through its vindictive strategy and its ill-conceived effort

8   to punish MIM, FUND II foisted upon its shareholders a loss of investment profit of more than

9   $50 million.

10       23. In the year following the loss of the 450 Sansome Street property, MIM also sold, at

11   FUND II's direct instruction and without commercially reasonable grounds, the two San Diego

12   properties.

13       24. Following the sale of the two San Diego properties, on or about January 31, 2006,

14   Mr. Al-Shihabi, joined by Mr. Al-Sager, both acting in the scope and course of their agency as

15   managing directors of FUND II, instructed MIM in writing to pay $2 million from FUND II's

16   California accounts to retire a liability that had been incurred by the Al-Mal Kuwaiti Company

17   on other United States' investments unrelated to FUND II.  At that time, both managing

18   directors informed MIM that the Al-Mal Kuwaiti Company would replenish the $2 million to

19   FUND II.  But Al-Mal Kuwaiti Company failed to replenish the $2 million.

20       25. Moreover, the $2 million in expenses that MIM was instructed to pay from

21   FUND II's accounts were caused by Mr. Al-Shihabi's interference with other investments held

22   by the Al-Mal Kuwaiti Compay and, if the expenses had been properly booked and the

23   $2 million repaid to FUND II, the resulting loss to the Al-Mal Kuwaiti Company would have

24   reflected poorly on Mr. Al-Shihabi.  Mr. Al-Shihabi accordingly wished to falsely book the

25   expenses to FUND II, and to then blame MIM for the business losses that FUND II would then

26   incur.

27       26. MIM refused Mr. Al-Shihabi's request that the $2 million in expenses be

28   improperly booked to FUND II instead of shown as an accounts receivable still owing to

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1    FUND II from the Al-Mal Kuwaiti Company.  Final financial statements and audit reports for

2    FUND II and FUND II's subsidiary companies were thereafter prepared by outside auditors at

3    the California office of Ernst & Young.  MIM provided all of the information and records

4    requested by Ernst & Young and cooperated in the preparation of the financial statements and

5    audit reports, which were completed in the period between May 30, 2006 and October 2, 2006,

6    lacking only the signature of Mr. Al-Shihabi.

7        27. Mr. Al-Shihabi, however, refused to sign the financial statements or audit reports,

8    and declined to provide information requested by Ernst & Young concerning the origin and

9    allocation of the $2 million in expenses that had been incurred by Al-Mal Kuwaiti Company,

10   but paid from the California accounts of FUND II.  This refusal to cooperate in the preparation

11   of the final accounting statements has continued to this day, despite regular demand by

12   Ernst & Young for FUND II's cooperation and Mr. Al-Shihabi's signature on the financial

13   statements and audit reports.

14       28. The shareholders of FUND II have thus been left in the dark and without audited

15   statements on the fund's operations for more than two years.

16                                        IV.

17                            FIRST CAUSE OF ACTION

18                            BUSINESS DEFAMATION

19       29. Plaintiff incorporates by reference, as though set forth in full, the allegations of

20   paragraphs 1 through 28, above.

21       30. Continuously until the present time, on specific dates and times known only to

22   FUND II but on occasions within the last year, when the shareholders of FUND II have

23   inquired about the status of the fund, Mr. Al-Shihabi, acting in the scope and course of his

24   agency as the managing director of FUND II, has falsely blamed MIM for the inaction and

25   inability to close the operations of FUND II.  These shareholders of FUND II have ceased

26   doing business with MIM with respect to other investments.

27       31. The statements by Mr. Al-Shihabi were known by Mr. Al-Shihabi to be false at the

28   time he made them, and were made with the intention of harming MIM's business and of

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

1    harming the relationship between MIM and the investment community in Kuwait.    As

2    previously noted, for more than ten years, MIM has enjoyed a strong relationship with the

3    investment community in Kuwait, and has relied upon the business of Kuwaiti nationals,

4    companies and organizations that wished to invest in real estate within the United States.  That

5    business has been irreparably damaged.

6        32. Moreover, on March 6, 2007 FUND II, acting by and through Pinky Anand, an

7    assistant to Mr. Al-Shihabi, sent an e-mail to the auditors at the California office of

8    Ernst & Young, LLP, copied to an attorney at King & Spalding and to an employee of Legg

9    Mason Real Estate Services, blaming MIM for the inaction and inability to close the operations

10   of FUND II.  A true and correct copy of the e-mail is attached hereto as **Exhibit C**.  FUND II

11   copied this e-mail to Legg Mason Real Estate Services to tarnish MIM's reputation in the real

12   estate management industry.

13       33. The e-mail falsely suggests that MIM gave bad advice to FUND II, falsely states

14   that FUND II had attempted to correct the misallocation of the $2 million payments with MIM,

15   and falsely stated that MIM was the cause of FUND II's "inability to sign the financial

16   statement as directors."  FUND II knew that the e-mail was false when it was sent.  Indeed, for

17   many months, FUND II had rebuffed all communications and all attempts by MIM and

18   Ernst & Young, LLP to provide the information needed for the final reports.  In contrast, MIM

19   had long before provided all of the information that Ernst & Young requested.  Contrary to the

20   e-mail's assertions, the delay was not caused in any way by MIM.

21       34. Within the last year, the Al-Mal Kuwaiti Company experienced another change in

22   management following a hostile takeover, and Mr. Al-Sager was replaced as the company's

23   Chairman by Loay Jasim Al-Kharafi.  As was customary, the chairman of Al-Mal Kuwaiti

24   Company became one of the two managing directors of FUND II, replacing Mr. Al-Sager in

25   that capacity.   Unfortunately, Mr. Al-Kharafi has continued to disparage MIM and has

26   continued to blame MIM for the inaction and inability to close the operations of FUND II.

27       35. Indeed, on May 28, 2008, Mr. Al-Kharafi, acting on behalf of FUND II and acting

28   in the course and scope of his duties as the Chief Executive Officer and Managing Director of

1  FUND II as well as in the course and scope of the Al-Mal Kuwaiti Company's agency as the

2  sponsor of FUND II, caused an article to be published in ALQABAS, a Kuwaiti newspaper of

3  general circulation, widely read by the investment community in Kuwait, and posted in the

4  Internet where it is available for viewing worldwide, and where it is regularly read by Kuwaiti

5  nationals who are living in the United States. Mr. Al-Kharafi provided extensive quotes for the

6  article, and purported to explain to FUND II's investors the $2 million payment from FUND II

7  that Mr. Al-Sager had instructed MIM to make.

8      36. In his comments, which were intended for publication in ALQABAS and which

9  were included in a press announcement made by Mr. Al-Kharafi on the steps of the Kuwaiti

10  parliament, Mr. Al-Kharafi accused Mr. Al-Sager of "hiding … two million dollars from"

11  FUND II, and he stated that Mr. Al-Sager had been referred for criminal prosecution. He

12  further identified MIM as the manager of FUND II and stated that MIM "had also been referred

13  to the general prosecutor." Again speaking as the Chief Executive Officer and Managing

14  Director of FUND II and speaking on FUND II's behalf, Mr. Al-Kharafi stated that "when we

15  received the company [through the hostile takeover], we assigned an accounts auditor to

16  perform a comprehensive evaluation and audit of all funds and assets and to reinventory and

17  isolate each. The violations were discovered by this process. The Meridian violation was the

18  first to be discovered, but there are others."

19      37. Mr. Al-Kharafi's comments were spoken with the understanding and intention that

20  they would be rebroadcast in print form by newspapers of general circulation, including in

21  ALQABAS. And the comments were indeed rebroadcast in print form, and also rebroadcast

22  through the Internet. A true and correct copy of the article published in ALQABAS on May

23  28, 2008, translated into English by a professional translator, is attached hereto as **Exhibit D**.

24      38. The statement by Mr. Al-Kharafi that MIM "had also been referred to the general

25  prosecutor" was intended to charge MIM of engaging in criminal conduct, and the statement

26  was understood by those who heard it as well as those who read it as a statement that MIM had

27  committed a crime. The statement was false, and was known by Mr. Al-Kharafi to be false.

28  MIM did not commit any crime.

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

39. The statements that the FUND II Board "assigned an accounts auditor to perform a comprehensive evaluation and audit of all funds and assets and to reinventory and isolate each" and that the "violations were discovered by this process," combined with the reference to the $2 million payment from FUND II as the "Meridian violation" was intended to, and necessarily did disparage MIM in the conduct of its business and profession, and was intended to, and was understood by all who read and heard it of accusing MIM of having acted negligently, dishonestly and fraudulently.  These statements were false and were known by Mr. Al-Kharafi to be false when he made them.  Indeed, the only audits of FUND II that were done at the behest of FUND II's Managing Directors were those arranged by Mr. Al-Shihabi, as discussed in paragraph 18 above, which occurred years before MIM was instructed to make the $2 million payment from FUND II's accounts.  Also, it was MIM who refused Mr. Al-Shihabi's attempt to book the $2 million payment as an expense incurred by FUND II, rather than as an accounts receivable owed to FUND II by Al-Mal Kuwaiti Company; and it was MIM who disclosed the transaction to the accountants at Ernst & Young, who were hired by MIM to prepare the final accounting statements for FUND II.  Indeed, after the hostile takeover of the Al-Mal Kuwaiti Company had been completed, it was MIM who provided the new management, including Mr. Al-Kharafi, with information on the status of FUND II, including information about the $2 million payment that MIM had been instructed to make from the accounts of FUND II.

40. The accusations set forth in Exhibit D were made by Mr. Al-Kharafi, speaking on behalf of FUND II and speaking as the Chief Executive Officer and Managing Director of FUND II, in an attempt to explain the poor performance of FUND II and to falsely blame that poor performance on MIM's mismanagement.  FUND II and all who acted on its behalf knew that their false statements about MIM would damage MIM and cause a severe impact to MIM's business, which they knew was conducted in California.  FUND II and all who acted on its behalf intended to damage plaintiff in California and their false statements did indeed cause damage to Plaintiff in California.

41. The statements were intended to, and necessarily did, disparage MIM in the conduct

of its business and profession, and the statements were understood by all who heard them as impugning MIM's competence, professionalism, ethical standards and acumen.

42. The audience who heard FUND II's defamatory statements included many investors who had previously retained MIM's services and who likely would have, but for FUND II's defamatory remarks, continued to retain MIM's services for the foreseeable future.

43. However, in response to the false remarks and representations recited above, the shareholders of FUND II and the bulk of the investment community in Kuwaiit were induced to, and did, cease doing business with MIM and they moved their investment assets from California. Following the publication of the falsehoods stated above, MIM's business has plummeted, causing a loss to Plaintiff in a sum exceeding $7 million and to be proved at trial.

44. In making the false statements described above, FUND II acted to intentionally cause harm to MIM, and FUND II acted with malice, oppression and fraud. Accordingly, in addition to actual damages, Plaintiff should be awarded punitive damages, by way of punishment and example.

WHEREFORE, Plaintiff prays for relief as set forth below.

## V.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.    For general damages according to proof in a sum exceeding $7 million;

2.    For punitive damages in an amount sufficient to punish defendant's wrongful conduct and provide an example and a deterrence, according to proof at trial;

3.    For costs of suit; and

4.    For such other and further relief as the court deems just and proper.

Dated: July 25, 2008

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**

By:_____/s/_____
          Douglas A. Applegate

Attorneys for Plaintiff
Meridian Investment Management, Inc.

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: July 25, 2008

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP


By:_____/s/_____
            Douglas A. Applegate

Attorneys for Plaintiff
Meridian Investment Management, Inc

Private Placement Memorandum
Dated March 20, 2000

Memorandum **No.**

## $50,000,000 (U.S.)

# MERIDIAN REAL ESTATE FUND II

Meridian U.S. Real Estate Fund II (the "Fund") consists of two Cayman Islands corporations, _____ ("Debt Co.") and _____ ("Equity Co."), with registered offices in the Cayman Islands. The Fund has been organized to invest in real estate assets in the US and select non-US markets The Fund's Investment Manager will be Meridian Investment Management, Inc., a U.S. corporation based in San Francisco, California and Concord, Massachusetts. See "Investment Manager and Local Subadvisers".

The Fund is offering to non-U.S. investors ("Investors") up to 10,000 of its units (the "Units"), each Unit consisting of three common shares of Debt Co. and two common shares of Equity Co., at a price of $5,000 per Unit. The Fund will seek to raise a minimum of $30 million. The minimum investment for individual Investors is $250,000 and for institutional Investors is $1,000,000. As of the date of this Memorandum neither Debt Co. nor Equity Co. has made any investments.

The purchase of Units offered hereby entails a number of significant risks. Because of these risks, Units should be purchased only by persons able to bear the risk of and withstand the total loss of their investment. See "Risk Factors."

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, AND ARE NOT OFFERED IN THE UNITED STATES OF AMERICA OR ITS TERRITORIES OR POSSESSIONS, NOR TO UNITED STATES PERSONS, INCLUDING U.S. RESIDENTS, U.S. CITIZENS AND CORPORATIONS OR OTHER ENTITIES ORGANIZED UNDER THE LAWS OF THE UNITED STATES OR ANY STATE THEREOF. THE FUND IS COMPOSED OF TWO COMPANIES CONSTITUTED UNDER THE LAWS OF THE CAYMAN ISLANDS AND REGISTERED AS EXEMEPT COMPANIES IN THE CAYMAN ISLANDS; THEREFORE, NEITHER THE UNITS NOR THE COMMON SHARES UNDERLYING SUCH UNITS MAY BE OFFERED OR SOLD TO, OR HELD BY, PERSONS RESIDENT OR DOMICILED IN THE CAYMAN ISLANDS. THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

**SPONSOR**
**Al-Mal Kuwaiti Company**
**P.O. Box 26308**
**Safat 13124**
**Kuwait**

EACH PURCHASER OF THE SECURITIES OFFERED HEREBY IN MAKING ITS PURCHASE WILL BE DEEMED TO HAVE MADE CERTAIN ACKNOWLEDGMENTS, REPRESENTATIONS AND AGREEMENTS AS SET FORTH IN THE UNIT PURCHASE AGREEMENT ATTACHED HERETO AS EXHIBIT A. THE INTERESTS HAVE NOT BEEN REGISTERED WITH, RECOMMENDED BY OR APPROVED BY THE--UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY OTHER FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY, NOR HAS ANY SUCH COMMISSION OR REGULATORY AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

---

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAN41NATION OF THE FUND AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THE OFFERING IS BEING MADE ON THE BASIS OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY DECISION TO PURCHASE SECURITIES IN THE OFFERING MUST BE BASED ON THE INFORMATION CONTAINED HEREIN.

---

THIS PRIVATE PLACEMENT MEMORANDUM HAS BEEN PREPARED BY THE FUND AND IS BEING PROVIDED ON A CONFIDENTIAL BASIS TO A LIMITED NUMBER OF NON-U. S. INVESTORS FOR INFORMATIONAL USE SOLELY IN CONNECTION WITH THE CONSIDERATION OF THE PURCHASE OF THE SECURITIES OFFERED HEREBY. ITS USE FOR ANY OTHER PURPOSE IS NOT AUTHORIZED.

---

THE SECURITIES OFFERED HEREBY ARE SUBJECl'TO RESTRIC'NONS ON TRANSFER. SEE "DESCRIPTION OF DEBT CO. AND EQUITY CO. COMMON SHARES - RESTRICTIONS ON TRANSFER."

---

AN INVESTMENT IN THE FUND INVOLVES INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF PRINCIPAL. THERE CAN BE NO ASSURANCE THAT THE FUND's INVESTMENT OBJECTIVES WILL BE ATTAINED. SEE "RISK FACTORS."

---

THE CONTENTS OF THIS PRIVATE PLACEMENT MEMORANDUM ARE NOT TO BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OWN ATTORNEY, BUSINESS ADVISER AND TAX ADVISER AS TO LEGAL, BUSINESS OR TAX ADVICE.

---

EACH PERSON RECEIVING THIS PRIVATE PLACEMENT MEMORANDUM ACKNOWLEDGES THAT (A) SUCH PERSON HAS BEEN AFFORDED AN OPPORTUNITY TO REQUEST FROM THE FUND AND TO REVIEW ALL ADDITIONAL INFORMATION CONSIDERED BY IT TO BE NECESSARY TO VERIFY THE ACCURACY OF OR TO SUPPLEMENT THE INFORMATION HEREIN, (B) IT HAS NOT RELIED ON THE SPONSOR OR ANY PERSON AFFILIATED WITH THE SPONSOR IN CONNEC71ON V= ITS INVESTIGATION OF THE ACCURACY OF SUCH INFORMATION OR ITS INVESTMENT DECISION AND (C) NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION CONCERNING THE FUND OR THE SECURITIES OFFERED HEREBY OTHER THAN AS CONTAINED HEREIN AND INFORMATION GIVEN BY DULY AUTHORIZED OFFICERS AND EMPLOYEES OF THE FUND IN CONNEC71ON V= THE PROSPECTIVE D4VESTORS'EXANIINATION OF THE FUND AND THE TERMS OF THE OFFERING, AND, IF *GIVEN* OR MADE, SUCH OTHER INFORMATION OR REPRESENTATIONS SHOULD NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE FUND.

---

THIS PRIVATE PLACEMENT MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, TO ANY PERSON IN ANY JURISDICTION WHERE SUCH OFFER OR SOLICITATION WOULD BE UNLAWFUL. DELIVERY OF THIS PRIVATE PLACEMENT MEMORANDUM AT ANY TIME DOES NOT IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF OR THE DATE SPECIFICALLY RELATED TO SUCH INFORMATION AS SET FORTH HEREIN.

---

THE DISTRIBUTION OF THIS PRIVATE PLACEMENT MEMORANDUM AND THE OFFER OR SALE OF THE SECURITIES MAY BE RESTRICTED BY LAW IN CERTAIN =SDICTIONS. PERSONS INTO WHOSE POSSESSION THIS PRIVATE PLACEMENT MEMORANDUM COMES MUST INFORM THEMSELVES ABOUT, AND OBSERVE, ANY SUCH RESTRICTIONS, AND NEITHER THE FUND NOR THE SPONSOR SHALL HAVE ANY RESPONSIBILITY THEREFOR.

---

NO ACTION HAS BEEN TAKEN BY THE FUND THAT WOULD PERMIT AN OFFERING OF THE SECURITIES OR THE CIRCULATION OR DISTRIBUTION OF THIS PRIVATE PLACEMENT MEMORANDUM OR ANY OFFERING MATERIAL IN RELATION TO THE FUND OR THE INTERESTS IN ANY COUNTRY OR IMSDICMON WHERE ACTION FOR THAT PURPOSE IS REQUIRED.

---

THE SECURITIES OFFERED HEREBY MAY NOT BE OFFERED TO MEMBERS OF THE PUBLIC IN THE CAYMAN ISLANDS.

---

This Private Placement Memorandum may not be copied or reproduced in whole or in part nor may it be distributed or any of its contents disclosed to anyone other than the prospective Investors to whom it is being provided, without the prior written consent of the Fund.

All references herein to "dollars" or "$" are to United States Dollars.

# MERIDIAN U.S. REAL ESTATE FUND

### Table of Contents

Page

INTRODUCTION .................................................... 1

THE FUND ........................................................ 2

FUND SPONSOR ................................................... 3

INVESTMENT MANAGER AND LOCAL SUBADVISERS.................... 3

INVESTMENTS ..................................................... 5
Financial Criteria ............................................... 7
Product Type ................................................... 8
Location ....................................................... 8
Property Holding Period ........................................ 9
Property Management .......................................... 9

BUSINESS STRUCTURE ........................................... 10
Fund Size ..................................................... 10
The Offering .................................................. 10
Fund Term .................................................... 10
Fund Closing Date ............................................. 11
Payment of Subscription Price; Installments ...................... 11
Pre-Investment Period Investment Proceeds ...................... 11
Fund Structure ................................................ 12

MANAGEMENT STRUCTURE ...................................... 12

ALLOCATIONS AND DISTRIBUTIONS ............................... 13
Holding Companies ............................................ 13
Equity Co ..................................................... 13
Debt Co . ..................................................... 14
Pre-Investment Returns ........................................ 14

FEES AND COSTS ................................................ 14
Organizational and Investment Strategy Costs .................... 14
Placement Fee ................................................. 14
Management Fee ............................................... 14
Incentive Fee .................................................. 15
Other Costs and Expenses ...................................... 15

CONFLICTS OF INTEREST .................................................…………………………….. 15

DESCRIPTION OF DEBT CO. AND EQUITY CO. COMMON SHARES ................... 16
    Dividend Rights ...............................................…………………………………... 16
    Voting Rights ......................................………………………………………... 16
    Redemption of Shares .............................................…………………………... 16
    Other Provisions: .........................................…………………………………... 16
    Restrictions on Transfer ..................................:...........…………………………... 16
    Competitive Advantage .............................................………………………... 17

RISK FACTORS ............................................……………………………... 17
No Operating History .........................................………………………………... 18
General Operating Risks and Local Economic Conditions .............. ........................ 18
Dependence on Targeted Markets ............................................…………………... 18
Reliance on Key Personnel .....................................……………………………... 18
Risks of Unspecified Investments ....................................………………………... 18
Conflicts of Interest ..............................................………………………………... 19
Lack of Control Over Holding Companies ...............................……………………... 19

TAX CONSIDERATIONS ...........................................……………………………... 19
Tax Treatment of Investors ...........................……………………………………... 19
The Tax Treatment of Fund ....................……………………………………... 20

AUDITORS ...............................................…………………………………........... 21

ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT .............……………………... 21

REPORTING ............................................……………………………………... 22

HOW TO SUBSCRIBE ..........................................………………………………... 22

Exhibits
    Exhibit A - Unit Purchase Agreement

Private Placement Memorandum

Dated May 1, 2000

# MERIDIAN U.S. REAL ESTATE FUND II

## INTRODUCTION

Meridian U.S. Real Estate Fund II (the "Fund") is comprised of two Cayman Islands corporations, <u>Meridian Real Estate Finance Company</u> ("Debt Co.") and <u>Meridian Real Estate Investment Company</u> ("Equity Co.") (collectively, the "Companies"). It has been organized to engage in the business of investing and managing real estate assets in US and select non-US markets. See "Investments" herein.

The Fund is offering up to 10,000 of its Units, each Unit consisting of three common shares of Debt Co. and two common shares of Equity Co., at a price of $5,000 per Unit. Of the purchase price of $5,000 per Unit, $3,000 will be allocated to Debt. Co. and $2,000 will be allocated to Equity Co. The minimum investment by an individual Investor is $250,000 and by an institutional Investor is $1,000,000. See "Business Structure -- The Offering" herein.

The net proceeds of the sale of the Units will be used by the Companies to acquire direct and indirect equity and debt interests in real properties. The income from operations before depreciation, if any, and the net proceeds derived from resale of such properties will, subject to the payment of the Companies' debts and expenses, be available for dividends and distributions on the common shares of Debt Co. and Equity Co. The net proceeds from the resale of any investment which is disposed of within 36 months of the closing of this offering may be reinvested by the Fund rather than distributed.

The sponsor of the Fund is Al-Mal Kuwaiti Company ("Al-Mal"), a Kuwaiti company whose principal address is P.O. Box 26308 , Safat 13124, Kuwait (the "Sponsor"). See "Fund Sponsor" herein.

Neither the Units nor the underlying common shares of the Companies have been registered under the United States Securities Act of 1933, as amended (the "Securities Act"), or the securities laws of any state thereof, and neither the Units nor the underlying common shares are being offered in the United States of America or its territories or possessions or to United States persons, including residents and citizens of the United States or any of its territories or possessions and corporations or other entities organized under the laws of the United States or any political subdivision thereof. Neither the Units nor the underlying common shares of the Companies may be sold, transferred, pledged or otherwise disposed of for a period of one year after the completion of the offering. Thereafter, the Units may be transferred and the underlying common shares of Debt Co. and Equity Co. may be separately transferred, subject to certain restrictions. See "Description of Debt Co. and Equity..Co.

Common Shares -- Restrictions on Transfer" herein. Each purchaser of the Units will be required to represent and warrant that such purchaser is not acting on behalf of a United States person and that he will not reoffer or resell the Units or the underlying common shares of the Companies in the United States or its territories or possessions or to United States persons, wherever located unless: (i) the transaction is registered under the Securities Act and any applicable state securities laws, or (ii) an exemption from such registration is available and the Fund or the applicable Company has received an opinion of its counsel to such effect satisfactory to it.

There is no market for the Units or the underlying common shares of the Companies or any other securities of the Fund and there can be no assurance that a market will develop. The Fund does not intend to register the Units or the shares of the Companies under the Securities Act or the securities laws of any other jurisdiction. However, the Sponsor has agreed to use its best efforts to locate a qualified buyer for any holder who desires to sell its Units or the underlying common shares of the Companies.

Qualified non-U.S. persons and entities desiring to purchase Units should complete the Unit Purchase Agreement accompanying this Memorandum and return it, together with a check or wire transfer for the purchase price, to Al-Mal Kuwaiti Company, P.O. Box 26308, Safat 13124, Kuwait. See "How to Subscribe" herein.

The Units and the shares of the Companies will be issued in registered form. Investors seeking confidentiality may make arrangements for the shares to be purchased and held in the name of a nominee but for the benefit of the Investor.

Bank of Butterfield International (Cayman) Ltd. will act as the Fund's and Companies' Administrator and as Registrar and Transfer Agent for the Units and the common shares of the Companies.

## THE FUND

The Fund is not a distinct legal entity but consists of Debt Co. and Equity Co., two Cayman Islands companies. The Fund has been established as a vehicle through which non- U.S. Investors (individual and institutions) can invest in U.S. and non-US real estate.

The Fund will seek to take advantage of the opportunities offered to investors in the select real estate markets by assembling a portfolio of real estate investments designed to generate attractive returns to Investors. Equity Co. intends to invest primarily by holding non-voting common stock in separate special purpose U.S. corporations ("Holding for US investments Companies") which will in turn invest in existing income-producing real properties located in select U.S. markets. For investments in non-US locations the structure of the owning entity will be consistent with the most tax efficient structure allowed in a particular jurisdiction. Equity Co. may also invest in other entities that invest in real estate of the type in which the Fund would invest ("Target Funds") or make mortgage loans to third parties. Debt Co. intends primarily to make non-recourse mortgage loans to such Holding Companies secured by the read property owned by each such Holding Company. Debt Co. may also make loans directly to Equity Co. The Holding Companies may also obtain mortgage loans from third parties, in which event Debt Co.'s

loans would likely be subordinated. The Fund's investment portfolio will be designed to provide current cash return to Investors and also to offer gains from capital appreciation due to anticipated market growth and value enhancement management.

The Fund intends to identify, acquire and manage real estate assets in reliance upon the advice of an investment manager (the "Investment Manager"), which will be Meridian Investment Managenent, Inc. ("Meridian"). The Investment Manager will identify local subadvisers as required and will use its long standing relationships with local, regional and national real estate market experts, real estate owners and developers to execute investment strategies. See "Investment Manager and Local Subadvisers." The Investment Manager also will own all of the voting stock of each of the Holding Companies. See "Business Structure - Fund Structure."

The Board of Directors of each of Debt Co. and Equity Co. is empowered to make all decisions with respect to the management and operation of their respective Companies, and, therefore, the Fund. The Memorandum and Articles of Association of each of Debt Co. and Equity Co. provide that the Board of Directors will consist of five (5) members selected by the shareholders. Of the **five** initial members of each Company's Board, two (2) are common to both Debt Co. and Equity Co. and have been selected by the Sponsor. The remaining directors will be elected following the closing of this offering. See "Management Structure."

## FUND SPONSOR

Al-Mal is the sponsor of the Fund. Al-Mal is an investment management firm located in Kuwait City, Kuwait which was established in 1980. Recently a new group of investors joined Al-Mal increasing its capital strength and developing a new strategic direction for the company. Al-Mal includes institutional investors, high net-worth individuals and prominent merchant families from the Kuwait region as its investors. Al-Mal is organized as a holding company with a strategy to develop interests in local real-estate, local equities and fund management.

## INVESTMENT MANAGER AND LOCAL SUBADVISERS

Meridian, a U.S. corporation with offices at 44 Montgomery Street, San Francisco, California and One Main Street, Concord, Massachusetts, has been selected by the Boards of Directors of the Companies as the Fund's Investment Manager. Debt Co. and Equity Co. will each enter into an advisory agreement with Meridian.

Meridian's real estate management services will be under the leadership of Mr. Carl Stegerwald, Senior Vice President, Real Estate. Mr. Stegerwald brings 25 years of real estate development, engineering and construction experience to Meridian and the Fund. Mr. Stegerwald lead the investment activities for Meridian US Real Estate Fund which closed on February 1, 1998. This fund to date has invested capital in select US growth markets and has exceeded the return targets to Investors. Prior to joining Meridian, Mr. Stegerwald served for 17 years as

a corporate real estate manager for a large high-technology corporation. Mr. Stegerwald is a graduate of Villanova University, College of Engineering, and received a masters degree with honors in Business Administration from Northeastern University. Mr. Stegerwald is also a Registered Professional Engineer in the State of Maine and the Commonwealth of Massachusetts.

Under the investment management agreements between Meridian and the Companies (the "Advisory Agreements"), Meridian will establish and maintain a real estate investment program which is consistent with the Fund's overall investment objectives (see "Investments"). Meridian will use its own experience in the real estate markets and will call upon an established network of local subadvisers and other strategic real estate resources to capitalize on changing market conditions with the goal of maximizing returns to the Fund. Meridian will gather and evaluate information with respect to local and national conditions and trends, comparative values, and economic and financial data affecting the Companies' real estate investments and their investment policies and objectives; identify, investigate and evaluate various real estate properties available for acquisition; furnish advice and make recommendations with respect to the acquisition thereof; negotiate options to acquire such properties when requested by Equity Co. and assign options acquired by Meridian to Equity Co. Meridian will also provide asset management services to the Companies, including review and approval of operating and maintenance budgets, capital improvement budgets and schedules for improvements; monitoring of borrower compliance with the terms of mortgage loans; and assistance in the negotiation of significant leases. Meridian will also maintain strategic management plans for each property relating to such issues as refinancing, property taxes and sales strategies. In addition, Meridian with the assistance of local subadvisers will on behalf of Equity Co. select property managers of the respective real estate properties of Equity Co. and will negotiate the terms pursuant to which such managers are retained. Finally, Meridian will administer the day-to-day real estate investment operations of the Fund, provide the office space, equipment and personnel required for the foregoing and will perform such other administrative functions as the Companies and Meridian may from time to time agree.

As compensation for the services performed under the Advisory Agreements, Meridian will receive an investment management fee. See "Fees and Costs -- Management Fee."

Meridian will pursue investment opportunities for the Companies identified through its own market sources as well as those identified by local subadvisers with whom Meridian will form strategic relationships. The subadvisers may assist Meridian in locating, analyzing and monitoring the investments. The network of local subadvisers is one which Mr. Stegerwald has developed and has worked with in the past. All of these subadvisers are real estate service companies. They have an in-depth knowledge of each of their respective local and regional markets from a historical, current and future direction standpoint. They have access to investment opportunities often before they reach the general investment public. Many of these subadvisers have worked with Meridian on the initial fund and have been major contributors to it's success.

These diverse real estate companies, as well as others that may be engaged in the future by the Investment Manager, are expected to provide maximum exposure of the Fund to the selected real estate markets.

For their services, the local subadvisers will receive normal commercial brokerage fees which are typically to be paid by the seller of real estate.

The Fund expects to retain Torto Wheaton Research ("TWR") with offices in Boston, Massachusetts, to provide economic forecasts of targeted U.S. markets. TWR is a well-known real estate research and investment advisor. The firm is largely comprised of economists who model and analyze the largest U.S. urban centers for each of the major property types. TWR monitors and forecasts demand, supply, values, net operating income yields, net operating income returns and vacancy rates.

The Investment Manager will use the information from TWR to carefully review and monitor its investment strategy. The fees of TWR incurred prior to the time the Fund is fully invested will be paid one-half by the Fund as an organizational and investment strategy cost. (See "Fees and Costs.")

## INVESTMENTS

The investment objectives of the Fund are to generate current distributable cash flow to the Investors, and to maximize the long term appreciation of the assets of the Fund, all in a manner consistent with the preservation and protection of invested capital.

As the U.S. economy and other European and Latin American economies continue to be strong the Investment Manager has targeted select markets in which to invest because of strong fundamentals in those markets which lead to appreciation in real estate values. The Investment Manager believes this type of investment offers unique opportunities to investors who wish to place a portion of their investment portfolio in the real estate markets.

The Fund intends for the Companies' capital to be invested primarily through the "direct investments" in existing or to be developed income producing, commercial office buildings, industrial space and residential apartments which can be acquired or developed for costs which are estimated to produce the targeted Investor returns. "Direct investments" are those in which a Holding Company, either directly or through a joint venture, holds title to the real property. Direct investments are distinguished from "non-direct investments" in which Equity Co. would invest in mortgage loans to such third parties. The Fund will generally seek properties that are generating a positive cash flow after debt service and are located in one of several strong markets in the U.S, Europe, and Latin America. See "Location" below.

The Fund intends to make "direct investments" either as the sole investor in a property or through co-investment in properties. Co-investments may be in the form of a partnership, limited liability company or joint venture with a third party which has special interest in or knowledge of the property or because the capital required in purchasing the relevant property is too large for the Fund to prudently commit to a single investment.

Through "direct investments" Debt Co. will primarily make non-recourse mortgage loans to each Holding Company secured by the property held by such Holding Company. Third parties may also make mortgage loans to such Holding Companies secured by the same property, in which event the loan from Debt Co. would be subordinated to the third party debt.

In "non-direct investments" Equity Co. will invest a portion of its capital in mortgage loans. The loans would be secured by properties of the type in which Equity Co. plans to hold equity interests. The mortgage loans may have an equity participation or Equity Co. may purchase loans as a means to access the value of the underlying property.

It is anticipated that only a portion of the total capital raised in this offering may be invested in these "non-direct investments" in the aggregate. The Investment Manager considers that the flexibility to make such different types of investments will assist in achieving the Fund's investment objectives. Equity Co. may obtain a portion of the funds for a non-direct investment through a loan from Debt Co. During the period between capital calls and investment in real estate interests (Pre-Investment Period), the Companies will be placing Fund cash in short-term non-real estate investments, as described under "Business Structure – Investment Proceeds."

**Financial Criteria:** The Fund intends to raise capital from Investors for investments in the real estate markets. It is anticipated that the Fund will be fully invested by the end of the two-year period following the initial closing of the Fund. The Investment Manager intends to invest initial in existing income-producing properties that can be purchased at or below replacement cost. Acquiring existing properties below replacement cost protects investors from vulnerability to competition from new construction. As the markets continue to expand and demand for space increases, the lack of new space allows property rents and property values to increase. Speculative construction generally commences when rents are at values which support the high cost of new construction. The Fund intends to seek specific property types, in selected markets, which are priced at levels which allow for growth in current returns and also gains to Investors through capital appreciation of the property.

The Investment Manager also intends on investing in new development projects. Investing in new development projects, in select markets, allows investors to take advantage of an imbalance between supply and demand. Bringing a new product to market in a relatively short period of time can produce substantial returns if market and delivery risks are managed.

Each property will be evaluated based on its ability to meet the Fund's investment objectives. Properties will be analyzed as to their ability to generate positive current returns rather than relying solely on future returns. In order to create a balanced and diversified portfolio the Fund will seek to invest in multiple properties. To achieve this no more than 25% of the Fund's total capital raised in this offering will be invested in any one property under normal circumstances. If the Investment Manager believes a particular property presents such a uniquely attractive opportunity that the Investment Manager feels an investment greater than this amount is warranted, it will present the proposed investment to the Board of Directors of Equity Co. and/or Debt Co., as applicable, for approval.

As noted above, the Investment Manager may commit in the aggregate up to 15% of the total capital raised in this offering in "non-direct" investments, such as investments in and mortgage loans other than loans secured by properties in which a Holding Company has an interest, with the approval in each instance of the Board of Directors of Equity Co. It is not the intent of the Fund to invest in public equity real estate investment trusts ("REIT's") or collateralized mortgage-backed securities.

The Fund intends to leverage Investors' contributed capital with third party mortgage financing. Each investment is expected to be leveraged, with the amount of third party leverage expected to be between 60% and 80% of total cost of the asset. Total cost includes all acquisition costs, reserves for tenant improvements, capital improvements, leasing commissions and vacancy.

**Product Type:** The Fund intends to establish a balanced and diversified portfolio of real properties. To achieve this portfolio, the Fund intends to maintain a flexible approach in reviewing the opportunities for investment. The Fund intends to invest in: commercial Class A and B office buildings; industrial warehouse, distribution, light manufacturing and R&D properties; and multifamily apartment buildings. The Investment Manager believes this wide range of product types should allow the Fund to be opportunity driven and to invest in the best product types available in a particular market.

The fund will invest in existing income producing properties, existing properties which require facility upgrade or renovation and projects involving new construction.

**Location:** The Investment Manager believes the location of a property remains the most important factor to be considered in real estate investment. To achieve a diversified portfolio, the Fund will invest in several strong U.S. markets and non-US markets.

The Investment Manager will work with local subadvisers to invest in those markets which demonstrate current market strength and have reasonable projections for continued strength. Key determinants for market strength include: population changes', changes in number of jobs and types of job; past and current vacancy rates; absorption of space; new construction starts; property sales figures; and rent changes. These factors and others are analyzed to determine current and future market strength. It is the intent of the Investment Manager to invest Fund capital in markets which have the best potential for
growth and to time these investments to achieve maximum benefit to the Fund.

Generally, the Investment Manager intends to search for investments in the following markets:

Boston, Massachusetts
Tampa, Florida
West Palm Beach, Florida
Seattle, Washington
Denver, Colorado
Oakland, California
San Francisco, California
Southern California
Asia
Europe i.e. Czech Republic
Latin American, i.e. Brazil

Based on current and forecasted market information, these markets are projected to provide good growth in operating income as well as capital appreciation. They show beneficial correlations between real estate demand and supply during the Fund's life, generally favourable vacancy rates and market sizes which are large enough to sustain a critical mass of activity.

In addition to these target markets, the Investment Manager may also consider other markets for investment if attractive opportunities are presented. It is important that properties be selected in several different markets. This will enable the Fund to establish a diverse portfolio which will help manage the overall risk to the Fund and also enable the Fund to capitalize on the strongest segments within those markets.

**Property Holding Period:** The holding period for each investment will vary depending on the profile of each investment and the remaining term of the Fund. However, the average property holding period to achieve the overall investment objectives is estimated to be 3 to 5 years.

An investment may be sold in a shorter period of time than that discussed above if the Investment Manager determines such an earlier sale is in the best interest of the Fund. In no case shall an investment be held for a period longer than the remaining duration of the Fund, unless the Board of Directors of Debt Co. and/or Equity Co., as the case may be, consents to the holding and the Boards of Directors of both companies consent to a corresponding extension of the Fund's term. The net proceeds from the resale of an investment which is disposed of within 36 months following the closing of this offering may be reinvested by the Fund.

**Property Management:** It is the intent of the Investment Manager to engage property managers to provide the on-site management for each direct equity investment. Property managers will be selected on the basis of experience, cost and financial reporting capability. Good property management is critical to achieving low operating costs and minimal capital investments. Investment Manager reserves the right to consolidate certain operations of property management to ensure tight control and efficiencies in operation.

The Investment Manager will provide asset management services to the Companies pursuant to the Advisory Agreement. These services include review and approval of operating and maintenance budgets, capital improvement budgets and schedules, monitoring of borrower compliance with terms of mortgage loans, and assistance in the negotiations of significant leases for the properties. The Investment Manager will maintain strategic management plans for each property relating to such issues as refinancing, property taxes and sales strategies.

# BUSINESS STRUCTURE

**Fund Size:** The Fund will seek to raise a minimum of $30 million from Investors, and subscriptions will be accepted to a maximum of $50 million. If, however, subscriptions of less than $30 million are received, the Sponsor may in its discretion nevertheless determine to proceed with the Fund's investment plan if the Sponsor determines that the amount actually received is sufficient to operate the Fund.

**The Offering:** The minimum investment for each Investor will be $250,000 for individuals and $1,000,000 for institutions, with the subscription price payable in three equal installments Investment in the Fund will be in the form of a Unit. Each Unit will consist of three common shares of Debt Co. and two common shares of Equity Co. Neither the Units nor the common shares underlying the Units may be sold, transferred, pledged or otherwise disposed of for a period of one year after the Fund Closing Date. Thereafter, Units may be transferred and the underlying common shares of the Companies may be separately transferred subject to restrictions imposed as a result of U.S. securities and tax laws. See "Description of Debt Co. and Equity Co. Common Shares -- Restrictions on Transfer." Subscriptions for Units will be accepted until the Fund Closing Date (as defined below). All initial installment subscription monies received prior to the Fund Closing Date will be held in escrow by the Sponsor until the Fund Closing Date pursuant to the terms of an Escrow Agreement with the National Bank of Kuwait. If subscriptions aggregating at least $30 million have not been received by the Fund Closing Date (including any extension thereof) and the Sponsor determines that the actual amount received is insufficient for the successful operation of the Fund, then, all such monies will be returned to Investors pursuant to the terms of the Escrow Agreement. The Fund will not pay commissions or finder's fees in connection with the sale of Units, although the Investment Manager and Sponsor may do so from their own resources. Any interest earned prior to the Fund Closing Date, net of expenses, will be returned to the Investors.

**Fund Term:** The Fund is expected to operate for a period of five (5) years. The Boards of Directors of Equity Co. and Debt Co. will call a meeting of their respective shareholders at the end of such period at which the shareholders of each of Equity Co. and Debt Co. will be asked to consider the liquidation of the respective Companies. If the holders of two-thirds of the shares of either of Equity Co. or Debt Co. present and voting at the meeting vote in favor of liquidation, the relevant Company's business will be wound up and terminated as promptly as practical thereafter. If shareholders of both Companies vote in favor of liquidation, these actions will result in the termination of the Fund. Until and unless such a liquidation vote is adopted, the Boards of Directors of Equity Co. and Debt Co. will call a meeting of shareholders of their respective companies in each of the succeeding two years for the same purpose. If in any year the shareholders of one Company adopt a resolution of liquidation and the shareholders of the other Company do not, the Board of Directors of the Company whose shareholders did not adopt the resolution shall consider what action if any may be appropriate under the circumstances. Such action may include, without limitation, resubmitting the matter of liquidation to its shareholders for reconsideration in light of the impact the other Company's liquidation may have on such Company.

- 10 -

If not terminated earlier, both Companies will be terminated automatically after seven (7) seven years of operations. The Investment Manager may also recommend to the shareholders of both Equity Co. and Debt Co. the liquidation and termination of the Fund prior to the end of its initial five-year term if the Investment Manager determines that such early liquidation and termination is in the best interest of the Fund.

**Fund Closing Date:** The Fund Closing Date is scheduled May 31, 2000. Each Investor's executed Unit Purchase Agreement (attached as Exhibit A hereto) and first installment of the subscription price are expected to be received by that time. The Fund Closing Date may be extended to June 30, 2000 in the sole discretion of the Sponsor.

**Payment of Subscription Price Installments:** Payment of the subscription price must be made in U.S. dollars from an account not located in the U.S., including U.S. territories or possessions. The subscription price for one unit is $5,000, which is to be paid net of 0 withholdings, costs of exchange, banking and similar charges. The first installment of the subscription price, in the amount of $1,666.67 per Unit, must be received on or before the Fund Closing Date. The second and third installments of the subscription price, each in the amount $1,666.67 per Unit, are payable on or before November 30, 2000 and May 31, 2001 respectively.

Any Investor which fails to pay its second or third installment when due will be liable to the Companies for interest on such unpaid amounts at the annual rate of 12%, in addition to any costs, charges or expenses the Companies may incur as a result of such non-payment. In addition, if after due notice, such Investor still does not make payment of any amount due on an installment or is otherwise in Default (as defined in the Unit Purchase Agreement annexed hereto as Exhibit A) all of the common shares of Equity Co. and Debt Co. represented by such Investor's Units may be forfeited, and the Companies may in their discretion resell, re-allot or otherwise dispose of such Shares. The Investor shall remain liable to the Companies for any unpaid amounts together with interest thereon at the rate specified above and any expenses or costs (including attorneys fees and court costs) incurred by the Companies in enforcing their rights and remedies. The Companies will apply the proceeds of any permitted disposition of such shares against the Investor's obligations. To the extent that the proceeds of any such disposition exceed the Investor's unpaid installment amounts, the Companies will reimburse to the Investor an amount of the Investor's previously paid installments equal to such excess, less interest and other expenses as described above. In no event, however, will the Companies be obligated to such Investor for any amount exceeding installment amounts previously paid by the Investor.

**Pre-Investment Period Investment Proceeds:** Net cash proceeds from the offering will be invested by the Companies in short-term, interest bearing instruments from the time of the capital calls until their investment in real estate interests (Pre-Investment Period) pursuant to the Fund's objectives as described under "Investments". The Fund does not anticipate any specific rate of return on the net proceeds during the Pre-Investment Period. Interest actually earned, net of expenses, during the Pre-Investment Period will be distributed to Investors at least annually. As noted above, it is expected that the net proceeds of this offering will be fully invested within the two-year period following the Fund Closing Date.

The Pre-Invetment Period is not to be considered in determining Minimum Return (hereinafter defined under "Allocation and Distributions"). Returns to Investors during the Pre-Investment Period shall be as herein described.

**Fund Structure:** The Fund is comprised of two separate Cayman Islands corporations, Equity Co. and Debt Co., the common shares of which comprise the Fund's Units. Each Company will be governed by its Board of Directors. See "Management Structure."

Equity Co.:

It is expected that Equity Co. will purchase non-voting stock in a separate Holding Company for each equity investment. The Holding Company will hold title to the property or, alternatively, will hold interests in a joint venture vehicle holding title to the property.

Each Holding Company will issue two classes of equity securities: voting common stock and non-voting common stock. Only the voting common stock will be entitled to vote on matters submitted to a vote of shareholders of the Holding Company, including the election of directors of the Holding Company. The non-voting common stock will have no voting rights of any kind, except as provided by law. The voting and non-voting stock of the Holding Companies will be identical in all other respects (including rights to dividends and to proceeds of the sale of the Holding Company's assets upon the Holding Company's liquidation).

It is expected that Equity Co. will hold all of the non-voting common stock of each Holding Company representing 98.5% of such Holding Company's aggregate equity capitalization. Meridian will hold all of the voting common stock of each Holding Company representing 1.5% of such Holding Company's aggregate equity capitalization.

Debt Co.:

Debt Co. will generally make interest-bearing, non-recourse mortgage loans to each Holding Company secured by the property to be acquired by such Holding Company. Each Holding Company may also obtain loans from third parties.

It is expected that the mortgage loans extended by Debt Co. to each Holding Company will bear interest at a rate of 12% per annum, with principal and interest payable monthly in arrears to the extent sufficient cash flow is available therefor. Any debt service payments which cannot be made from cash flow will accrue and bear interest at the rate of 12% per annum, compounded annually. See "Allocations and Distributions."

## MANAGEMENT STRUCTURE

The Fund is not a distinct legal entity but will be operated under the general supervision and overall management of the Boards of Directors of Debt Co. and Equity Co.

The Board of Directors of each Company will initially be comprised of five members. Two of such members will initially be common to both Boards  The remaining initial directors

will be selected by the Sponsor in consultation with the Investors. Thereafter, Directors of each Company will be elected annually by the shareholders of the Company. To the extent common shares of the two Companies are transferred separately, share ownership and voting control of the two Companies may diverge and the commonality among the two Boards may be reduced over time. Moreover, the Memorandum and Articles of Association of each Company will prohibit the election of any person to its Board if as a result a majority of the members of its Board would be persons who also serve as Directors of the other Company.

The principal executive officers of Debt Co. and Equity Co. are as follows:

|  | Name | Position |
|---|---|---|
| Equity Co. | Abdul Mohsen Hayat | Managing Director |
| Debt Co. | Abdul Mohsen Hayat | Managing Director |

## ALLOCATIONS AND DISTRIBUTIONS

**Holding Companies:** The Fund anticipates that each Holding Company, or a joint venture in which a Holding Company is a partner, will obtain a non-recourse mortgage loan from Debt Co. Interest on these loans is expected to be payable at the rate of 12% per annum and will generally be payable monthly only to the extent sufficient cash flow is available therefor from the operations of the property after payment of third party expenses. To the extent that cash flow is not sufficient to pay interest when due, such interest will accrue at the rate of 12% per annum, compounded annually, and be payable out of the first available cash flow. Any cash from operations in excess of debt service, after provision for adequate reserves, received by a Holding Company is expected to be retained by the Holding Company until the property is sold unless a distribution can be made without any tax withholding. Net proceeds, after repayment of all indebtedness, from the sale of a property received by a Holding Company, after provision for payment of U.S. capital gains tax will be distributed to Equity Co. and the owner of the voting common stock as a liquidating distribution.

**Equity Co.:** The Fund anticipates that the principal source of cash for Equity Co. will be distributions received from the Holding Companies and the proceeds from non-direct investments. Such funds shall be characterized as deriving from the operations of the Holding Company or the non-direct investment as the case may be ("Operating Distributions"), or as the net proceeds of the sale of a property by the Holding Company or the sale of a non-direct investment, as the case may be ("Net Sale Proceeds"). Operating Distributions shall be paid, after the payment of any third party expenses of Equity Co. then due and the establishment of appropriate reserves, first, as dividends to the stockholders of Equity Co. until the stockholders of Equity Co. have received an amount equal to a 7.2% per annum return (preferred return), compounded annually commencing at the end of the Pre-Investment Period, as hereinafter defined, on the aggregate capital contributed to Equity Co. and Debt Co. as a result of this offering (reduced by any repayment of such capital), and taking into consideration any amounts distributed by Debt Co. to its stockholders as if such amounts had been paid by Equity Co. to its stockholders (the "Minimum Return"), the second,

- 13 -

80% to the stockholders of Equity Co. in the form of dividends and 20% to the Investment Manager as an Incentive Fee. Net Sale Proceeds shall be paid, after the payment of any third party expenses then due and the establishment of appropriate reserves, first, to the stockholders of Equity Co. until the Minimum Return through the date of payment shall have been paid; second, to the stockholders of Equity Co. as a repayment of capital in an aggregate amount equal to the amount of capital invested in the Holding Company which sold the property or invested by Equity Co. directly, as the case may be; and, third, 80% to the stockholders of Equity Co. in the form of dividends and 20% to the Investment Manager as an Incentive Fee. There can be no assurance that cash will be available to pay dividends or repay any capital.

**Debt Co.:** The Fund anticipates that the principal source of cash for Debt Co. will be payments of principal and interest on loans made to the Holding Companies and Equity Co. The Fund anticipates that Debt Co. will declare dividends semiannually, although there can be no assurance that cash will be available to pay on such a schedule or at all. The Memorandum and Articles of Association of Debt Co. require the Board of Directors of Debt Co. to declare minimum dividends at the rate of 12% per annum on the Investors' unreturned capital invested in Debt Co commencing on the end of the Pre-Investment Period. To the extent Debt Co. does not have sufficient cash to pay any such dividend, the deficiency will accrue at the rate of 12% per annum, compounded annually, until paid.

**Pre-Investment Period:** Pre-investment Period shall be that time extending from the initial capital call until Investors capital is invested in real estate assets. Preferred Return as herein defined, is not included in the Pre-investment Period.

**Pre-Investment Period Returns:** The Fund anticipates that Debt Co. and Equity Co. will distribute to Investors at least annually any interest, net of expenses, earned on funds held for investment during Pre-Investment Period.

## FEES AND COSTS

**Organizational and Investment Strategy Costs:** The Fund will incur costs associated with organizing the Fund, including costs for legal, tax and administrative advice associated with the organization of Debt Co. and Equity Co., and the development of an investment strategy. These costs, (including one-half of the fees payable to TWR, one of the Fund's subadvisers, incurred prior to the time the Fund is fully invested), will be payable by the Fund commencing on the Fund's Closing Date, and will be reimbursed by the Fund to the Investment Manager should the Investment Manager pay any of these costs. These organizational and investment strategy costs borne by the Fund are not expected to exceed $160,000 and will be payable 60% by Debt Co. and 40% by Equity Co.

**Placement Fee:** Each Investor shall pay a one time placement fee of one-half of one percent (0.5%) of commitment, in addition to basic commitment to the Investment Manager for organizing and establishing the Fund. Placement Fee shall be paid with initial payment.

- 14 -

**Management Fee:** The Investment Manager will receive an annual Management Fee equal to 1% of the overall value of assets under management. Management Fee shall include all Investment Managers' salaries and office overhead costs. Management Fee does not cover travel and other third party expense (Third Party Expenses) which will be billed separately to the Fund. The Management Fee will be paid quarterly to the Investment Manager commencing on the Fund's Closing Date. In general, each Holding Company will assume the obligation to pay the Management Fee earned in respect of the funds from Equity Co. and Debt Co. invested in such Holding Company. Equity Co. and Debt Co. will be obligated to pay the Management Fee earned in respect of all other funds.

**Incentive Fee:** Investment Manager will be entitled to an Incentive Fee. See "Allocations and Distributions"

**Other Costs and Expenses:** Each of the Companies and each of the Holding Companies will pay all costs and expenses incurred in connection with its own affairs. Each Holding Company will pay the total costs associated with any purchase or sale of property and the placement of any other real estate investments. These costs include professional fees, brokerage fees, advisor fees, administrator, transfer agent and registrar fees and any other related cost. The Investment Manager will bear its own costs and expenses, except as described above.

CONFLICTS OF INTEREST

Because Al-Mal, Meridian and their respective affiliates carry on a wide range of activities in the real estate field, the Fund will be subject to certain conflicts of interest. Al-Mal, Meridian and their respective affiliates reserve the right to engage in other real estate and business ventures. The Investors in the Fund will have no interest in any real estate assets currently owned or managed by Al-Mal or Meridian. The officers and directors of Meridian will not devote their full time to the business of the Fund. Meridian may provide investment advice to Al-Mal or others and may be retained by other real estate funds in the future.

At least a majority of the members of the Boards of Directors of Debt Co. and Equity Co. will at all times consist of persons who do not serve on both Boards. Further, although a Unit consists of shares of Debt Co. and Equity Co., after the expiration of the one-year period following the Fund Closing Date such shares of the Companies may be transferred independently. Accordingly, the stockholders of Debt Co. and Equity Co. may not be identical in the future. Because of these differences in management and ownership and because Debt Co. will make mortgage loans secured by properties in which Equity Co. has an interest, the two Companies' interests may diverge and disputes may arise between Debt Co. and Equity Co., including disputes as to the operation of the Fund generally. Because Meridian will act as the Investment Advisor to both Debt Co. and Equity Co., Meridian will have a conflict of interest, as will any Board members common to both Boards.

The Companies have agreed that Meridian will not have any responsibility or liability to the Companies or any of their stockholders as a result of a conflict of interest arising from any real estate transaction so long as Meridian has acted in good faith and in a manner it reasonably believes to be equitable in the circumstances. The Companies will indemnify their officers and directors to the fullest extent permitted by the laws of the Cayman Islands.

# DESCRIPTION OF DEBT CO. AND EQUITY CO. COMMON SHARES

The authorized capitalization of each of Debt Co. and Equity Co. consists of 50,000 common shares, $1.00 par value per share. The following summary describes the rights and privileges of the holder of the Units and, if separately transferred, the common shares of the Companies as set forth in the Memorandum and Articles of Association of each, a copy of which will be provided to Investors upon request. This summary does not purport to be complete and is qualified in its entirety by reference to the foregoing documents.

**Dividend Rights:** The holder of the common shares will be entitled to dividends when and as declared by the Board of Directors of the relevant Company. The holders of common shares of Debt Co. will be entitled to dividends at the rate of 12% per annum on their unreturned capital contributed to Debt Co. commencing on the end of the Pre-Investment Period, subject to the availability of distributable cash in Debt Co. to pay such dividends. See "Allocations and Distributions -- Debt Co."

**Voting Rights:** The holders of the common shares shall be entitled to vote on specified matters including the election of Directors, amendments to the Memorandum and Articles of Association and certain other matters set forth below. On all matters on which the holders of the common shares are entitled to vote, they shall be entitled to one vote for each share held, and, except to the extent otherwise required by law, a majority vote of the outstanding common shares shall be required to approve any proposed matter.

**Redemption of Shares:** If the Board of Directors of either Debt Co. or Equity Co. determines at any time that the redemption of common shares of Debt Co. or Equity Co., respectively, is necessary to preserve the legal or tax status of such Company or to prevent such Company from incurring increased tax or reporting requirements, the Board of Directors will have the right to redeem common shares for their then fair market value, as determined by the Board of Directors in good faith.

**Liquidation Rii!hts:** In the event of any liquidation, dissolution or winding up of the affairs of the Company and after the properties and assets of the company have been applied to the satisfaction of the company's liabilities according to their legal priorities, the holders of the common shares shall be entitled to be paid any remaining amounts pro rata.

**Other Provisions:** Neither Company shall authorize or issue any shares of any other class of stock ranking prior to, or on a parity with, the common shares of such Company with respect to dividends or distributions or the distribution of assets upon the liquidation, dissolution or winding up of the affairs of the company or otherwise, except that the company may authorize and issue additional conunon shares which shall rank equally in all respects with the common shares initially authorized.

**Restrictions on Transfer:** Neither the Units nor the underlying common shares of Debt Co. or Equity Co. have been registered under the Securities Act or the securities laws of any state of the United States. Neither the Units, nor the underlying common shares of the Companies may be sold, transferred, pledged or otherwise disposed of for a period of one year after the Fund Closing Date.

Each purchaser of the Units and the underlying common shares will be required to represent and warrant that such purchaser is not acting on behalf of a United States person and that he will not reoffer or resell the Units or the underlying common shares in the United States or its territories or possessions or to a United States person, wherever located unless (i) the transaction is registered under the Securities Act and any applicable state securities laws, or (ii) an exemption from such registration is available and the Company has received an opinion of its counsel to such effect satisfactory to it.

Although the underlying common shares may be separately transferred subject to the above restrictions, no transfer will be permitted which would cause any person to directly or indirectly acquire more than 49.9% of the common shares of either Debt Co. or Equity Co., and any such attempted transfer shall be void.

**Competitive Advantage:** The Investment Manager believes the structure of the Fund, although in certain aspects complex, along with the investment approach, have the potential to create a competitive advantage for the Fund and its Investors. The Investment Manager believes the following advantages will become increasingly important to the Fund and its Investors as competition for real estate investments increases:

Investment criteria allows the Fund to seek different types of investment opportunities in multiple markets. This will permit the Investment Manager flexibility to take advantage of favorable opportunities as they present themselves and to respond to changes in market conditions.

Availability and accessibility of contributed capital enables the Fund to decide and act quickly when suitable investments are found.

The subadvisers constitute an experienced team of advisers which the Investment Manager believes are among the best in the industry at selecting the right investment markets, locating individual investments and evaluating potential investments for acquisition. The team will provide local market information and seek to ensure the Fund has access to attractive investment opportunities.

The structure of the Fund offers unique opportunities and benefits to the Investors. Principals of the Sponsor have knowledge and experience related to investments in U.S. real estate and will be available to Investors over the life of the Fund to discuss the Fund. This will provide for efficient and effective reporting and communication to the Investors. This offers a significant advantage to Investors.

## RISK FACTORS

Investment in the Fund involves risks. Prospective Investors should consider the following factors, among others, before making a decision to make an investment in the Fund.

**No Operating History:** The Fund has not yet commenced operations and has no operating history. However, the Investment Manager along with the Sponsor have previously established and are currently running a similar fund. The results and performance of the previous fund are excellent and are exceeding target returns to Investors.

**General Operating Risks and Local Economic Conditions:** Investments made by the Fund will be subject to the risks incident to the ownership and operation of commercial real estate generally. Among the risks of investing in real estate is the possibility that the properties will not generate income sufficient to meet operating expenses or will generate -income and capital appreciation, if any, at rates lower than those anticipated or available through other investments.

A property's revenue and value may be adversely affected by a number of factors, including the national, state and local economic climate and real estate conditions (such as oversupply of space or reduced demand for space and changes in market rental rates); the perceptions of prospective tenants of the safety, convenience and attractiveness of the property; the ability of the owner to provide adequate management, maintenance and insurance; the ability to timely collect rent from tenants; the expense of periodically renovating, repairing and releasing space; acts of nature such as earthquakes or floods; and increasing operating costs (including real estate taxes and utilities) which may not be passed through to tenants.

Certain significant expenditures associated with investments in real estate (such as mortgage payments, real estate taxes, insurance and maintenance costs) are generally not reduced when circumstances cause a reduction in rental revenues from the property. In addition, real estate values and yields from investments in properties may also be affected by such factors as conditions in financial markets, environmental conditions and compliance with laws.

**Dependence on Targeted Markets:** The Fund anticipates that most of the investments it will make will be located in the target markets previously mentioned. The Fund's performance could be adversely affected by economic conditions in, and other factors relating to, these geographic areas, including supply and demand for space in these markets. These and other factors or a decline in the economy or real estate values in these markets may adversely affect the Fund's financial performance and its ability to make distributions to its stockholders.

**Reliance on Key Personnel:** The Fund's success depends in large part on the skill and acumen of Mr. Stegerwald, who heads the Investment Manager's real estate operations. If Mr. Stegerwald should cease to participate in the Fund's business, the Fund may have difficulty obtaining suitable investment management services from other sources and the Fund's ability to select attractive investments and manage its portfolio could be severely impaired.

**Risks of Unspecified Investments:** The Fund has not identified any proposed investments, and, accordingly, prospective Investors have no basis on which to evaluate the Fund's future portfolio of real estate.

**Conflicts of Interest:** Conflicts may arise between the real estate operations of the Fund and the Sponsor. If the ownership of Debt Co. and Equity Co. is not identical at any time in the future, the interests of the two Companies could be in conflict and the Investment Manager could have a conflict of interest in continuing to advise both Companies. See "Conflicts of Interest."

**Lack of Control Over Holding Companies:** The Fund will hold only non-voting stock of the Holding Companies, and, accordingly, will not be able to elect any directors or officers of such companies. All of the voting common stock of the Holding Companies will be owned by the Investment Manager which will thereby exercise exclusive control over such companies. As noted above, the interests of Meridian and the Fund may differ. See "Conflicts of Interest."

## TAX CONSIDERATIONS

The following generally summarizes the principal United States federal and Cayman Islands tax considerations relating to the purchase, ownership and disposition of interests in the Fund. The statements of United States and Cayman Islands tax laws set out below are based on the laws in force and as interpreted by the relevant taxation authorities as of the date of this Memorandum and are subject to any changes in law or in the interpretation thereof by the relevant taxation authorities occurring after such date. This summary is of a general nature only and does not discuss all aspects of United States or Cayman Islands taxation that may be relevant to a particular Investor. The application of certain provisions of U.S. federal income tax law to the Fund is uncertain and positions taken by the Fund could be challenged by the U.S. tax authorities. If the positions taken by the Fund cannot be sustained, then additional U.S. Federal income tax could become payable, thereby reducing the returns to the Investors.

PROSPECTIVE INVESTORS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS WITH RESPECT TO THE UNITED STATES FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES, AS WELL AS WITH RESPECT TO THE TAX CONSEQUENCES IN THE CAYMAN ISLANDS AND OTHER JURISDICTIONS, OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF INTERESTS IN THE FUND APPLICABLE IN THEIR PARTICULAR TAX SITUATIONS.

Tax Treatment of Investors: For purposes of this discussion, it is assumed that none of the shares of Debt Co. or Equity Co. will be held by any person who (i) is a citizen, resident or former citizen or resident of the United States, (ii) is a corporation, partnership or other entity created or organized under the laws of the United States or any state thereof, (iii) is an estate or trust which is considered to be resident in the United States for U.S. federal income tax purposes, or (iv) has an office or other fixed place of business in the United States to which the shares of Debt Co. or Equity Co. are attributable. It is also assumed that the Investors are not residents of the Cayman Islands or are otherwise exempt from taxation in the Cayman Islands.

Dividends paid to the Investors by Debt Co. or Equity Co. will not be subject to tax in the United States or the Cayman Islands. Such dividends will be taxable, if at all, only in the Investor's country of citizenship, residence or domicile.

Capital gains realized by the Investors upon the sale or other disposition of shares in Debt Co. or Equity Co. will not be subject to tax in the United States or the Cayman Islands. Such gains will be taxable, if at all, only in the Investor's country of citizenship, residence or domicile. (As discussed below, capital gains realized by the Fund will generally be taxed at the Holding Company level.)

The shares of Debt Co. and Equity Co. will not be subject to any gift, estate or wealth tax in the United States or the Cayman Islands. Such shares will be taxable, if at all, only in the country of citizenship, residence or domicile of the Investor or transferee.

The Investors will not be required to **file** tax returns in the United States or the Cayman Islands by reason of their investments in Debt Co. and Equity Co.

**Tax Treatment of the Fund:** The Fund has been structured using Debt Co. and Equity Co. in an effort to minimize the taxes imposed on income derived by the Fund. Neither Debt Co. nor Equity Co. intends to engage in trade or business in the United States. Instead, it is anticipated that a separate Holding Company will be established for each U.S. property acquired by the Fund and that Equity Co. will own non-voting common stock of the Holding Company. The Holding Company will borrow from both third parties and Debt Co. It is anticipated that the interest expense incurred by the Holding Company will be deductible for U.S. federal income tax purposes and that interest paid to Debt Co. will be eligible for the "portfolio interest" exemption from the normal 30% U.S. withholding tax on interest paid by a U.S. person to a non-U.S. person.*

Each Holding Company will be subject to U.S. federal income tax on its taxable income, including both operating income and capital gains realized on the sale or other disposition of its property. It is anticipated that the Holding Company's deductions for operating expenses, interest, taxes, depreciation and amortization will exceed the operating

---

* In order to avoid the application to the Holding Companies of certain limitations on the deductibility of interest expenses paid to a "related person", it is essential that no single Investor owns directly, indirectly or constructively more than 49.9% of the stock of Debt Co. or Equity Co. Each Investor will be required to represent and warrant that its direct, indirect and constructive ownership of the stock of Debt Co. or Equity Co. does not exceed 49.9%. In addition, the transfer of shares of Debt Co. and Equity Co. will be restricted in order to prevent any single Investor from accumulating more than 49.9% of the stock of Debt Co. or Equity Co. Notwithstanding these and other restrictions, it is possible that the U.S. tax authorities could challenge the independence of Debt Co. and Equity Co., and assert that interest paid to Debt Co. by the Holding Companies is paid to a "related person" and, therefore, subject to the limitations on deductibility.

income from the property, resulting in net operating losses. Such losses can be carried forward for up to 15 years, and can also reduce the amount of capital gain subject to tax at the time the property is sold. To the extent that a Holding Company realizes taxable income in excess of its net operating losses, such income will generally be subject to U.S. federal income tax at the rate of 35% plus state income tax in the state where the property is located.

If a Holding Company makes a distribution to Equity Co. which is considered to have been paid out of current or accumulated earnings and profits, such distribution will be a dividend subject to a 30% U.S. withholding tax. On the other hand, if the distribution is not paid out of current or accumulated earnings and profits of the Holding Company, the distribution will be treated as, first, a non-taxable return of capital to the extent of Equity Co.'s basis in the stock of the Holding Company, with any excess treated as a capital gain which will be subject to U.S. tax if the Holding Company still owns U.S. property at the time of the distribution. Alternatively, if the Holding Company liquidates after selling all of its U.S. property, then the distribution in liquidation will not be taxable.

If the Fund makes or acquires a mortgage loan secured by U.S. real property, the interest thereon should generally qualify for exemption from U.S. withholding tax as "portfolio interest". The exemption will apply only to interest which is not contingent on the cash flow from the property or the appreciation in the value of the property.

Debt Co. and Equity Co. will be exempt from all taxes in the Cayman Islands. Each company expects to receive a guarantee from the Governor of the Cayman Islands that it will be entitled to maintain its tax exemption for a period of 20 years. Accordingly, it is anticipated that the only income taxes payable by the Fund will be the U.S. federal and state income taxes paid by the U.S. Holding Companies on their taxable income, including capital gains.

In managing the Fund, the Investment Manager intends to consult with such tax and other advisors as it may deem appropriate regarding further steps to minimize taxes and maximize the net after-tax returns for the Investors. It is possible that changes to the structure of the Fund will be made in an effort to achieve this objective.

## AUDITORS

Each Company's annual consolidated financial statements will be audited by an internationally known public accounting firm to be approved by its Board of Directors.

## ADMINISTRATOR, REGISTRAR AND TRANSFER AGENT

Bank of Butterfield International (Cayman) Ltd. will act as the Fund's and the Companies' Administrator and as Registrar and Transfer Agent for the Units and the common shares of the Companies.

## REPORTING

The Fund shall prepare and distribute to each Investor a report on the status of the Fund on a semi-annual basis. The reports will be distributed after the end of the second quarter and at the end of the fiscal year.

The reports will contain the financial statements of the Companies, the status of the investment activity, a review of activity during the period covered and any--other pertinent information pertaining to the Fund.

Formal reporting will occur at regular planned intervals with specified reporting criteria. However, one of the advantages of the Fund structure is that Investors will have convenient access to to the principals of the Sponsor in Kuwait for any specific reports or information they may require. While the Investment Manager is located in the U.S., where the investments will be made and managed, the Sponsor are located closer to the Investors and can interact on a local level.

## HOW TO SUBSCRIBE

A prospective Investor who meets the qualifications for investment in the Units may subscribe by executing the Unit Purchase Agreement, a form of which is annexed hereto as Exhibit A, and delivering it to Al-Mal Kuwaiti Company, P. 0. Box 26308 Safat 13124, Kuwait, together with a check or wire transfer for the amount of the purchase price payable to "Al-Mal -- Escrow Account." The Sponsor reserves the right to reject any subscription, in whole or in part, for any reason.

## ADVISORY AGREEMENT

This Agreement is made and entered into as of September 1, 2000, by and between Meridian Real Estate Investment Company II, a Cayman Islands company (the "Company"), and Meridian Investment Management, Inc., a Delaware corporation (the "Advisor").

WHEREAS, the Company desires to avail itself of the experience, resources, advice and assistance of the Advisor and to have the Advisor undertake duties and responsibilities hereinafter set forth with respect to real estate investments of the Company, whether made directly or through its subsidiaries (which term shall be deemed to include any company of which the Company owns more than 50% of the equity capitalization, without regard to voting power), subject to the supervision of the Board of Directors of the Company (the "Board"), as provided in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

## ARTICLE I

### Appointment

The Company hereby appoints the Advisor to serve as its investment and management advisor on the terms and conditions set forth in this Agreement, and the Advisor hereby accepts such appointment.

## ARTICLE II

### Duties of Advisor

Subject to the supervision of the Board, the Advisor shall use its best efforts to perform the following duties for and on behalf of the Company (which shall be deemed to include, except as the context indicates otherwise, any subsidiary through which the Company invests):

2.1    Investment Plan.  The Advisor, in consultation with the Board, shall establish and maintain an appropriate plan for investment in real estate in the United States consistent with the Company's overall investment objectives, which plan shall include policy guidelines for property type and size, geographic diversification, tenancy, yield, leverage and such other factors as the Board may from time to time determine.

2.2    Market Research.  The Advisor shall gather and evaluate information, conduct market research on real estate markets in the United States, and the local and national trends, comparative values and economic and financial data affecting the Company's real estate investments and investment policies and objectives in such markets.

2.3    Investments.  The Advisor shall, on behalf of the Company, identify, investigate and evaluate appropriate properties for investment; furnish advice with respect to the acquisition thereof; negotiate the price and terms of investments; negotiate options to acquire such properties when requested by the Company's Board and assign options acquired by the Advisor to the Company; perform or supervise a due diligence examination of potential investments, including environmental, structural and legal reviews; and supervise the documentation of investments.

2.4    Portfolio Management.  The Advisor shall advise the Company on all aspects of the Company's portfolio of real estate investments in an effort to optimize the long-term investment results of the portfolio (including without limitation the management of the day-to-day operations of the Company, the preparation of operating and maintenance budgets, capital improvement budgets and schedules for improvements; monitoring borrower compliance with any mortgage loans made by the Company and assistance in the negotiation of significant leases) and shall perform and supervise the performance of such other administrative functions in connection with the management of the Company as may be agreed upon by the Advisor and the Board.  The Advisor will also develop and maintain strategic management plans for each property relating to such issues as refinancing, property taxes and sales strategies.

2.5    Property Management.  The Advisor, on behalf and at the expense of the Company, shall, with such assistance of consultants or local subadvisors as the Advisor may require, investigate, select and retain, as appropriate, property managers and, following appointment of each such property manager, conduct relations with such property manager in connection with the Company's properties managed by it.  Any such property managers may be affiliates of the Advisor.

2.6    Financing Activities.  The Advisor shall negotiate, as appropriate, on behalf of the Company, with investment banking firms, banks, insurance companies, pension funds, mortgage lenders and other institutions or investors for secured or unsecured borrowings by the Company.

2.7    Sales.  The Advisor shall, on behalf of the Company, identify appropriate properties for sale, negotiate the price and other terms of sale and supervise the documentation related to the consummation of such sales.

2.8    Investment of Cash.  The Advisor shall advise the Company on the short-term investment and reinvestment of any idle monies of the Company in accordance with the Company's investment policies.

2.9    Reports and Records.  The Advisor shall, on behalf of the Company, maintain appropriate records and documents for each property in the Company's portfolio.  The Advisor shall, on behalf of the Company, cause to be prepared and delivered to the shareholders of the Company annual and semi-annual reports which contain financial statements and which will discuss investment activity during the period and the status of the Company's investments and contain such additional information which the Advisor deems relevant to the shareholders.

## ARTICLE III

### Compensation

The Company shall pay the Advisor for its services compensation at the rates and at the times specified herein.

3.1    <u>Advisory Fee</u>. The Company shall pay the Advisor an annual fee equal to one percent (1%) of the overall value of the Company's assets under management. For purposes of this Section 3.1, assets contributed by the Company to its subsidiaries shall be deemed assets of the subsidiaries and not of the Company, provided the Company has entered into an assignment agreement with the relevant subsidiary whereby the subsidiary assumes the fee obligation to the Manager with respect to such amounts, in which case the subsidiary rather than the Company shall be liable to the Advisor for the fee in respect thereof. Such fee shall be payable within ten days following the end of each quarter in an amount equal to 0.25% of the average Unreturned Capital during such quarter. If this Agreement is terminated prior to the end of a quarter pursuant to Section 5.2 hereof, the fee payable for such quarter shall equal a pro rata percentage of 0.25%, based on the number of days in the quarter which have elapsed prior to termination, times the average Unreturned Capital for the period commencing with the first day of such quarter and ending on the date of termination.

3.2    <u>Additional Services</u>. If the Company shall request the Advisor to render services to the Company other than those required to be rendered by the Advisor hereunder, such additional services, if performed, shall be compensated separately on terms to be agreed upon from time to time between the Advisor and the Company, which terms shall not exceed either (a) the terms under which the Advisor is then performing similar services for others or (b) the terms under which qualified unaffiliated persons are then performing such services for comparable organizations.

3.3    <u>Expenses of the Advisor</u>. Without regard to the amount of compensation received hereunder by the Advisor, the Advisor will bear the following expenses:

(a)    Employment expenses of the personnel employed by the Advisor and of officers, directors and employees of the Company who are also employees of the Advisor including, but not limited to, salaries, wages, incentive payments, payroll taxes and the cost of employee benefit plans; and

(b)    Rent, telephone, utilities, office furniture and equipment and machinery (including computers, to the extent utilized) and other office expenses of the Advisor.

3.4    <u>Expenses of the Company</u>. The Company shall pay all of its expenses except those which are the responsibility of the Advisor pursuant to Section 3.3 of this Agreement and, without limiting the generality of the foregoing, it is agreed that the following expenses of the Company shall be paid by the Company:

(a)    To the extent the Advisor is not required to pay such expenses pursuant to Section 3.3(a) hereof, salaries and other employment expenses of the personnel employed by the

- 3 -

Company; directors' fees and expenses incurred in attending directors' meetings; and the cost of directors' and officers' liability insurance;

(b)    Expenses relating to any office or office facilities maintained by the Company separate from the office or offices of the Advisor;

(c)    Advertising and promotional expenses, if any, incurred by the Advisor in seeking investments for the Company or seeking to sell any of the Company's assets;

(d)    The cost of borrowed money;

(e)    All taxes applicable to the Company;

(f)    Legal, accounting, auditing, underwriting and other expenses and taxes incurred in connection with the organization or dissolution of the Company, or the issuance, distribution or transfer of the Company's securities;

(g)    Fees and expenses paid to local subadvisors and independent contractors, consultants, managers and other agents employed directly by the Company or by the Advisor at the Company's request for the account of the Company;

(h)    To the extent not paid by borrowers from the Company, costs of loan administration and mortgage servicing;

(i)    Expenses connected with the acquisition, disposition, leasing and ownership of investments, including, to the extent not paid by others, but not limited to: legal fees and other expenses of professional services; maintenance, repair and improvement of property; brokerage and sales commissions; and expenses of the Advisor's personnel in traveling in connection with the performance of its duties hereunder;

(j)    All insurance costs incurred in connection with the Company;

(k)    Expenses connected with payments of dividends or interest or distributions in cash or any other form made or caused to be made by the Board of Directors to holders of securities of the Company;

(l)    All expenses connected with communications to holders of securities of the Company and the other bookkeeping and clerical work necessary in maintaining relations with holders of securities and in complying with the continuous reporting and other requirements of governmental bodies or agencies, including the cost of printing and mailing certificates for securities and proxy solicitation materials and reports to holders of the Company's securities;

(m)    Transfer agent and registrar's fees and charges; and

(n)    Legal, appraisal, accounting and auditing fees and expenses.

3.5    Reimbursement of the Advisor.  To the extent that the Advisor pays any of the expenses of the Company set forth in Section 3.4, the Advisor shall, within 30 days after each

month in which such expenses were incurred, invoice the Company therefor, and the Company shall pay such invoice within 30 days after the date of the invoice.

## ARTICLE IV

### Other Activities of the Advisor

4.1    Other Activities.  Nothing in this Agreement shall prevent the Advisor or an affiliate of the Advisor from engaging in other activities and receiving compensation therefor, including, without limitation, the rendering of advice to other investors and the management of other investments, including investors and investments advised, sponsored or organized by the Advisor or its affiliates, and including joint ventures and partnerships in which the Company is a co-venturer or partner and the other co-venturers and partners in such joint ventures and partnerships.  Nothing in this Agreement shall limit or restrict the right of any director, principal, officer, employee or shareholder of the Advisor or an affiliate of the Advisor to engage in any other business or to render services of any kind to any other corporation, partnership, firm, individual, trust or association.

4.2    Allocation of Investment Opportunities.  The Company acknowledges that the Advisor currently performs management services for entities other than the Company, and expects to perform management and other services for other entities in the future.  If the Advisor is presented with a potential investment which might be made by more than one entity which it advises or manages, the decision as to the suitability of the property for investment by a particular entity will be based on a review of the investment objectives of each entity and upon such factors as cash available for investment, maximum investment limit per acquisition, the nature of the development, the time frame for funding the investment, other potential investments available to such entity, estimated income tax effects, leverage policies, any regulatory restrictions on investment and the length of time funds have been available for investment in the particular market.  The Advisor will then determine for which entity the particular investment is most suitable and allocate to that entity the opportunity to make the particular investment.

## ARTICLE V

### Term and Termination

5.1    Term.  This Agreement shall commence upon the date set forth above and will terminate upon liquidation of the Company unless earlier terminated pursuant to Section 5.2 hereof.

5.2    Termination.  At the option of the Company, this Agreement may be terminated:

(a)    immediately if the Advisor shall violate any material provisions of this Agreement and, after written notice of such violation, shall not cure such default within 60 days;

- 5 -

(b)    immediately if the Advisor shall be adjudged bankrupt or insolvent by a court of competent jurisdiction, or any order shall be made by a court of competent jurisdiction for the appointment of a receiver, liquidator or trustee of the Advisor or of all or substantially all of its property by reason of the foregoing, or approving any petition filed against the Advisor for its reorganization;

(c)    immediately if the Advisor shall institute proceedings for voluntary bankruptcy or shall file a petition seeking reorganization under the Federal bankruptcy laws or for relief under any law for the relief of debtors, or shall consent to the appointment of a receiver of itself or of all or substantially all of its property, or shall make a general assignment for the benefit of its creditors, or shall admit in writing its inability to pay its debts generally as they become due; or

(d)    immediately in the event it is "assigned" by the Advisor except to the extent such assignment is permitted in Section 8.2.

The Advisor agrees that if any of the events specified in subsections (b), (c) or (d) of this Section 5.2 shall occur, it will give written notice thereof to the Company within 7 days after the occurrence of such event.

5.3    <u>Compensation Upon Termination</u>. Upon any termination of this Agreement, the Advisor shall be entitled to receive (a) immediate payment of any unpaid advisory fees payable pursuant to Section 3.1 hereof, (b) immediate payment of any reimbursement provided for in Section 3.5 and (c) reasonable compensation for the services, if any, which the Advisor performed after the date of such termination, payable within 30 days of the date such services were performed.

5.4    <u>Rights of Termination Cumulative</u>. The rights of termination specifically provided shall be considered to be cumulative, and shall be in addition to the rights of termination for breach of the Agreement otherwise inuring to the parties by operation of law.

### ARTICLE VI

### Exculpation and Indemnification

The Advisor assumes no responsibility under this Agreement other than to render the services called for hereunder in good faith and shall not in any event be responsible for any action of the Company in following or declining to follow any advice or recommendations of the Advisor. Neither the Advisor, its shareholders, directors, principals nor its employees shall be liable to the Company, the Board or the shareholders of the Company, except by reasons of acts constituting bad faith, willful misfeasance, gross negligence or reckless disregard of their duties. The Advisor may consult with legal counsel, which may be the regular counsel of the Advisor or other counsel, independent public accountants or other professional advisors and, not withstanding anything to the contrary herein, shall not be liable for any action taken or omitted in good faith by it in accordance with the advice of such counsel, accountants or advisor, or at the request or direction of the Board in connection with the performance of its duties under this Agreement.

- 6 -

The Company shall indemnify and hold harmless the Advisor, its shareholders, directors, principals and employees from and against any and all liabilities, claims, damages or losses arising in the performance of its duties hereunder or from any act or omission arising out of its activities on behalf of the Company, including without limitation any judgement, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened proceeding, other than any loss or expense (a) arising from the Advisor's willful misfeasance, gross negligence or reckless disregard of its duties, (b) arising from a breach or failure by the Advisor to perform an obligation or responsibility under this Agreement or (c) as to which indemnification is barred by applicable law.

## ARTICLE VII

### Action Upon Termination or Cancellation

7.1     Accounting.  The Advisor shall immediately upon termination:

(a)     pay over to the Company all monies collected and held for the account of the Company pursuant to this Agreement, after deducting any accrued compensation and reimbursement for its expenses to which it is then entitled;

(b)     deliver to the Company a full accounting, including a statement showing all payments collected by it and a statement of all monies held by it, covering the period following the date of the last accounting furnished to the Company; and

(c)     deliver to the Company all property and documents of the Company then in the custody of the Advisor.

7.2     Change of Name.  Upon termination of this Agreement by either party, the Board of the Company shall, upon the written request of the Advisor, make reasonable efforts (including, if necessary, calling a meeting of shareholders and recommending an amendment to the Company's Memorandum and Articles of Association) to cause the name of the Company to be changed to a name that does not contain all or a distinctive portion of the name of the Advisor or any affiliate thereof or any approximation or abbreviation thereof and that is sufficiently dissimilar to such name as to be unlikely to cause confusion or identification with the Advisor.

## ARTICLE VIII

### Miscellaneous

8.1     Amendments.  This Agreement shall not be modified or terminated except by an instrument in writing signed by both parties hereto, or their respective successors or assigns, or otherwise as provided herein.

8.2     Assignment.  This Agreement shall not be assignable by either party without the consent of the other, except that the Company may assign its rights and transfer its obligations hereunder to one or more subsidiaries without the Advisor's consent as provided in Section 3.1.

Any permitted assignment of this Agreement shall be conditioned on the assignee's execution of a written instrument acceptable to the non-assigning party pursuant to which the permitted assignee agrees to be bound hereunder in the same manner as the assignor is bound hereunder.

8.3    No Partnership, Joint Venture or Agency. The Company and the Advisor are not, and shall not be deemed to be, partners or joint venturers with each other, nor shall either be deemed the agent of the other. Neither the Company, nor the Adviser shall be authorized to bind the other to any contract or obligation without the express written consent of the other.

8.4    Survival. The provisions of Sections 5.3, 7.1 and 7.2 and Article VI (and any definitions necessary for the operation of such provisions) shall survive the termination of this Agreement.

8.5    Notices. Any notice, report or other communication required or permitted to be given hereunder shall be in writing and shall be given: (a) by delivery in person to an officer of the party to whom it is addressed, or (b) by telegraph, telecopy, international overnight delivery service or other commercially reasonable means, to the person to whom it is addressed at the following address:

To the Company:

> Meridian Real Estate Investment Company II
> c/o Maples & Calder
> Ugland House
> P.O. Box 309
> Grand Cayman Islands
> British West Indies
> Attn: Gareth Griffiths, Esq.

With a copy to:

> Hale and Dorr LLP
> 60 State Street
> Boston, MA  02109
> Attn: Christopher P. Harvey, Esq.

To the Advisor:
> Meridian Investment Management, Inc.
> One Main Street
> Concord, MA  01742
> Attn: Carl Stegerwald

- 8 -

With a copy to:

> Hale and Dorr LLP
> 60 State Street
> Boston, MA 02109
> Attn: Christopher P. Harvey, Esq.

If any notice is telegraphed, the same shall be deemed served or delivered forty-eight hours after the transmission thereof. Any notice or other documents sent or delivered in any other manner shall be effective only if and when received.

— Either party, by notices aforesaid, may designate a different address or addresses for notices, reports or other communications intended for it.

8.6    Headings. The section headings used herein have been inserted for convenience of reference only and do not constitute matters to be considered in interpreting this Agreement.

8.7    Governing Law and Jurisdiction. This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts excluding that body of law pertaining to conflicts of law. The parties hereby irrevocably consent to the jurisdiction of the federal or state courts located within the Commonwealth of Massachusetts.

8.8    Entire Agreement. This Agreement contains the entire agreement between the parties with respect to the subject hereof and supersedes any prior written or oral agreements with respect to the subject hereof.

IN WITNESS WHEREOF, the Company and the Advisor have executed this Agreement as of the day and year first above written.

MERIDIAN REAL ESTATE INVESTMENT
COMPANY II

By:_____
Name:_____
Title:_____

Executed outside U.S.

MERIDIAN INVESTMENT MANAGEMENT, INC.

By:_____ *Carl Stegerwald* _____
Name:_____ *Carl Stegerwald* _____
Title:_____ *Senior Vice President* _____

Executed in Concord, Massachusetts

- 9 -

**From:** Pinky Anand [mailto:pinky@almal.com.kw]
**Sent:** Tuesday, March 06, 2007 3:04 PM
**To:** 'Stan.Willis@ey.com '
**Cc:** 'Albright, Alan'; 'Jay D. Matthes'
**Subject:** RE: Meridian's Financial Statements

Dear Mr. Willis,

Reference to your emails of February 14 and 23, the reason for delay of such approval is point no. 6 in the consolidated statements of Fund II, in particular, the payment of US$2million as a consultant fee. We were ill-advised to have such amounts categorized that way. We had attempted prior to your year end to ratify the situation with Meridian Management that Al Mal Investment Company (as a shareholder) would incur the US$2million directly to Meridian and prefer to follow that route for payments.

We have attempted prior to December 2006 with Meridian Management to ratify that situation by direct payment of Al Mal to Meridian without it being passed through the fund. We at Al Mal are ready to transfer US$2million to Meridian directly and opt to ratify the classification of your comments on the financial statements. It was obvious to us that till now Meridian has not addressed this issue with you and hence our inability to sign the financial statements as directors.

Our lawyers have been instructed to contact their legal counsel to address certain disputes that they have presented to us recently. Hence, we are reluctant to transfer the above mentioned mis-classified amount, without all other uncertainties are legally addressed. We cannot guarantee the speed at which, such negotiations might take between the legal counterparts and we have instructed our lawyers to push management of release of all cash without dispute in the funds, to be distributed to the shareholders.

In order to benefit the shareholders and unless you advise otherwise, the US$2million in note 6, could be classified not as expenses, but as a receivable from a shareholder (i.e. Al Mal) or better yet omitted from the notes altogether if the closing of the fund is affected and Al Mal has transferred the cash.

Again, your feedback of what is in the best interest of shareholder is appreciated and we re-affirm our commitments and ability to pay US$2million mentioned in note 6 to Meridian, in the very near future.

Best Regards,

Mutasem Al Shihabi
Deputy General Manager

**From:** Stan.Willis@ey.com [mailto:Stan.Willis@ey.com]
**Sent:** Friday, February 23, 2007 7:52 AM
**To:** alsagerm@yahoo.com; mutasem@almal.com.kw; issamkhalaf@gmail.com; iyaqoub@almal.com.kw
**Cc:** KKTailo@aol.com
**Subject:** Meridian's Financial Statements

Gentlemen,

Please note that I have made several attempts at Meridian's request to contact you. We have been waiting for many months (since the end of September) in hopes of receiving your approval (in the form of a signed letter of representation) so that we could finally issue the Financial Statements. I have never ran into a situation like this where the Director refuses to perform their responsibilities of reviewing and approving financial statements.

We can not issue without your approval and my firm is pressing for me to close this out. I fear that soon, lack of approval could lead to non-issue. Meridian has fulfilled everything on their end to get these statements issued. It is now up to you to provide approval.

Please let me know if you have any questions or let me know if you need me to send the LOR and draft financial statements again.

Regards,

Stan J. Willis | Ernst&Young, LLP

Global Asset Management Practice

560 Mission Street, Suite 1600 | San Francisco, CA 94105-2907

| ☎ : +1 415.894.8810 | 7: +1 866.362.5898 | stan.willis@ey.com

**Any U.S. tax advice contained in the body of this e-mail was not intended or written to be used, and cannot be used, by the recipient for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code or applicable state or local tax law provisions.**

Issue 12570 – Date of Publication: 05/28/2008
Date of Printing: 07/06/2008
Print

# Al-Kharafi: "Al-Mal" Building a Conservative Policy to Manage Risks

By: Hasan Malak

The regular general assembly for the Al Mal Investment Company approved the recommendation of the board of directors for the following: withholding distribution of dividends for the fiscal year ending 12/31/2007, issuing bonds within the limits of paid-up capital, provided they are made available for general subscription, compensating the board of directors according to the conditions for these bond issues and in compliance with law and the Company's bylaws.

The assembly, with an attendance of 71.78%, certified the compiled financial statements, after discharging the members of the board from liability and hearing the reports of the board of directors and the account auditors.

The chairman of the board and elected member Loay Jasim Al-Kharafi said that work conditions in 2007 differed from previous years, which requires the board to adjust policies and strategies and perform an internal housecleaning to provide a fair value for the shareholders.

He announced that the company would institute a conservative policy to guard against risks before seeking out profit opportunities by implementing the following:

1.     Confirm ownership of the Company's assets and the fair value of these assets.

2.     Arrive and an accurate and confirmed number for the Company's liabilities and there there is no increase or decrease in these liabilities.

3.     Ensure that an accurate picture is provided for any possible liabilities the Company may incur in the future, whether in the form of contractual liabilities or legal matters pertaining to the prior period.

The Company's income amounted to 17.9 million dinars, in comparison to 14.7 million dinars for 2006.  He said that the net profit was 4.8 million dinars, in comparison to 5.6 million dinars in 2006, with a share profit rate of 10 fils per share.  Returns on shareholder rights were 6%.

Market Factors

Al-Kharafi attributed the decrease in net profit, despite the increase in income, to the inclusion of costs and other burdens which totaled 6.2 million dinars, including 2.3 million dinars from the devaluation of investments for economic and operational reasons and from market conditions.  There was a total loss of 3.9 million dinars related to the enactment of the board's policies.   He said it was necessary to show the true value of the Company's investments and endeavor to show actual liabilities and whether these debts were required to be including in the accounting for the previous fiscal period.

Use of Internal Resources

He said that the Company would endeavor to use its internal resources to strengthen its financial position and service shareholder interests, hence the recommendation to withhold dividends for fiscal year 2007.  Al-Kharafi that he would continue looking for promising investment opportunities by focusing on a variety of economic sectors, such as real estate, industry, energy, and services, in addition to developing and restructuring current investments.

He mentioned that the board would build its investment strategy by focusing on direct investment and arranging funding structures for its operations, in addition to building a network of local and international strategic alliances through its parent company and the parent company's subsidiaries and affiliates.  He pledged to achieve greater returns and superior performance by virtue of the professional experience of the board and executive administration.

In this light, Al-Kharafi announced the referral of the previous chairman of the board to the general prosecutor for certain excesses, has he put it, and the hiding of two million dollars from a fund controlled by the Company which was disposed of in a manner violating the purposes of the fund.

Al-Kharafi stated in a press announcement on the margins of the general assembly: "We referred the matter before the end of the last session of the National Assembly.  We will present the matter of immunity before the current assembly in its first session.  The general prosecutor has initiated an investigation in this case and will determine if it warrants proceeding with a trial.  Referral to the court would require presenting the question of immunity before the National Assembly."

He indicated that the Public Institute for Social Security owns more than 50% of the fund and that the total value of the fund was 22 million dollars.  The amount required will be determined by the prosecutor.

The fund was founded in the United States (Cayman) by Meridian Investment Management, which has also been referred to the general prosecutor.

He said that the case was like any other legal procedure for the collection of international funds.

On the discovery of the violations, Al-Kharafi said: "When we received the company, we assigned an accounts auditor to perform a comprehensive evaluation and audit of all funds and assets and to reinventory and isolate each.  The violations were discovered by this process.  The Meridian violation was the first to be discovered, but there are others.

He explained that there is a difference between an administration violation and a criminal violation, but whereas the fund is owned by the government, the matter may go beyond just an administrative violation.  He added that the Public Institute for Social Security had previously managed the fund's performance and that there had not been any fears of these transgressions.

Al-Kharafi repeated: "There are two million dollars missing from the fund; doesn't the matter justify determining whether this amount was disposed of for purposes not tied to the fund? We presented this to the prosecutor for his enquiry into the purposes for this behavior.  Does this represent a liability and is it considered a violation or not?  Likewise, there should be an enquiry into the party that benefited from the transaction of this money."

He gave assurances that if any further violations are discovered, they will be referred to the general prosecutor so as to ensure the Company's right, whether the case is criminal or civil.