William J. Ziegler (SBN 041203)
Douglas A. Applegate (SBN 142000)
George M. Lee (SBN 172982)
**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
101 Montgomery Street, 27th Floor
San Francisco, California 94104
Phone: (415) 979-0500
Fax:   (415) 979-0511

Attorneys for Plaintiff
Meridian Investment Management, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MERIDIAN INVESTMENT MANAGEMENT, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>MERIDIAN REAL ESTATE INVESTMENT COMPANY II, a Cayman Islands company; and DOES 1 through 10, inclusive,<br><br>Defendants, | Case No. C 08-02542 MMC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**<br><br>Date:   September 26, 2008<br>Time:   9:00 am<br>Dept:   Courtroom 7, 19th Floor<br><br>Hon. Maxine M. Chesney |

TABLE OF CONTENTS

I. Introduction ........................................................................................................................1

II. Brief Factual Summary ......................................................................................................1

III. Analysis .............................................................................................................................3

    A.    Choice of Law – California Law Applies to the Defamation Claim ............................4

    B.    The Defamation Claim Is Pled With Sufficient Specificity. ..........................................6

    C.    The Statements to the Shareholders Were Defamatory. ................................................7

    D.    The E-Mail to Legg Mason Was Defamatory. ..............................................................8

    E.    The Al-Kharafi Statements Are Actionable. ..................................................................9

IV. Conclusion .......................................................................................................................13

# TABLE OF AUTHORITIES

**Cases**

*Arpin v. Santa Clara Valley Transp. Agency*, 261 F3d 912 (9th Cir. 2001) .......................... 10

*Beliveau v. Caras*, 873 F.Supp. 1393 (CD CA 1995) ............................................................ 10

*Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955 (2007) .......................................................... 9

*Bennett v. Schmidt,* 153 F3d 516 (7th Cir. 1998) ..................................................................... 4

*Cauchi v. Brown,* 51 F.Supp.2d 1014 (ED CA 1999) .............................................................. 4

*Colle v. Brazos County, Texas,* 981 F2d 237 (5th Cir. 1993) ................................................... 4

*Credit Managers Assn. v. Superior Court*, 51 Cal.App.3d 352 (1975) .................................... 6

*Croslan v. Housing Authority for the City of New Britain*, 974 F.Supp. 161 (D. Conn. 1997) ... 6

*Gilligan v. Jamco Develop. Corp.,* 108 F3d 246 (9th Cir. 1997) .............................................. 3

*Hurtado v. Super. Ct.,* 11 Cal.3d 574, 114 Cal.Rptr. 106 (1974) ............................................. 5

*Moore v. Green*, 431 F.2d 584 (9th Cir. 1970) ......................................................................... 5

*National Union Fire Inc. Co. of Pittsburgh v. Dassault Falcon Jet,* 263 Fed.Appx. 604 .......... 5

*Nissan Fire & Marine Ins. Co., Ltd. v. Bax Global, Inc.*, 2008 WL 2402478 (9th Cir. 2008) ... 5

*Paulsen v. CNF, Inc.*, 91 F.Supp.2d 804 (ND CA 2005) ........................................................ 10

*United States v. Redwood City,* 640 F2d 963 (9th Cir. 1981) .................................................. 4

*United States v. White,* 893 F.Supp. 1423 (CD CA 1995) ....................................................... 4

*Wilbanks v. Wolk*, 121 Cal.App. 4th 883 (2004) ...................................................................... 5

**Other Authorities**

Schwarzer, et al., *Cal. Prac. Guide: Federal Civil Proc. Before Trial* (T.R.G. 2008) ......... 4, 10

**Rules**

Fed. Rule Civ. Pro. 12(b)(6) ............................................................................................. *passim*

# I.

## Introduction

In seeking to dismiss plaintiff's complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, defendant Meridian Real Estate Investment Company II ("FUND II") improperly relies upon matters that are not part of the complaint or the court's file, and which cannot properly be judicially noticed. That extrinsic evidence, moreover, is inadmissible hearsay. On this ground alone, the motion should be denied.

In addition, however, FUND II's analysis is simply wrong. Plaintiff Meridian Investment Management, Inc. ("MIM") has properly pled a claim against FUND II for business defamation.

# II.

## Brief Factual Summary

In 1998, plaintiff MIM worked with the Al-Mal Kuwaiti Company to create a real estate investment fund that invested in real estate within the United States. The Al-Mal Kuwaiti Company was the lead investor for that fund, as well at its sponsor and decision-maker. Once the investment fund was established, MIM actively managed the investment portfolio in exchange for a contractual management fee. (FAC at ¶5.) In the Spring of 2000, MIM worked with the Al-Mal Kuwaiti Company to create a second real estate investment fund – defendant FUND II. Again, the Al-Mal Kuwaiti Company acted as the lead investor and the sponsor of FUND II, and the Al-Mal Kuwaiti Company appointed the managing directors for FUND II. And again, MIM was hired to manage the investment portfolio for FUND II in exchange for a management fee. (FAC at ¶5-8 and Exhibit B.)

From the outset, all of the investors in FUND II knew that MIM had been hired to manage FUND II's investment portfolio. (FAC at ¶7.) Things initially progressed well, and MIM acquired three real estate investments for FUND II – a commercial office building in downtown San Francisco, and two properties in San Diego, California. (FAC at ¶¶9-10.)

A few months after September 11, 2001, however, the Al-Mal Kuwaiti Company experienced a management shake-up. The new management for the Al-Mal Kuwaiti Company, in turn, appointed a new director for FUND II, replacing Mr. Abdul Mohsen Hayat (who had worked well with MIM) with Mr. Mutasem Al-Shihabi. (FAC at ¶13.)

Mr. Al-Shihabi endeavored to replace MIM as the manager for FUND II; when that effort failed, Mr. Al-Shihabi insisted that MIM liquidate the real estate holdings of FUND II. Ultimately, MIM complied, and by mid-2005, the investment properties were all sold. (FAC at ¶¶20-23.)

From other real estate investment activities in the United States unrelated to FUND II, the Al-Mal Kuwaiti Company had incurred a $2 million liability. On or about January 31, 2006, Mr. Al-Shihabi and Mr. Al-Sager (the chairman of the Al-Mal Kuwaiti Company and a second director of FUND II) instructed MIM in writing to retire the $2 million liability using cash from FUND II's California accounts – cash that the Al-Mal Kuwaiti Company promised to replenish. (FAC at ¶24.) But the Al-Mal Kuwaiti Company failed to repay the $2 million sum.

Indeed, Mr. Al-Shihabi (in an effort to cover up his responsibility for causing Al-Mal Kuwaiti Company's $2 million debt in the first place) tried to get MIM to book the $2 million payment as a FUND II expense, rather than an account receivable owed to FUND II by the Al-Mal Kuwaiti Company. (FAC at ¶25.) MIM refused.

MIM also hired accountants at Ernst & Young to prepare the final accounting statements for FUND II. MIM informed Ernst & Young of the $2 million sum owed to FUND II by the Al-Mal Kuwaiti Company; and Ernst & Young's final audited financial statements were completed on or about October 2, 2006. The statements lacked only the signature of Mr. Al-Shihabi as a director of FUND II. (FAC at ¶26.)

But Mr. Al-Shihabi refused to sign the final financial statements, leaving FUND II in limbo, unable to wind-up and unable to do anything. Not surprisingly, the investors in FUND II ultimately began to ask Mr. Al-Shihabi what was going on. But instead of telling the truth, Mr. Al-Shihabi lied, and blamed the inaction on MIM. (FAC at ¶30.) In response to e-

mail inquiries from Ernst & Young, Mr. Al-Shihabi on March 6, 2007 again lied and blamed MIM, and he again tried to cover up his responsibility for the $2 million debt that the Al-Mal Kuwaiti Company had incurred and had instructed MIM to pay from the accounts of FUND II. Mr. Al-Shihabi copied his e-mail comments to Legg Mason Real Estate Services, in an effort to tarnish MIM's reputation in the real estate managing community. (FAC at ¶¶32-33 and Exhibit C.)

These lies to FUND II's investors and to Legg Mason Real Estate Services severely injured MIM's business. But the biggest lies were yet to come, after the Al-Mal Kuwaiti Company experienced another management shakeup following a hostile takeover. (FAC at ¶34.) With that shakeup, Mr. Al-Sager, the chairman of the Al-Mal Kuwaiti Company and the managing director of FUND II, was replaced by Mr. Loay Jasim Al-Kharafi. And shortly before May 28, 2008, Mr. Al-Kharafi held a press conference on the steps of the Kuwaiti parliament and accused Mr. Al-Sager of misusing and hiding $2 million from FUND II, in essence accusing Mr. Al-Sager of embezzlement. And Mr. Al-Kharafi then went further, and accused MIM of being criminally complicit. As intended and expected, Mr. Al-Kharafi's accusations were reported in the press, including in ALQABAS, a Kuwaiti newspaper of general circulation, widely read by the investment community in Kuwait. (FAC at ¶35 and Exhibit D.)

## III.

### Analysis

Before turning to FUND II's various arguments and the potshots that they have lobbed against the First Amended Complaint, we would stress that motions brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure are disfavored. As the leading treatise observes:

> Many courts view Rule 12(b)(6) motions with "disfavor" because of the lesser role pleadings play in federal practice and the liberal policy re amendment: "The motion to dismiss for failure to state a claim is viewed with disfavor and is *rarely granted*." [*Gilligan v. Jamco Develop. Corp.* (9th Cir. 1997) 108 F3d 246, 249 (emphasis added; internal quotes omitted); *Colle v. Brazos County,*

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

*Texas* (5th Cir. 1993) 981 F2d 237, 243—challenges to "bare-bones pleadings" are doomed with respect to an attack based on a failure to state a claim]
A 12(b)(6) dismissal is proper only in "extraordinary" cases. [*United States v. Redwood City* (9th Cir. 1981) 640 F2d 963, 966; *Cauchi v. Brown* (ED CA 1999) 51 F.Supp.2d 1014, 1016 (citing text); *United States v. White* (CD CA 1995) 893 F.Supp. 1423, 1428 (quoting text)]

"Instead of lavishing attention on the complaint until the plaintiff gets it just right, a district court should keep the case moving—if the claim is unclear, by requiring a more definite statement under Rule 12(e), and if the claim is clear but implausible, by inviting a motion for summary judgment." [*Bennett v. Schmidt* (7th Cir. 1998) 153 F3d 516, 518]

Schwarzer, et al., *Cal. Prac. Guide: Federal Civil Proc. Before Trial* (T.R.G. 2008) §9:210.

### A. Choice of Law – California Law Applies to the Defamation Claim

FUND II starts its analysis with the assertion that Massachusetts law governs this case. (Surprisingly, FUND II then proceeds to rely upon Connecticut law, discussed further below.) But in support of the assertion that Massachusetts law governs this case, FUND II relies solely upon MIM's opposition to FUND II's prior 12(b)(6) motion, and the Court's ensuing order. But neither the opposition papers, nor the Court's order, stated that Massachusetts law applied to MIM's cause of action for Business Defamation.

Certainly, we asserted that Massachusetts law governed MIM's breach of contract claim, since the parties' contract has a choice-of-law provision expressly stating that "This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts excluding that body of law pertaining to conflicts of law." (FAC, Exhibit B at ¶8.7) But on the Business Defamation claim, we took no position, and instead simply noted that our proposed amended complaint was timely both under the statute of limitations under California law (two years) and under the statute of limitations under Massachusetts law (three years). The Court's order likewise took no position, and merely noted the two different possibilities.

Accordingly, FUND II has failed to provide a valid reason for resorting to Massachusetts (and Connecticut) law. When, as here, the claim at issue does not arise under Federal law, then the court applies the choice-of-law rules of its forum state – i.e., California.

*Nissan Fire & Marine Ins. Co., Ltd. v. Bax Global, Inc.*, Slip Copy, 2008 WL 2402478 (9th Cir. 2008). And California, in turn, applies a "three-step governmental interest analysis to choice-of-law questions." *National Union Fire Inc. Co. of Pittsburgh v. Dassault Falcon Jet,* 263 Fed.Appx. 604, 606:

> First, the court must examine the substantive law of each jurisdiction to determine whether the laws differ as applied to the relevant transaction. *Hurtado v. Super. Ct.,* 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666, 669 (1974). Second, the court must determine whether each relevant jurisdiction has a legitimate interest in having its law applied to the present case. *Id.* Third, the court identifies and "appl[ies] the law of the state whose interest would be the more impaired if its law were not applied." *Bernhard,* 128 Cal.Rptr. 215, 546 P.2d at 723.

*Id.*

On the first step, there is at least one area where the substantive law of California and Massachusetts differs – whether or not a plaintiff can seek punitive damages. Under California law, a party may claim punitive damages in defamation actions. See, e.g., *Wilbanks v. Wolk*, 121 Cal.App. 4th 883, 906 (2004). Under Massachusetts law, punitive damages are apparently not available. (See FUND II's motion at p. 10.) Accordingly, because there is a difference in the law of the two states, the Court must proceed to determine which state has the greater interest in the action.

And on that issue, the answer is clearly California. For when FUND II made its defamatory statements, MIM had closed its Massachusetts office and was solely operating in California. Thus, the injury that occurred was felt solely in California, and it is thus California that has the greatest interest in the matter. As the Ninth Circuit noted in *Moore v. Green*, 431 F.2d 584, 591-592 (9th Cir. 1970):

> Libel is made actionable for the purpose of protecting the interest of the victim's reputation. [Citing *Prosser*, Law of Torts]. Here, the allegedly libelous statements injured the reputation of [the plaintiff], a resident of California. Any damage suffered by him was suffered in California, and it is that state which is most interest in the protection of his reputation.

Under this authority, it is clear that plaintiff's claim for business defamation is governed by California law, not by Massachusetts law.

**B. The Defamation Claim Is Pled With Sufficient Specificity.**

In its motion to dismiss, FUND II argues that a portion of MIM's defamation claim is too vague to support a cause of action – the portion arising from Mr. Al-Shihabi's false statements to FUND II's investors blaming the inaction and inability to close the fund on MIM. For that portion of the complaint, MIM alleged:

> 30.  Continuously until the present time, on specific dates and times known only to FUND II but on occasions within the last year, when the shareholders of FUND II have inquired about the status of the fund, Mr. Al-Shihabi, acting in the scope and course of his agency as the managing director of FUND II, has falsely blamed MIM for the inaction and inability to close the operations of FUND II.  These shareholders of FUND II have ceased doing business with MIM with respect to other investments.
>
> 31.  The statements by Mr. Al-Shihabi were known by Mr. Al-Shihabi to be false at the time he made them, and were made with the intention of harming MIM's business and of harming the relationship between MIM and the investment community in Kuwait.  As previously noted, for more than ten years, MIM has enjoyed a strong relationship with the investment community in Kuwait, and has relied upon the business of Kuwaiti nationals, companies and organizations that wished to invest in real estate within the United States.  That business has been irreparably damaged.

(FAC at ¶¶30-31.)

Citing solely to a Connecticut district court decision in *Croslan v. Housing Authority for the City of New Britain*, 974 F.Supp. 161 (D. Conn. 1997), FUND II argues that these allegations are too vague, since they do not identify a "specific statement" alleged to be defamatory.  Apparently, FUND II believes that we must articulate the precise words that Mr. Al-Shihabi used when he blamed MIM for the inaction and inability to close the operations of FUND II.  That is not, however, what the law requires.

> Initially, we would note that the rule in California is well established: a plaintiff need not plead facts with specificity where the facts are within the knowledge and control of the defendant and are unknown to plaintiff.

*Credit Managers Assn. v. Superior Court*, 51 Cal.App.3d 352, 361 (1975).

In any event, the *Croslan* court faulted the defamation complaint that it faced because the complaint failed to state who heard the defamatory statements and the context in which they were made.  Our complaint, however, plainly discloses who heard the defamatory statements (the investors in FUND II) and the context in which the statements were made

*SEILER EPSTEIN ZIEGLER & APPLEGATE LLP*
*Attorneys at Law*

1 (responding to inquiries from the investors about the status of the fund.)  And the *Croslan*
2 court's comments that the plaintiff had failed to identify particular communications arose in the
3 context of a summary judgment motion, where the burden of producing evidence had shifted to
4 the plaintiff.  That is far different than the situation that MIM faces, where no discovery has
5 been undertaken at all.

6     Under the proper standards that govern this lawsuit, MIM's complaint is sufficiently
7 specific.

### C. The Statements to the Shareholders Were Defamatory.

10     FUND II next argues that the First Amended Complaint does not show a false statement
11 that anyone would reasonably construe as charging MIM with professional incompetence,
12 dishonesty, malfeasance or a lack of skill as an investment adviser.  (Motion at p. 5.)
13 Nonsense.

14     FUND II's shareholders are sophisticated investors.  They knew that in April of 2003,
15 MIM had been instructed to liquidate the real estate holdings in FUND II.  (FAC at ¶19.)  And,
16 indeed, by mid-2005, the fund's real estate holdings had all been sold.  (FAC at ¶23.)  Over a
17 year later, however, the investors still had not received their money back.  They naturally
18 wanted to know why.

19     In reality, MIM had done everything it could to wind up the fund; and the only
20 remaining step was for the FUND II director, Mr. Al-Shihabi, to sign the final audited financial
21 statements.  But Mr. Al-Shihabi refused to sign the financials and acknowledge that the Al-Mal
22 Kuwaiti Company owed $2 million to FUND II (which Mr. Al-Shihabi would then have to
23 book as an expense for the Al-Mal Kuwaiti Company).  This was the sole reason that the fund
24 could not be liquidated.  But Mr. Al-Shihabi falsely blamed MIM.

25     The statements that MIM was responsible for the inaction and the failure to close the
26 operations of the fund thus directly impugned MIM's professionalism and competence.  And
27 the statements were clearly understood that way by FUND II's shareholders, since those
28 shareholders ceased doing business with MIM.  (FAC at ¶30.)

**SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**
Attorneys at Law

**D. The E-Mail to Legg Mason Was Defamatory.**

FUND II next argues that the e-mail Mr. Al-Shihabi sent to Ernst & Young on March 6, 2007, copied to two individuals at Legg Mason, is also not defamatory. Indeed, FUND II asserts that there are no lies in that e-mail, only statements of opinion.

Again, FUND II is clearly wrong.

The e-mail states that "We were ill-advised to have [the $2 million debt payment] categorized that way [as a consultant fee payment made on behalf of the Al-Mal Kuwaiti Company for debts unrelated to FUND II]." But this is flatly wrong. FUND II's directors were not advised to categorize the payment in any particular way. Rather, they *instructed* MIM *in writing* to make the payment (FAC at ¶24). MIM then duly reported the transaction to the accountants so that it could be properly reported in the final accounting statements. The e-mail statement that the directors received bad advice from MIM is factually incorrect.

The e-mail further states, "We have attempted prior to December 2006 with Meridian Management to ratify that situation by direct payment of Al Mal to Meridian without it being passed through the fund." This statement, too, is factually incorrect. Neither Mr. Al-Shihabi nor any other FUND II director ever attempted to ratify the situation; and they never made any effort whatsoever to repay the $2 million. The accusation that MIM had failed to cooperate with the Al-Mal Kuwaiti Company's effort to repay the $2 million sum is flatly factually wrong.

The e-mail further states, "It was obvious that til now Meridian has not addressed this issue with you and hence our inability to sign the financial statements as directors." This assertion is likely utterly false. In reality, MIM *had* fully addressed the issue with the accountants; it was the FUND II managers who refused to cooperate and rebuffed all communications attempts by MIM and Ernst & Young. (FAC at ¶¶26, 33.)

Thus, the e-mail clearly contains more than just an "opinion." Further, when read in its entirety and in context, it is clear that with the e-mail, FUND II's director Mr. Al-Shihabi was accusing MIM of failing to cooperate with the accountants, and of blocking the Al-Mal

Kuwaiti Company's efforts to repay the $2 million that it owed to FUND II. If either accusation were true, then MIM would, at a minimum, have been professionally negligent.

The e-mail is clearly defamatory.

### E. The Al-Kharafi Statements Are Actionable.

We turn, then, to the last topic raised by FUND II's motion: whether the comments made by Mr. Al-Kharafi in a press conference, which were published in a newspaper of general circulation on May 28, 2008, are actionable.

On this topic, FUND II first berates us for failing to seek leave to amend before including allegations regarding Mr. Al-Kharafi's recent statements to the press. FUND II correctly notes that these allegations were not included in the proposed amended complaint that we attached to our opposition to FUND II's earlier motion to dismiss. But that was because we only learned of Mr. Kharafi's statements after we filed that opposition. And since the allegations are based upon events that occurred after the initial filing of this lawsuit, but that are intricately tied to the matters already pled, the new matter would clearly be properly asserted through a supplemental pleading. To the extent we failed to properly seek leave of court, however, we apologize.[1]

The main issue that FUND II raises is whether or not Mr. Kharafi had authority to speak for FUND II. Of course, a motion under Federal Rule 12(b)(6) must accept the truth of all matters properly pled.

> The complaint must be construed on the assumption that *all of its allegations are true* ... even if doubtful in fact. [*Bell Atlantic Corp. v. Twombly* (2007) US , , 127 S.Ct. 1955, 1965—well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"]

Schwarzer, et al., *Cal. Prac. Guide: Federal Civil Proc. Before Trial* (T.R.G. 2008) §9:213. And since the First Amended Complaint clearly alleges that Mr. Al Kharafi *was* acting on

---

[1] In an abundance of caution, however, we are formally seeking leave, by separate motion, to add to our complaint the allegations concerning Mr. Al-Kharafi's statements.

1  behalf of FUND II, that should be the end of the inquiry. As the First Amended Complaint
2  states:

3  > Indeed, on May 28, 2008, Mr. Al-Kharafi, acting on behalf of FUND II and
4  > acting in the course and scope of his duties as the Chief Executive Officer and
   > Managing Director of FUND II as well as in the course and scope of the Al-Mal
   > Kuwaiti Company's agency as the sponsor of FUND II, caused an article to be
5  > published in ALQABAS, a Kuwaiti newspaper of general circulation.

6  (FAC at ¶35.)

7  So how does FUND II try to avoid the plain and unambiguous allegations in the
8  complaint? By supplying an evidentiary declaration that purports to show that Mr. Al-Kharafi
9  was not, after all, a director of FUND II. But FUND II's attempt to introduce extrinsic
10 evidence on a Rule 12(b)(6) motion is patently improper. For it is clear that "the court cannot
11 consider material outside the complaint (e.g., facts presented in briefs, affidavits or discovery
12 materials)." Schwarzer, et al., *Cal. Prac. Guide: Federal Civil Proc. Before Trial* (T.R.G.
13 2008) §9:211, citing *Arpin v. Santa Clara Valley Transp. Agency*, 261 F3d 912 (9th Cir. 2001),
14 925; *Beliveau v. Caras*, 873 F.Supp. 1393, 1395 (CD CA 1995); *Paulsen v. CNF, Inc.*, 91
15 F.Supp.2d 804, 807 (ND CA 2005).

16 But even if the Court could properly consider the evidence that FUND II has submitted,
17 it would not change anything. For one, the Register of Directors and Officers for FUND II that
18 defendant attached to the declaration of Mark Neo is clearly hearsay. Mr. Neo's declaration
19 expressly notes that the Register merely reports the information conveyed to Maples & Calder
20 by FUND II itself. The Register is thus nothing more than an out-of-court recitation by
21 FUND II itself as to who its Directors and Officers are, submitted for the truth of the matter
22 asserted, but not under penalty of perjury by FUND II itself. The document is inadmissible
23 hearsay.

24 Further, the document was clearly created precisely for this lawsuit, and it is thus
25 inherently unbelievable. For from the face of the Register, it is clear that FUND II didn't
26 bother to keep Maples & Calder apprised of its changes in management for five years, from
27 September of 2003 through July of 2008. After we filed our First Amended Complaint
28 asserting that Mr. Al-Kharafi was a director for FUND II, however, FUND II rushed to update

1  its Registration.  It is hardly surprising that *after* plaintiff filed the First Amended Complaint,

2  FUND II decided to report to Maples & Calder that *nobody* currently is a director for FUND II.

3  Yes, that is what the Registration that FUND II has submitted claims:  there is *nobody* who

4  currently is a director of officer of FUND II.

5  Nor, for that matter, has FUND II even attempted to rebut the allegation that

6  Mr. Al-Kharafi's libelous accusations against MIM were uttered on FUND II's behalf "in the

7  course and scope of the Al-Mal Kuwaiti Company's agency as the sponsor of FUND II."

8  Indeed, Mr. Al-Kharafi's statement to the press expressly confirmed this agency, and expressly

9  disclosed that the Al-Mal Kuwaiti Company controls FUND II.  For in the press conference,

10  Mr. Al-Kharafi asserted that: "two million dollars from a fund ***controlled by the Company*** . . .

11  was disposed of in a manner violating the purposes of the fund."  (FAC, Exhibit D at p. 2.)

12  Likewise, the Registration maintained by Maples & Calder discloses that 100% of the directors

13  and officers of FUND II have always been employees or officers of the Al-Mal Kuwaiti

14  Company.  There is simply no doubt that the Al-Mal Kuwaiti Company controls FUND II and

15  speaks on its behalf.

16  As the lead investor and sponsor of FUND II, the Al-Mal Kuwaiti Company has always

17  held the agency to act on FUND II's behalf.  And with his press conference, it is clear that

18  Mr. Al-Kharafi was speaking for FUND II.  For at the conference, Mr. Al-Kharafi announced

19  the referral of the prior chairmen to the prosecutor, stating that "***We*** referred the matter before

20  the end of the last session of the National Assembly."  The only entity that was injured by

21  Mr. Al-Shihabi's refusal to book the $2 million payment from FUND II as an account

22  receivable owed by the Al-Mal Kuwaiti Company, however, was the fund itself.  It was thus

23  only FUND II that had suffered an injury sufficient to confer standing to lodge a criminal

24  complaint.  The "we" that Mr. Al-Kharafi spoke of was thus clearly FUND II.

25  From all perspectives, it is clear that when he accused Mr. Al-Kharafi and MIM of a

26  criminal violation, Mr. Al-Kharafi was speaking on behalf of FUND II, acting within the scope

27  and course of his undisputed agency.  FUND II's current efforts to distance itself from

28  Mr. Al-Kharafi's remarks wholly fails.

1   FUND II's assertion that nobody could reasonably find a defamatory meaning in
Mr. Al-Kharafi's remarks about MIM[2] is likewise plainly wrong.  For this argument, FUND II
argues that the statement that MIM was referred to the prosecutor would not lead anyone to
conclude that MIM was guilty of criminal conduct.  "As far as the reader knows," FUND II
argues, "MIM was referred to the prosecutor for questioning as a witness."  (Motion at p. 10.)

Even if FUND II had accurately quoted what Mr. Al-Kharafi said, its interpretation
would strain all credulity.  But what Mr. Al-Kharafi actually said about MIM was the MIM
"has *also* been referred to the general prosecutor."  (FAC, Exhibit D at p. 2.)  Thus, Mr. Al-Kharafi first described the criminal fraud of the prior chairmen in the "hiding of two million dollars" and he stated that the prior chairmen had accordingly been referred to the general prosecutor.  He also discussed the issue of whether the former chairmen might enjoy immunity (again clearly charging a violation of the law), and then added that MIM "has *also* been ferred to the general prosecutor."  With this context, nobody would reasonably interpret Mr. Al-Kharafi's statements as merely suggesting that MIM was a witness.  Without doubt, Mr. Al-Kharafi falsely accused MIM of being complicit in the criminal embezzlement of $2 million from FUND II.

FUND II's attempts to escape responsibility for Mr. Al-Kharafi's lies about MIM all fail.  Mr. Al-Kharafi's statements are actionable, and were properly pled in MIM's complaint for business defamation.

---

[2] FUND II also speculates that the reporter who wrote the newspaper article, rather than Mr. Al-Kharafi, may have been the one who asserted that MIM had also been referred to the prosecutor.  That speculation is not only contradicted by the clear allegations of the First Amended Complaint itself (FAC at ¶¶36, 38 and 40), it is also contradicted by any fair reading of the newspaper article itself.  For it is clear from the newspaper article that the reporter merely published what Mr. Al-Kharafi stated in his press conference; there is utterly no indication whatsoever that the reporter himself undertook an independent investigation.  Nor, for that matter, would an independent investigation have led the reporter to state that MIM had been referred to the prosecutor, since that referral never happened.

SEILER EPSTEIN ZIEGLER & APPLEGATE LLP
Attorneys at Law

## IV.

## Conclusion

For the foregoing reasons, FUND II's motion to dismiss should be denied.

Respectfully submitted,

Dated: September 5, 2008     **SEILER EPSTEIN ZIEGLER & APPLEGATE LLP**


         /s/ Douglas Applegate
        Douglas A. Applegate

        Attorneys for Plaintiff
        Meridian Investment Management, Inc.