**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MERIDIAN INVESTMENT MANAGEMENT, INC.,

            Plaintiffs,

  v.

MERIDIAN REAL ESTATE INVESTMENT COMPANY II,

            Defendant
_____/

No. C-08-2542 MMC

**ORDER GRANTING DEFERRED PORTION OF DEFENDANT'S MOTION TO DISMISS AND TO STRIKE; STRIKING PRAYER FOR PUNITIVE DAMAGES**

      By order filed September 24, 2008, the Court denied defendant Meridian Real Estate Investment Company II's ("Fund II") motion to dismiss and to strike, to the extent Fund II sought an order of dismissal, and deferred ruling to the extent Fund II sought an order striking the prayer for punitive damages, in order to afford the parties the opportunity to file supplemental memoranda addressing the applicability of a choice-of-law clause in the parties' "Advisory Agreement" (hereinafter, "Agreement")  Having read and considered the papers filed in support of and in opposition to the deferred portion of Fund II's motion, the Court rules as follows.

      The sole cause of action alleged in plaintiff Meridian Investment Management, Inc.'s ("MIM") First Amended Complaint ("FAC") is a claim of business defamation.  In their respective briefing, the parties agree that under Massachusetts law, MIM cannot recover

1   punitive damages as a remedy for a claim of defamation, whereas under California law,

2   punitive damages are available.  Additionally, MIM has argued, and Fund II, at least for

3   purposes of the instant motion, has not disputed that, in the absence of some agreement to

4   the contrary, California law would govern MIM's defamation claim.  Further, MIM has not

5   argued that the instant choice-of-law clause is unenforceable.  The parties disagree,

6   however, as to whether MIM's defamation claim falls within the scope of that clause.

7        The clause in question reads as follows:  "This Agreement shall be governed and

8   construed in accordance with the laws of the Commonwealth of Massachusetts excluding

9   that body of law pertaining to conflicts of law."  (See FAC Ex. B ¶ 8.7).  Under California

10  conflicts of law principles, "a valid choice-of-law clause, which provides that a specified

11  body of law 'governs' the 'agreement' between the parties, encompasses all causes of

12  action arising from or relating to that agreement, regardless of how they are characterized,

13  including tortious breaches of duties emanating from the agreement or the legal

14  relationships it creates."  See Nedlloyd Lines B.V. v. Superior Court, 3 Cal. 4th 459, 470

15  (1992) (holding breach of fiduciary duty claim fell within scope of choice-of-law clause,

16  where alleged fiduciary duty arose from agreement).  Under such test, "all causes of action

17  arising directly or indirectly from the business relationship evidenced by the contract" fall

18  within the scope of the clause.  See Cal-State Business Products & Services, Inc. v. Ricoh,

19  12 Cal. App. 4th 1666, 1677 (1993) (internal quotation and citation omitted) (holding tort

20  claims based on defendant's having fraudulently induced plaintiff to enter into agreement

21  fell within scope of choice-of-law and forum-selection clauses in agreement).

22       Here, MIM's defamation claim is based on several statements, each made by a

23  person who, MIM alleges, was speaking on behalf of Fund II.  For the reasons stated

24  below, the Court finds Massachusetts law applies to each of the statements on which

25  MIM's defamation claim is based.

26  **A.  Statements Made to Fund II Shareholders**

27       MIM alleges that Fund II told several of the Fund II shareholders that MIM was

28  responsible for the "inability to close the operations of Fund II."  (See FAC ¶ 30.)  MIM

1   alleges such remarks were false because Fund II's director had "refus[ed] to cooperate in

2   the preparation of the final accounting statements," whereas MIM provided all "information

3   and records requested" by Fund II's auditors.  (See FAC ¶¶ 26-27.)  The Agreement

4   requires MIM to "prepare[ ] and deliver[ ] to the shareholders of [Fund II] annual and semi-

5   annual reports which contain financial statements."  (See FAC Ex. B ¶ 2.9.)  Consequently,

6   the above-referenced remarks are "integrally linked to the contractual relationship between

7   the parties," and resolution of a claim based on such remarks will involve application of the

8   above-quoted contractual provision, which sets forth MIM's obligations under the

9   Agreement.  See, e.g., McMahon v. RMS Electronics, Inc., 618 F. Supp. 189, 192 (S.D.

10  N.Y. 1985) (holding defamation claim, based on statement plaintiff had been terminated for

11  cause, fell within scope of arbitration clause because agreement set forth bases on which

12  termination for cause would be proper); cf., e.g., Bono v. David, 147 Cal. App. 4th 1055,

13  1060, 1067 (2007) (holding defamation claim, based on statement plaintiff was "unstable"

14  and "not capable of trust or honesty," did not fall with scope of arbitration agreement

15  between tenants in common to real property, because resolution of claim would not

16  "involve the construction or application of any provision of the [parties'] agreement").  At a

17  minimum, any claim based on such remarks "indirectly" arises from the business

18  relationship created by the Agreement.  See Cal-State Business Products & Services, 12

19  Cal. App. 4th at 1677.

20        Accordingly, to the extent the defamation claim is based on the alleged remarks

21  made to Fund II shareholders, Massachusetts law is applicable thereto.

22  **B. Statement in Email to Auditor**

23        MIM alleges that Fund II's director, in an email sent to Fund's II auditor and others,

24  stated that he had not approved Fund II's final financial statements because Fund II

25  disagreed with how certain payments had been "categorized" and that Fund II had been "ill-

26  advised to have such amounts categorized that way."  (See FAC Ex. C.)  As set forth in the

27  Court's September 24, 2008 order, such remarks, read in context, are reasonably

28  susceptible of a defamatory meaning, specifically, "that MIM provided incompetent

3

1   management services, both by providing bad advice as to classification of payments and by

2   refusing to work with Fund II's director to resolve his inability to sign Fund II's financial

3   statements." (See Order, filed September 24, 2008, at 4:9-13.)  As discussed above, the

4   Agreement requires MIM to prepare Fund II's financial statements.  Consequently, for the

5   reasons discussed above in connection with the alleged remarks to shareholders,

6   resolution of a claim based on the email to Fund II's auditor will require application of a

7   provision in the Agreement, and, at a minimum, such claim indirectly arises from the

8   business relationship created by the Agreement.

9       Accordingly, to the extent the defamation claim is based on such alleged remarks,

10  Massachusetts law is applicable thereto.

11  **C. Statements to Reporter**

12      MIM alleges that a Fund II director made defamatory comments to a reporter, who

13  republished them in a Kuwaiti newspaper.  Specifically, MIM alleges, Fund II's current

14  director told a reporter that Fund II's former director had been "referr[ed]" to a "general

15  prosecutor" for having "hidden two million dollars from [Fund II] which was disposed of in a

16  manner violating the purposes of the Fund," and that MIM had "also been referred to the

17  general prosecutor."  (See FAC ¶¶ 36, 38; Ex. D.)  As set forth in the Court's September

18  24, 2008 order, such remarks, when read in context, are reasonably susceptible of a

19  defamatory meaning, specifically, "that MIM had some criminal involvement with the 'hiding

20  of two million dollars' from Fund II."  (See Order, filed September 24, 2008, at 5:9-12.)

21      In particular, MIM, in describing the circumstances pertaining to the above-

22  referenced funds, alleges that after MIM sold two buildings owned by Fund II, Fund II's

23  former director instructed MIM to pay two million dollars of the proceeds to retire a liability

24  incurred by one of Fund II's shareholders, which payment MIM subsequently made, but

25  then "refused" to "book" the two million dollar payment on Fund II's financial statements in

26  the manner requested by the former director.  (See FAC ¶¶ 23-26.)  MIM further alleges

27  that thereafter, Fund II's former director, in the above-quoted email to Fund II's auditor,

28  took the position that MIM had erred when it "advised" Fund II to classify the two million

4

1    dollars on Fund II's financial statements as an "expense," and that the transactions should

2    have been classified as a "receivable from a shareholder."  (See FAC Ex. C.)

3         The Agreement requires MIM to "advise [Fund II] on the short-term investment and

4    reinvestment of any idle monies of [Fund II] in accordance with [Fund II's] investment

5    policies," (see FAC Ex. B ¶ 2.8), as well as to prepare Fund II's financial statements, (see

6    FAC Ex. B ¶ 2.9).  Additionally, the Agreement sets forth, in detail, the types of "expenses"

7    Fund II is required to pay.  (See FAC Ex. B ¶ 3.4.)  Such contractual provisions are directly

8    implicated by MIM's claim, which is, in essence, that MIM's payment of and/or classification

9    of two million dollars from the proceeds realized from the sale of Fund II properties were

10   not acts that in any manner were intended to, or did, afford Fund II's former director an

11   opportunity to "hide" such funds from Fund II.  Consequently, resolution of a claim, based

12   on the remarks allegedly made to the reporter, will require application of the above-

13   referenced contractual provisions in the Agreement, and, again, at a minimum, such claim

14   indirectly arises from the business relationship created by the Agreement.

15        Accordingly, to the extent the defamation claim is based on the remarks alleged to

16   have been made to the reporter, Massachusetts law is applicable thereto.

17   **D. Summary**

18        Because an award of punitive damages is, as a matter of Massachusetts substantive

19   law, unavailable as a remedy for a defamation claim, Fund II's motion to strike the prayer

20   for punitive damages will be granted.  See Stone v. Essex County Newspapers, Inc., 330

21   N.E. 2d 161, 169 (Mass. 1975) ("We reject the allowance of punitive damages in this

22   Commonwealth in any defamation action, on any state of proof.").

23   //

24   //

25   //

26   //

27   //

28   //

**CONCLUSION**

For the reasons stated above:

1.  Fund II's motion to dismiss and to strike, to the extent the Court deferred ruling thereon, is hereby GRANTED; and

2.  MIM's prayer for punitive damages is hereby STRICKEN from the First Amended Complaint.

**IT IS SO ORDERED.**

Dated: October 21, 2008

MAXINE M. CHESNEY
United States District Judge

6